# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BENJAMIN C. OYARZO and NICHOLAS HART,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**TUOLUMNE FIRE DISTRICT (A.K.A. "TUOLUMNE FIRE PROTECTION DISTRICT"), JOSEPH TURNER, in his individual and official capacities, DARLENE HUTCHINS, in her individual and official capacities, KENNETH HOCKETT, in his individual and official capacities, BRIAN MACHADO, in his individual and official capacities, TONEY POWERS, in his individual and official capacities, and DOES 1 THROUGH 20, Inclusive**<br><br>**Defendants.** | **1:11-CV-01271 LJO SAB**<br><br>**MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DOCS. 66, 67, 69, 70, 71 & 72).** |

## I. <u>INTRODUCTION</u>

This case concerns events that took place within the Tuolumne Fire Department ("TFD") in 2010. Plaintiffs Benjamin Oyarzo and Nicholas Hart, former employees of TFD, allege that certain of their superiors, both within TFD and on TFD's Board of Directors, retaliated against them for and took steps to deter them from exercising their First Amendment rights, retaliated against them for complaining about workplace safety issues, and violated their rights under the Firefighters Procedural Bill of Rights. (Second Amended Complaint ("SAC"), Doc. 25.)

Before the Court for decision are six motions for summary judgment. The Court first addresses four sets of motions for summary judgment filed by the four remaining Individual Defendants: Joseph Turner (Doc. 69), Darlene Hutchins (Doc. 70), Kenneth Hockett (Doc. 67), and Toney Powers (Doc. 66). Along with these motions, Defendants filed a joint statement of facts, independent statements of undisputed fact for each Individual Defendants' motion, and voluminous supporting documents.

Plaintiffs filed an opposition to Defendant Powers' motion (Doc. 78) and a consolidated opposition to the remaining Individual Defendants' motions (Doc. 82), along with responses to Defendants' statements of fact and equally voluminous supporting documents. Defendants replied (Docs. 81 & 90) and filed objections to evidence (Docs. 81-1 & 90-1). Upon preliminary review of the pleadings, the Court requested and received supplemental briefing on two issues related to Plaintiff Oyarzo's First Amendment claims. (*See* Docs. 96 & 98-101, 103.)

Next, the Court addresses two motions for summary judgment filed by Defendant TFD, one against Plaintiff Oyarzo's claims (Doc. 72), the other against Plaintiff Hart's claims (Doc. 71). Plaintiffs filed a consolidated opposition to TFD's motions along with a consolidated response to TFD's Statement of Undisputed Fact. (Docs. 88 & 91.) TFD filed a consolidated reply, along with 56 pages of objections to evidence.[1] (Docs. 95 & 95-1.)

The motions were originally set for hearing in late May and early June 2013, but the hearings were vacated to permit extended filing deadlines; the matters were then submitted for decision on the papers pursuant to Local Rule 230(g). (Doc. 75.) The Court finds that the extensive briefing thoroughly addresses the relevant issues, obviating the need to re-set oral argument.[2]

## II. BACKGROUND[3]

### A.    The Defendants.

TFD is a public agency and fire district composed of approximately 1,200 acres in Tuolumne County, California. (Joint Statement of Undisputed Fact ("JSUF"), Doc. 67-2[4], #A). TFD is governed by a five-member board of directors. (Master Statement of Undisputed Fact for Individual Defendants'

---

[1] It is not this Court's practice to rule on evidentiary matters individually in the context of summary judgment, unless otherwise noted. Objections that were material and meritorious were sustained. *See Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (noting that it is often unnecessary and impractical for a court to methodically scrutinize and give a full analysis of each evidentiary objection on a motion for summary judgment); *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1118–22 (E.D. Cal. 2006) (same).

[2] The Court notes that there is significant overlap and repetition among and between many of the motions. This created an overly voluminous and unwieldy record that has impeded the Court's decision-making process.

[3] The facts set forth in this Background section are taken from the joint statements of undisputed facts, undisputed facts submitted by Defendants, and Plaintiffs' versions of disputed events/facts.

[4] Unnecessarily, this document was filed multiple times, alongside each Individual Defendants' motion. The Court will only reference the first-filed copy.

2

Motions ("MSUF"), Doc. 83,[5] #1.)

Defendant Hutchins became a member of TFD's Board in 2005 and served continuously as director until her resignation on August 31, 2010. (MSUF #19.) She served as Secretary from 2009 to August 31, 2010. (MSUF #20.) In November 2010, she was re-elected to the Board and remained on the Board at least through the filing of the motions addressed in this Memorandum Decision and Order. (MSUF #21.)

Defendant Turner was elected Chair of TFD's board in December 2007 and served until his resignation on August 3, 2010.[6] (MSUF #3.)

On August 17, 2010, Defendant Hockett was appointed to TFD's Board. (MSUF #14.) He was appointed Chair of the Board on August 30, 2010, and served as Chair until November 8, 2011. (MSUF #13.)

Defendant Powers started as a Relief Engineer with TFD in August 2008; he was hired as a full time Engineer in November 2008. (Powers' Statement of Undisputed Fact ("PSUF"), reflected in Plaintiffs' response thereto at Doc. 78-1, ## 5-6.) Throughout all of the relevant events in this case, Oyarzo was Powers' superior, while Powers was Hart's superior. (PSUF ## 7-8.)

**B.    Plaintiff Oyarzo's Employment History & Asserted Protected Activities.**

Plaintiff Oyarzo first began working for TFD in 2006. (MSUF #2.) He was promoted to Captain in 2007. (Oyarzo Decl. ¶ 3.) The TFD Board voted to appoint Oyarzo as TFD's Fire Chief in May 2008.[7] (MSUF #4.) In February 2009, Oyarzo was given a favorable performance evaluation. (MSUF #5.)

In 2009, Oyarzo, with the assistance of Plaintiff Hart, began working to annex land from the County of Tuolumne into the jurisdiction of the Tuolumne Fire District. (*See* MSUF # 27; Oyarzo Decl.

---

[5] Each Individual Defendant filed independent statements of undisputed fact alongside each Defense motion. Plaintiffs consolidated three of these statements of fact (those associated with Defendants Turner, Hutchins, and Hockett) into a consolidated document. Wherever possible, the Court has relied upon this consolidated document in lieu of referencing the Individual Defendants' statements of fact.
[6] Plaintiff disputes the validity of Turner's election but not the fact that it occurred. (*See* Doc. 83 at #3.)
[7] Plaintiffs dispute the validity of this vote, (*see* Doc. 83 at 43), a topic that is discussed at length below, but not the fact that the vote occurred.

¶ 9; JSUF #J.) The Parties dispute whether Oyarzo held himself out as a representative of TFD during his work on this annexation project and/or whether his work on annexation fell within his job description.

It is undisputed that, at first, Oyarzo's work on annexation was fully supported by the TFD Board. (MSUF #28.) It is also undisputed that, later, Tuolumne County and other fire protection organizations expressed displeasure with TFD's attempt to annex territory. (*See* MSUF ## 28-29.) In February 2010, after a meeting with these other entities, TFD's annexation effort was placed on hold until June 2010. (MSUF #29.) The hold was put in place at the request of Tuolumne County, so that the County could complete a County-wide first responder study. (MSUF #30.) TFD stopped pursuing annexation in February 2010, and the effort never resumed during Oyarzo's employment with TFD. (MSUF #31.)

In March 2010, Oyarzo claims that he "discovered that two self-contained breathing apparatuses [] had not been properly tested by the firefighting staff and posed a safety risk to the firefighters." (Oyarzo TFD Decl., Doc. 89-4, ¶ 36.)[8] After discovering that the units had not been inspected as required by the firefighters, Oyarzo "verbally admonished the firefighting staff and reported the safety violation to the TFD Board." (*Id.*)

In mid-April 2010, Oyarzo claims that he visited Defendant Turner's house and spoke with Turner about annexation. During that conversation, Oyarzo expressed his intent to continue with annexation after June 30, 2010, in part because he had a personal interest in seeing the additional territory (which included his personal residence) annexed into TFD's jurisdiction. According to Oyarzo, Turner informed Oyarzo that he no longer supported annexation and became angry with Oyarzo when Oyarzo stated his intent to continue pursuing annexation. (*See* Oyarzo Decl. ¶¶ 12-13.)[9]

In early June 2010, certain TFD firefighters and interns submitted written complaints to the Board regarding Oyarzo. (PSUF # 31.) Plaintiffs assert that Defendant Powers worked with Defendants

---

[8] Documents that were filed in connection with TFD's two motions for summary judgment bear "TFD" in their descriptions.
[9] Defendants challenge this portion of Oyarzo's declaration as a sham. This challenge is discussed in detail below. *See infra* at note 16.

Turner and Hutchins to solicit these complaints in retaliation for Oyarzo's First Amendment activities.

Defendant Powers testified at his deposition that numerous interns had been complaining about Oyarzo. (Powers Depo. 59-7:9.) Powers informed Defendant Turner of the complaints. (*Id.* at 59:9-10.) First, Turner told Powers to inform Oyarzo of the complaints to "give him a chance to correct them." (*Id.* at 50:12-15.)[10] Later, Turner directed Powers to have the complainants document their concerns in writing. (*Id.* at 50:20-22.) After Powers collected a number of written complaints, Turner met privately with several board members, including Hutchins, to convince them to terminate Oyarzo. (*See* Hutchins Depo. 77:4-84:10[11]; Burns Depo. 83:30-85:8, 92:16-24, 204:11-206:22.[12]) On June 8, 2010, Turner threatened to resign if the Board did not terminate Oyarzo. (Burns Depo. 85:2-4, 90:1-6, 207:16-20.) Finally, when the Board refused to vote to immediately terminate Oyarzo, Turner placed Oyarzo on a three-week forced vacation and told Oyarzo not to contact anyone at TFD. (Burns Depo. 225:15-227:12; Hart Depo. 126:18-127:8; Pltf. Ex. D7.) On June 28, 2010, TFD's Board voted to place Oyarzo on paid administrative leave. (MSUF #6.)

Meanwhile, in July 2010, Oyarzo filed a reverse validation action challenging several Board members, including Joe Turner. (JSF O; Pltf. Ex. A4.) The action also requested invalidation of all votes taken since on or about May 2008 in which Joe Turner participated as part of a three-person majority. (*Id.*) Joe Turner resigned from the Board on August 3, 2010. (JSF O; Turner Depo. 126:20-127:1.) On

---

[10] Defendants object to portions of Powers' deposition on this subject, arguing Plaintiffs' have taken Powers' testimony out of context. (Doc. 90-1 at #53.) This is not an objection that would justify disregarding the portions of Powers' deposition cited by Plaintiffs. Rather, the Court has considered the entire section of testimony, including the passages cited by Defendants.

[11] Defendants object to this portion of Hutchins' Deposition on the ground that it is not relevant to show that Turner encouraged complaints against Oyarzo from employees and interns. (Doc. 90-1 at #40.) The Court is not considering it for this purpose.

[12] Defendants raise various objections to these portions of Deposition of Stephenie Burns. The first objection -- that certain portions of her deposition are inadmissible for lack of foundation or because they are speculative and not based on personal knowledge (Doc. 90-1 at ##44, #48-50) -- is OVERRULED. The Court has carefully reviewed these passages and sees absolutely no basis for such objections, as she is describing events from a first person perspective. Defendants next object that one passage is "irrelevant to show that Turner solicited or encouraged complaints against Oyarzo by employees or interns. (*Id.* at #44.) Her testimony has not been considered for this purpose. Defendants further object, generally, that all portions of the Burns declaration here cited are "irrelevant." (*Id.* at ##44-50.) This general objection is OVERRULED. Her testimony is relevant to establishing the existence, timing, and participants in any adverse action(s) taken against Oyarzo. Finally, Defendants object that certain passages contain inadmissible hearsay. (*Id.* at ## 48-50.) Presumably, Defendants are not objecting to Ms. Burns' descriptions of statements Mr. Turner allegedly made to her, as these are admissible under Fed. R. Evid. 801(d)(2). To the extent Defendants are referencing statements made to her by non-parties to this case, the Court has not considered those statements.

August 30, 2010, the TFD Board reconsidered all of the prior votes called into question by Oyarzo's validation action, including the previous vote "appointing Ben Oyarzo Fire Chief effective May 12, 2008." (Pltf. Ex. A2 (TFD 836).) Although many of the confirming votes passed, the motion to retroactively confirm Oyarzo's appointment to the position of "Chief" in May 2008 did not pass. (*Id.*)

On September 6, 2010, Oyarzo returned to work at the rank of Captain. (MSUF #9.)

On September 14, 2010, the Board appointed Hockett and fellow Board member Ben Orr to handle TFD's day-to-day operations, with some limitations as to their authority over employees. (MSUF #15.) Hockett served in this capacity until April 11, 2011. (*Id.*)

On September 27, 2010, Oyarzo went on medical leave. (MSUF #11.)

At the October 11, 2010 Board meeting, TFD was informed that it was approximately $50,000 "in the red," and that Tuolumne County was loaning TFD money. (MSUF #102.) The Board considered potential changes to staffing levels and employee hours to save money. (*Id.*) At the November 8, 2010 board meeting, staff-reorganization was again discussed. (MSUF #103.) Among many options, a motion was made to offer all employees the classification of Engineer at the rate of $12.00 per hour for the five paid staff. (*Id.*) The motion did not pass at that meeting. (*Id.*) However, at the December 13, 2010 meeting, the Board voted to lay off the least senior firefighter and offer the remaining firefighters Engineer positions at $12.00 per hour. (MSUF #104.) Oyarzo, who returned from medical leave on December 11, 2010 (MSUF #11), was offered continued employment at TFD as an Engineer at $12.00 per hour (JSUF #J). He refused the offer. (*Id.*) His last day of employment with TFD was December 31, 2010. (*Id.*)

A previous Order *in Hart v. Fire District*, 1:12-cv-01271 LJO DLB (Doc. 24), issued before that case was consolidated with Oyarzo's parallel action, found that the Individual Defendant Board Members were absolutely immune from claims arising out of their votes to reorganize TFD.

**C.    Hart's Employment History & Asserted Protected Activty.**

Plaintiff Nicholas Hart was hired as a full time employee of TFD in February 2009. (JSUF #H.) Hart claims that Defendant Powers approached Hart for assistance in Powers' "effort ... to force Mr.

6

Oyarzo from his employment with the TFD." (Hart TFD Decl., Doc. 89-3, ¶ 3.) Hart claims that he refused to assist Powers and informed Powers of his belief that such activity was illegal. (*Id*. at ¶ 4.) Hart believed that Powers was retaliating against Oyarzo because Oyarzo disciplined and reported firefighters for safety violations. (Hart Depo. at 171:9-15.) The record further indicates that Hart told members of TFD's board about his belief that Powers was improperly retaliating against Oyarzo because Oyarzo disciplined and reported firefighters for safety violations. (*Id*. at 171:9-13.) In August 2010, Hart submitted a letter in support of Oyarzo's continued employment to Virginia Van Bolt, Ben Orr, and Stephenie Burns, all of whom were TFD Board Members. (Hart TFD Decl. ¶ 7.)

Hart claims that during the summer of 2010, Powers began to retaliate against him for supporting Oyarzo. Among other things, he asserts Powers removed Hart from positions of responsibility, transferred those positions to others, including interns, encouraged others in the firehouse to mock and ostracize Hart, and purposefully failed to communicate information about a public appearance Hart was supposed to make on behalf of TFD, knowing Hart would be disciplined for failing to make that appearance. (*See* Doc. 78 at 7-8.)

Hart claims he informed Defendant Hockett of these retaliatory acts (Hart Decl. ¶ 8), but asserts Hockett did nothing to prevent further retaliation, and in fact committed additional retaliatory acts, including forcing Hart to work 48-hour shifts on his own, and disciplining Hart on two occasions (*see* Doc. 82 at 20-23).

The nature, severity, and motivation for these asserted acts of retaliation are hotly disputed. It is undisputed, however, that as a result of the November 8, 2010 reorganization vote, Hart (the least senior firefighter at TFD) was laid off; his last day was December 31, 2010. (MSUF #146.)

### III. **STANDARD OF DECISION**

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

If the moving party would bear the burden of proof on an issue at trial, that party must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence to support the non-moving party's case." *Id*. When the moving party meets its burden, the non-moving party must demonstrate that there are genuine disputes as to material facts by either:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence. *See Anderson*, 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. Only admissible evidence may be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun*, 509 F.3d at 984.

//

//

//

# IV. <u>ANALYSIS OF INDIVIDUAL DEFENDANTS' MOTIONS.</u>

## A.    <u>First Amendment Claims.</u>

The SAC's Second and Third Causes of Action, brought by both Plaintiffs, allege First Amendment deterrence and retaliation, respectively, against all Defendants. (SAC ¶¶ 70-76 (deterrence); SAC ¶¶ 77-80 (retaliation).)

### 1.    <u>First Amendment Claims/Issues No Longer in Dispute.</u>

#### a.    <u>Oyarzo's First Amendment Claims Against Powers.</u>

Defendant Powers moves for summary judgment on both First Amendment claims brought by Oyarzo against him. Oyarzo does not object, conceding that discovery has demonstrated that Powers' "animus toward Oyarzo stemmed not from Oyarzo's protected First Amendment activities but from Powers' anger with Oyarzo for citing and reporting safety violations in the workplace." (Doc. 78 at 12.) Defendant Powers' motion for summary judgment as to Oyarzo's Second and Third Causes of Action is GRANTED.

#### b.    <u>Oyarzo's First Amendment Claims Against Hockett.</u>

Defendant Hockett moves for summary judgment on both First Amendment claims brought by Oyarzo against him. (Doc. 67-1 at 9-14.) Hockett also argued that he was protected by qualified immunity. (*Id*. at 14.) Oyarzo's opposition offered no response to Hockett's motion. Accordingly, Hockett's motion for summary judgment on Oyarzo's First Amendment Claims (contained in the Second and Third Causes of action) is GRANTED.

#### c.    <u>Defendants Hockett and Hutchins are Absolutely Immune for Their Motion and Vote to Reorganize TFD.</u>

The August 30, 2011 Order in *Hart*, 1:12-cv-01271 (Doc. 24), found TFD Board of Directors are entitled to absolute (legislative) immunity for voting to reorganize TFD. (*See id*. at 11-12.) Based upon this ruling, Defendants Hockett and Hutchins move for summary judgment on any First Amendment claim based upon their votes to reorganize TFD. (Doc. 67-1 at 8; Doc. 70-1 at 7.) Plaintiffs do not object. Hutchins and Hockett were members of TFD's Board at the time of their votes to reorganize

TFD. For the reasons set forth in the August 30, 2011 Order, they are entitled to absolute immunity for this act. Nor can they be held liable for any damages flowing from that act. Their motions for summary judgment as to any First Amendment claim based upon this conduct are GRANTED.

### d. Oyarzo's Claim of Retaliation Based on His Validation Action.

Oyarzo's Third Cause of Action is based in part on his July 2010 validation action. (SAC ¶ 78.) Turner, Hutchins, and Hockett each move for summary judgment on this issue, arguing there is no evidence to support a retaliation claim based upon Oyarzo's validation action. (Doc. 67-1 at 12-13; Doc. 69-3 at 12; Doc. 70-1 at 12.) Oyarzo does not address this point in opposition. Accordingly, Turner's, Hutchins', and Hockett's motions for summary judgment as to any First Amendment claim brought by Oyarzo based upon Oyarzo's validation action are GRANTED.

### e. Hart's Claims Against Turner and Hutchins.

Hart's Second and Fourth Causes of Action for deterrence and retaliation were pleaded against all defendants. Defendants Turner and Hutchins move for summary judgment as to these causes of action, arguing that there is no evidence they were involved in any conduct that could violate Hart's First Amendment rights. (Doc. 69-3 at 16-22; Doc. 70-1 at 17-22.) Hart offered no opposition. Accordingly, Defendants Turner's and Hutchins' motions for summary judgment as to these claims are GRANTED.

### f. Hart's Claim of Deterrence and Retaliation Based Upon His Participation in the Annexation Effort.

Hart's Second and Fourth Causes of Action are based in part on his participation in in the annexation effort. Defendants Powers, Turner, Hutchins, and Hockett move for summary judgment on this theory of liability, arguing Hart acted as a private citizen in connection with annexation, there was no evidence of any deterrence or retaliation based upon Hart's participation in the annexation effort, and that they were protected by qualified immunity. (Doc. 66-3 at 16, Doc. 67-1 at 18, 20-22; Doc. 69-3 at 16-17, 19-22; Doc. 70-1 at 18, 20-22.) Hart did not respond do these arguments, and maintains only that Hart was deterred and retaliated against based upon his support for Oyarzo. (*See* Doc. 78 at 5, Doc. 82 at

10

20-24.) Defendants Powers', Turner's, Hutchins', and Hockett's motion for summary judgment on any First Amendment claim based upon Hart's annexation effort theory of liability is GRANTED.

**2.    Remaining First Amendment Retaliation Claims Against Remaining Individual Defendants.**

**a.    General Legal Standard.**

"The Supreme Court has clearly stated that public employees do not shed their First Amendment rights simply because they are employed by the government." *Huppert v. City of Pittsburg*, 574 F.3d 696, 702 (9th Cir. 2009). The Ninth Circuit articulated the relevant general standards applicable to a First Amendment retaliation claim in *Huppert*:

> "The First Amendment shields a public employee if he speaks as a citizen on a matter of public concern." *See, e.g., [Garcetti v.] Ceballos*, 547 U.S. [410,] 417 [(2006)]; *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *Connick v. Myers*, 461 U.S. 138, 142-143 (1983); *Pickering v. Bd. of Educ. of Twp. High School Dist. 205, Will Cty.*, 391 U.S. 563, 569-70 (1968). While this protection is applicable to such individuals, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Ceballos*, 547 U.S. at 421. "The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.
>
> Recently, in *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009), [the Ninth Circuit] distilled the Supreme Court's prior holdings on this issue into "a sequential five-step" inquiry:
>
>> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id.*

*Eng* provides additional detail about how the five-step inquiry is to be implemented and the relative burdens of each party.

- First, the "plaintiff bears the burden of showing that the speech addressed an issue of public concern." *Id.* at 1070 (internal citations and quotations omitted). The specific requirements for speech to qualify as an "issue of public concern" are discussed in detail below. "If the speech in

11

question does not address a matter of public concern, then the speech is unprotected...." *Id*. at 1070-71.

- Second, "the plaintiff bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee." *Id*. at 1071. Again, the specific distinctions between these categories of speech are discussed below. In general, however, if the evidence "demonstrate[s] an official duty to utter the speech at issue, then the speech is unprotected ...." *Id*.

- Third, "the plaintiff bears the burden of showing the state took adverse employment action and that the speech was a substantial or motivating factor in the adverse action." *Id*. If plaintiff fails to meet this burden "there can be no recovery...." *Id*.

- Fourth, if the plaintiff has passed the first three steps, "the burden shifts to the government to show that under the balancing test established by [*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968)], the state's legitimate administrative interests outweigh the employee's First Amendment rights." *Eng*, 552 F.3d at 1071 (internal citations and quotations omitted). "This inquiry, known as the *Pickering* balancing test, asks "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id*. (quoting *Garcetti*, 547 U.S. at 418). If the evidence, viewed in light most favorable to the non-moving party, indicates an adequate justification for suppressing the employee's speech, the moving party is entitled to summary judgment. *Id*. at 1071-72.

- Fifth "if the government fails the *Pickering* balancing test, it alternatively bears the burden of demonstrating that it would have reached the same adverse employment decision even in the absence of the employee's protected conduct." *Id*. at 1072 (internal citation and quotation omitted). "In other words, it may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action." *Id*. (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "This question relates to, but is distinct

from, the plaintiff's burden to show the protected conduct was a substantial or motivating factor. It asks whether the adverse employment action was based on protected and unprotected activities, and if the state would have taken the adverse action if the proper reason alone had existed." *Id*. (internal citation and quotation omitted). Summary judgment should be granted if the public entity presents undisputed evidence "that it would have made the same employment decisions even absent the questioned speech." *Id*.

### b. Oyarzo's First Amendment Claims

#### (1) Did Oyarzo Speak on a Matter of Public Concern?

Defendants do not dispute that Oyarzo's expressive conduct in connection with pursuing annexation addressed a matter of public concern.

#### (2) Did Oyarzo Speak as a Private Citizen or a Public Employee?

Defendants Hockett, Turner, and Hutchins move for summary judgment on Oyarzo's First Amendment claims, arguing that Oyarzo's speech and activities regarding annexation were performed as part of his official duties. (Doc. 67-1 at 9-10; Doc. 69-3 at 7-8; Doc. 70-1 at 7-8.)

The plaintiff "bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee." *Eng*, 552 F.3d at 1071 (citing *Garcetti*, 547 U.S. at 421-22). "Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Posey v. Lake Pend Oreille Sch. Dist. No*. 84, 546 F.3d 1121, 1127 n.2 (9th Cir. 2006) (internal citations and quotations omitted).

> While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the facts as found is a question of law. In evaluating whether a plaintiff spoke as a private citizen, we must therefore assume the truth of the facts as alleged by the plaintiff with respect to employment responsibilities. If the allegations demonstrate an official duty to utter the speech at issue, then the speech is unprotected, and qualified immunity should be granted.

*Eng*, 552 F.3d at 1071 (internal citations and quotations omitted). Put another way: "[W]hether the plaintiff spoke as a public employee or a private citizen-is a mixed question of fact and law." *Posey*, 546

13

F.3d at 1129. If the pleadings and evidence "present genuine disputes of material fact regarding the scope and content" of a plaintiff's job responsibilities, summary judgment is inappropriate. *Id.*

"[T]he inquiry into whether employee speech is pursuant to employment duties is a practical one." *Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir. 2007). While a formal job description is by no means "dispositive" in determining whether a given task is within the scope of an employee's professional duties, it is nevertheless "informative." *See id.* at 933*; see also Garcetti*, 547 U.S. at 424–25 ("We reject ... the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.... Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."). A court should also "look beyond the job description to the duties the employee actually performs." *Huppert*, 574 F.3d at 704. "Speech which has no official significance and bears similarities to actions taken by numerous citizens everyday falls outside the ambit of an employee's job duties and would be protected by the First Amendment." *Id.* (internal citations and quotations omitted).

### (a)    Oyarzo's Rank.

The Parties spend a great deal of time discussing whether speaking on the issue of annexation fell within Oyarzo's job description. It is undisputed that Oyarzo was appointed "Fire Chief" by TFD's Board in May 2008. (Pltf. Ex. D1 (OH 281-283).) However, Oyarzo disputes the validity of that appointment and maintains he was at all relevant times actually serving as the lower-ranked "Captain." This debate is not purely academic. The job description of Fire Chief provides that the Chief is to "plan, organize, direct, supervise, coordinate, and review all the activities and operations of the Fire District…." (Pltf. Ex. D6.) The duties of Captain are more limited. (Pltf. Ex. D5 (Job description for Fire Captain includes responsibility for the "day-to-day operation of the fire station" and other, related operational duties).)

Plaintiff Oyarzo argues he was never legally a "Fire Chief" because one of the three TFD Board

14

members who voted for his appointment[13] did not satisfy the requirements for Board membership. (Doc. 82 at 8-9.) More than two years later, in July 2010, Oyarzo filed a reverse validation action challenging several Board members, including Joe Turner. (JSF O; Pltf. Ex. A4.) The action also requested invalidation of all votes taken since on or about May 2008 in which Joe Turner participated as part of a three-person majority. (*Id.*) Joe Turner resigned from the Board on August 3, 2010. (JSF O; Turner Depo. 126:20-127:1.) On August 30, 2010, the TFD Board reconsidered all of the prior votes called into question by Oyarzo's validation action, including the previous vote "appointing Ben Oyarzo Fire Chief effective May 12, 2008." (Pltf. Ex. A2, TFD 836.) Although many of the confirming votes passed, the motion to retroactively confirm Oyarzo's appointment to the position of "Chief" in May 2008 did not pass. (*Id.*)

California Health and Safety Code § 13806 requires that actions to determine the validity of any action taken by a fire protection district be brought under the provisions of California Code of Civil Procedure § 860, *et seq*. Section § 860 allows a public agency to bring a validating proceeding (often referred to as a "reverse validation" action) "to determine the validity" of its own action. A related provision permits "any interested person" to bring a similar action within 60 days of the challenged action. Cal. Code Civ. Pro. § 863. Absent a timely challenge to the validity of an action, such actions "become immune from attack" by interested persons, "whether it is legally valid or not." *McLeod v. Vista Unified Sch. Dist.,* 158 Cal. App. 4th 1156, 1166 (2008). Oyarzo's validation challenge, filed in July 2010, was far too late to fall within the 60-day window to challenge his own appointment to Chief in May 2008.

Although § 860 does indicate on its face that public agencies are also subject to the 60-day limitations period, Plaintiffs argue that such agencies are nevertheless free to disregard the statute of limitations by virtue of language in Cal. Code Civ. Pro. § 869, which provides that the availability of a § 860 validating proceeding does not preclude any agency from utilizing other available remedies to

---

[13] Two of the five directors recused themselves from voting; the remaining three members (Joe Turner, Rommie Jones, and Craig Flores) voted unanimously in favor of promoting Oyarzo to Chief. (Pltf. Ex. D1 (OH 281-283).)

determine the validity of a thing or matter, citing *Kaatz v. City of Seaside*, 143 Cal. App. 4th 13, 30

(2006). Plaintiffs maintain that the May 2008 appointment of Oyarzo as Chief was invalidated not by

Oyarzo's lawsuit but by the TFD Board's own action to reconsider all of the challenged votes and then

reject Oyarzo's reappointment as Chief.

    *Kaatz* does not support this contention. *Kaatz* concerned whether the 60-day limitations period

set forth in the validation statute applied to a taxpayer's challenge to a municipality's purchase of

residential property on a decommissioned military base and immediate resale of that property to a

developer at a deep discount. *Id*. at 19. The court concluded that the transaction was simply not subject

to the validation statute, but confirmed the general rule that actions which <u>are</u> covered by the validation

statute are automatically deemed valid if neither the acting public entity nor any interested person

challenges the act within the 60-day window. Nonetheless, in a footnote, *Kaatz* explained:

> We note that while "any interested person" must bring a validating proceeding within 60 days, "no such restriction is placed on the [public] agency itself, which is in effect authorized by section 869 to disregard the 60–day statute of limitations imposed by section 860." [*City of Ontario v. Superior Court*, 2 Cal. 3d 335, 341 (1970)(fn. omitted.)] This is the case because the second sentence of section 869 provides: "The availability to any public agency, including any local agency, or to its officers or agents, of the remedy provided by this chapter, shall not be construed to preclude the use by such public agency or its officers or agents, of mandamus or any other remedy to determine the validity of any thing or matter."

*Id*. at 30 n. 17. Although this language suggests that a public agency could use other legal remedies

bearing different statutes of limitations to invalidate a prior action of its own outside the 60-day statute

of limitations, Plaintiffs point to no applicable remedy that was invoked in this case. The Board's post

hoc "reconsideration" of its vote to promote Oyarzo is a far cry from the kind of remedy referenced

section 869 (e.g., mandamus). To hold otherwise would totally ignore the California Supreme Court's

more general observation that: "[A]n agency may indirectly but effectively 'validate' its action by doing

nothing to validate it; unless an 'interested person' brings an action of his own under section 863 within

the 60–day period, the agency's action will become immune from attack whether it is legally valid or

not...." *City of Ontario*, 2 Cal. 3d at 341–42.

    TFD's Board meeting minutes from 2009 and the first six months of 2010 repeatedly refer to

Oyarzo as "Chief Oyarzo." (Turner Ex. C1.) In February 2009, Oyarzo was given a written evaluation as "Fire Chief Oyarzo." (Turner Ex. B3.) In March 13, 2010, he issued a letter to Hart as "Benjamin C. Oyarzo, Fire Chief." (Turner Ex. A1 Suppl. (attached to Doc. 90-2).) Oyarzo himself admitted that he was at the very least the "doing the Chief's duties" from the time of his appointment in May 2008 through his return from leave as Captain in September 2010. (Oyarzo Depo. 35: 18-36:3.) During this time, Oyarzo wore a Chief's uniform and drove a Chief's vehicle. (*Id.* at 39:6-7, 197:5-6.) He was a member of the California Fire Chief's Association, and attended Tuolumne County Fire Chief's meetings, although he claims to have done so in his capacity as "administrative captain." (*Id.* a. 49:24-50:2; 100:6-101:2.)

There is simply no evidence that Oyarzo was anything other than the "Fire Chief" from the time of his promotion to that position in 2008 through his placement on administrative leave in late June 2010. He did not file his validation action until July 2010, which was far too late to invalidate his promotion to Chief. He was treated as the Chief and acted as the Chief. He cannot now escape the plain language of the Fire Chief's job description, which describes a Fire Chief's general duties to include "plan[ning], organiz[ing], direct[ing], supervis[ing], coordinat[ing], and review[ing] all the activities and operations of the Fire District…." (Pltf. Ex. D6.) Specific duties "include[e]" but are "not limited to" "provid[ing] highly responsible and complex administrative support to the Board of Directors," "coordinat[ing] Fire District activities with other departments and outside agencies, [and] … act[ing] as public and intergovernmental relations representative…." *Id.*[14]

//

//

_____

[14] The duties of Chief also include "plann[ing], prepar[ing], and implement[ing] policies that are intended to lower the Fire District's ISO rating. (Pltf. Ex. D-6.) The Court takes judicial notice of the fact that the ISO rating system is a standardized system used to rate risk for insurance purposes, based in part on the fire suppression capabilities of local fire departments. (*See* http://www.iso.com/About-ISO/ISO-Services-for-Property-Casualty-Insurance/Underwriting-Information-on-Properties-and-Communities.html.) It is undisputed that annexation had the potential to lower the fire danger rating applicable to nearby properties <u>outside</u> then-existing TFD boundaries, (*see* Oyarzo Decl. ¶ 12), but the record does not contain evidence suggesting annexation could "lower the Fire District's ISO rating" within existing TFD boundaries, nor is it clear how the language of the job description should be interpreted. Nevertheless, the general description of a Fire Chief's job responsibilities are broad enough to encompass the annexation process at issue in this case.

**(b)**    <u>**Oyarzo's Subjective Perception of His Duties.**</u>

Oyarzo states in his declaration that:

> At no time during my employment with TFD did anyone communicate to me that I was expected to pursue annexation of County land as part of my job duties. At no time during my employment with TFD did anyone instruct me to pursue annexation of County land as part of my job duties.

(Oyarzo Decl. ¶¶ 6-7.) Rather, he perceived his daily duties as "management and supervision of the fire station and personnel, acting as duty officer while on shift, responding to and organizing TFD's response to emergency calls, organizing and participating in fire prevention activities, and repairing the fire district's equipment." (*Id.* at ¶ 5.) Defendants argue these assertions in Oyarzo's declaration should be disregarded because they contradict his prior deposition testimony, where Oyarzo admitted he took direction from TFD's board regarding the pursuit of annexation:

> Q:    Did you work with any other agencies with respect to this annexation effort?
>
> A.    The board brought up Amy Augustine, a planner that we used on the west side property annexation, and they were pleased with her work on that and they said -- they told me to go ahead and contact her and get her involved with it so we can get it filed with LAFCO.

(Oyarzo Depo. 114 at 19-25.)[15]

A party cannot "create a triable issue of fact, and thus survive summary judgment, merely by contradicting his or her own sworn deposition testimony with a later declaration." *Disc Golf Ass'n, Inc.*

---

[15] Oyarzo admits that he was paid by TFD for at least some of the time he spent working on annexation. (Oyarzo Depo. at 114: 11-18.) The fact that a "public employee was paid for the speech—e.g., drafting a memorandum, creating a report, advising a supervisor—...might be indicative of the nature of the speech," *Huppert v. City of Pittsburg*, 574 F.3d 696, 704 (9th Cir. 2009). However, it is far from dispositive. *See Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1071 (9th Cir. 2012) (finding employee spoke as a private citizen during deposition despite the fact that she was paid her regular salary during the deposition and was subpoenaed to testify on matters related to her employment); *Jacobson v. Schwarzenegger*, 650 F. Supp. 2d 1032, 1059 (C.D. Cal. 2009) (speech by attorney under contract with state to represent parolees at revocation hearings was not speaking as a private citizen, even though speech was made during uncompensated additional time, beyond that which was allowed under his contract, spent protecting clients' interests).

Defendants maintain Oyarzo cannot argue that his work on annexation was not part of his official duties because he was paid for some of his work on annexation and claims in this case that he should be paid for additional hours spent on the project. *See, e.g.,* Doc. 67-1 at 10 (Hockett MSJ); SAC ¶¶ 65-69 (FLSA claim). Plaintiffs are correct that Oyarzo is permitted to plead alternative theories of relief. *See MB Fin. Grp., Inc. v. U.S. Postal Serv.*, 545 F.3d 814, 819 (9th Cir. 2008) ("a plaintiff is generally entitled to plead alternative or multiple theories of recovery on the basis of the same conduct on the part of the defendant"). This is not the kind of situation in which judicial estoppel applies. *See In re An-Tze Cheng*, 308 B.R. 448, 453 (B.A.P. 9th Cir. 2004) (Courts "ultimately must be mindful that judicial estoppel is in tension with 'the well-entrenched principle that modern procedure welcomes inconsistent positions in the course of a single litigation.' ") (citing 18B Charles Alan Wright., *et al.*, FED. PRAC. & PRO., § 4477 (2d ed.)).

*v. Champion Discs, Inc.*, 158 F.3d 1002, 1008 (9th Cir. 1998). This is because "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). The sham affidavit rule may be invoked only if a district court makes "a factual determination that the contradiction was actually a sham" and "the inconsistency between a party's deposition testimony and subsequent affidavit ... [is] clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009). Here, Oyarzo's declaration is not clearly and unambiguously in conflict with this deposition testimony. Nothing in his deposition addresses the specific issue raised by his declaration, namely, whether anyone at TFD told Oyarzo pursuit of annexation was part of his job duties or instructed him to pursue annexation as part of his job.

For the purposes of summary judgment, the Court must assume the truth of Oyarzo's version of events (i.e., that he honestly believed his duties did not include pursuit of annexation). What remains unclear is whether an employee's self-serving testimony about his own subjective perception of his job duties can create a material dispute over whether he spoke as a public employee under the circumstances presented here, namely, where the job description of Chief plainly encompasses pursuit of annexation and Oyarzo admits that he pursued annexation at the direction of TFD's Board.

### (c)     <u>Other Relevant Facts.</u>

According to Defendants, Oyarzo's work on annexation was always pursued in his capacity as a representative of TFD. In California, petitions for annexation of territory by a local government agency are governed by the Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000. Cal. Gov. Code § 56000 *et seq.* Pursuant to that statute, annexation can only be initiated by a government agency or by a petition signed by at least 25% of the registered voters or landowners in the affected area. Cal. Gov. Code §§ 56654(b), 56700, 56864(a). It is undisputed that in this case, it was TFD that initiated the annexation process. Amy Augustine, a land use consultant, was hired by TFD's Board to prepare the annexation application for TFD. (Turner Ex. C1 (TFD 764).) The minutes of the February 18, 2010

Board meeting acknowledge that the meeting which resulted in the annexation being put on hold was between "Craig Pedro [County Administrative Oficer], County Fire, Cal Fire, Tribal Fire and Tuolumne Fire." (*Id.* at TFD 775.) There is no evidence that any group of citizens initiated or participated in an annexation petition, let alone that Oyarzo was a member of any such group.

Defendants also point to evidence indicating that Oyarzo pursued annexation as a representative of TFD. The sign in sheet for the February 10, 2010 meeting discloses that everyone, including Oyarzo, appeared in a representative capacity. (Hutchins Ex. A9 ("Ben Oyarzo" signed in for "Tuolumne Fire District").) The minutes of the February 18, 2010 TFD Board meeting indicate that "Joe Turner asked Chief Oyarzo to set up a meeting with Kevin Day, Tribal Chariman, to discuss the annexation again...." (Turner Ex. C1 (TFD 775).) Craig Pedro testified that in carrying forward the annexation effort, Oyarzo represented himself as having the authority of TFD's board. (Pedro Depo. at 98:1-16.) Mr. Pedro indicated that when Oyarzo was dealing with him, Mr. Pedro believed he was dealing with "the chief of the department." (*Id.* at 98:6-9.)

Oyarzo testified at his Deposition that he did not identify himself as the Chief of TFD during meetings with representatives of the Local Area Formation Commission, but instead identified himself by name only. (Oyarzo Depo. at 118: 7-12.) But, this testimony, which amounts only to an assertion about how Oyarzo introduced himself to LAFCO representatives, cannot be considered in a vacuum. As explained above, Oyarzo admitted to working with and under the direction of TFD's board regarding the pursuit of annexation. (*Id.* at 114: 19-25.)

Plaintiffs admit that Hart participated in the annexation effort and that his work on the annexation effort was done for TFD. (MSUF # 109.) It is not logical for Plaintiffs to assert that Hart worked for TFD in support of annexation while Oyarzo, Hart's superior, did not.

The above analysis demonstrates that there is no substantive evidence to support Oyarzo's contention that his speech in favor of annexation through February 2010 was made in his capacity as a private citizen. Accordingly, the Court makes a finding that any such speech is not protected conduct. However, such a finding is not required to rule on Defendants' motion. Even if one assumes, *arguendo*,

that Oyarzo has presented evidence that raises a material dispute as to whether his speech in favor of annexation before February 2010 was as a private citizen, he does not complain that he was retaliated against for any of his speech in favor of annexation prior to February 2010. It is undisputed that TFD's Board of Directors fully supported the annexation effort through February 2010, at which time annexation was placed on hold. (MSUF ## 28-29.)

(d)   **Oyarzo's Threat to Speak in his Capacity as a Private Citizen.**

The source of Oyarzo's entire First Amendment retaliation claim is the conversation he had with Defendant Turner in April 2010. According to Oyarzo's Declaration:

> 11. On April 13, 2010, the annexation effort was placed on hold until June 30, 2010 at the request of Tuolumne County representatives. I intended at that time to resume my annexation efforts immediately after the June 30, 2010 deadline.
>
> 12. The following week, I communicated my intent to continue pursuing the annexation to Joe Turner while visiting him at his house. Mr. Turner informed me that he no longer supported the annexation and became visibly angry with me when I stated my intent to continue pursuing the annexation after June 30, 2010. I explained to Mr. Turner that the annexation was important to me because I lived within the area that would be annexed, and the annexation would greatly increase the safety of my and hundreds of other homes in the area, which, consequently, would reduce insurance rates for all homeowners in the area.

(Oyarzo Decl. ¶¶ 11-12.)[16]

---

[16] Defendants assert that this portion of Oyarzo's declaration is a sham because it impermissibly contradicts his prior deposition testimony, and point to the following colloquies from Oyarzo's depositions as sources of conflict:

Q. Did Mr. Turner say anything to you after the meeting of February 2010 that indicated to you he blamed you for the fact that this annexation had been put on hold?

A. Blamed me that it was on -- put on hold?

Q. Yes.

A. I don't remember that.

Q. Did Mr. Turner ever tell you anything that led you to believe that he had changed his mind regarding annexation and now thought it was a bad idea?

A. I heard from another board member that he was trying to -- he was making comments that he didn't – all of a sudden, he didn't think it was a good idea.  He drove through Ponderosa Hills and didn't agree that it would be a good idea.

Q. Which board member told you that?

A. Stephanie Burns.

Q. Other than that comment by Stephanie Burns, did you ever hear anything that led you to believe that Mr. Turner had any animosity toward you that arose out of this annexation effort?

A. Her comments -- I can't remember from who -- that -- yeah, that I angered a lot of people at Cal Fire and Tuolumne County Fire.

According to Oyarzo's Declaration, his interest in annexation was more than just professional. His own personal residence was located just outside TFD's jurisdiction and within the area subject to annexation. Because annexation had the potential to lower the fire rating of those properties to be

Q.   Who told you that?

A.   I can't remember.

(Oyarzo Depo. 140:21-141:21.)

Q.   Okay.  At any time before the June 8th, 2010 board meeting, had anybody criticized your efforts on the annexation, anybody on the board?

A.   I can't remember.

Q.   At any time before the June 8th, 2010 board meeting, did any board member say anything to you which you took to mean that he or she thought it was your fault that the annexation effort had been placed on hold?

MR. BAUTISTA:  Objection to the question to the extent that it calls for speculation as to the thoughts of third parties.  Please answer the question if you can.

THE WITNESS:  Not that it was my fault that it was on hold, no.

MR. ABBOTT:  It's what we call a negative pregnant.  Did any board member ever impute fault to you in connection with the annexation effort before the meeting of June 8th, 2010?

MR. BAUTISTA:  Same -- objection.  Calls for speculation as to the thoughts of third parties and motivations of third parties.  Please answer the question to the best of your understanding.

THE WITNESS:  Could you repeat the question?

MR. ABBOTT:  Could you read it back, please?

(Record read.)

THE WITNESS:  Joe Turner.

MR. ABBOTT:  Q.  Okay.  What did he say specifically to you that you believed amounted to a criticism of your work in connection with the annexation?

A.   He said, "I don't think that we should take on Ponderosa Hills."

Q.   Okay.  And did you take that as a personal criticism of your work on the annexation or simply his view as to the advisability of taking on Ponderosa Hills?

A.   I took it as kind of late in the game why he'd be saying it at that point.  Why didn't he say it when we looked at the map and counted the parcel numbers, etcetera.

Q.   Did Mr. Turner ever say anything else to you which you took as a possible criticism of your work in connection with the annexation?

A.   I can't remember.

(Oyarzo Depo. 303:13-305:7.) Elsewhere in the briefing, Defendants note the following passage from Oyarzo's deposition that contains related content:

MR. ABBOTT:  Do you think that the board acted in any way to inhibit your efforts to annex the 68,000 acres?

[Interposed objection omitted]

THE WITNESS:  I think that they -- that they --  we shouldn't have waited for six months, but that was a board decision and that was their call.

(Oyarzo Depo. at 234:13-18.)

(*See supra* at IV.A.2.b(2)(b) for an explanation of the sham affidavit standard.) These colloquies, particularly the latter one, inquired into whether and to what extent the Board and Mr. Turner criticized the work Oyarzo had been doing on annexation. They do not probe into the related question of whether Oyarzo communicated any intent to continue on with the annexation project, nor any reaction Mr. Turner may have had to such a communication. Oyarzo's failure to mention at his deposition the April 2010 communication in which Turner became "visibly angry" may raise credibility issues for a trier of fact. However, the deposition questioning was not specific enough to permit a finding of a "clear and unambiguous conflict" between the declaration and deposition testimony. While a court "may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember," *Yeager v. Bowlin*, 693 F.3d 1076, 1080-81 (9th Cir. 2012), here, Oyarzo was never specifically questioned about his intent to continue to pursue annexation after the June 30, 2010 deadline. This portion of his declaration is not a sham.

annexed, annexation had the potential to lower Oyarzo's own insurance costs substantially. (Oyarzo

Decl. ¶¶ 17-18.) The combination of the fact that Oyarzo threatened to speak out on an issue in

contravention of the Board's wishes and the fact that he had a personal (rather than purely professional)

reason for doing so supports a finding that Oyarzo threatened to engage in speech that would have been

protected.

However, this claim cannot proceed because Plaintiffs entirely failed to disclose this theory of

First Amendment liability in discovery. Defendants' Fourth interrogatory asked Plaintiff to "describe all

protected political activity to which [Oyarzo] refer[ed] in paragraph 71 of the Complaint." (TFD Ex. A4,

A5, Interrogatory #4.) Oyarzo's initial response was:

> Plaintiff lobbied the County of Tuolumne for the annexation of territory from the county
> to Tuolumne Fire District. Plaintiff participated in meetings with officials of the County
> of Tuolumne for the purpose of achieving annexation of the land and contributed time
> and energy to planning and detailing the methods by which the land would be annexed.

(TFD Ex. A4, Response to Interrogatory #4.) Oyarzo's supplemental response was as follows:

> Beginning in 2009 and continuing through approximately May 2010, Plaintiff lobbied the
> County of Tuolumne for the annexation of territory from the county to the Tuolumne Fire
> District, which, had Plaintiff been successful, would have included the land on which
> Plaintiff's home was built. In 2009 and 2010, Plaintiff participated in meetings with
> officials of the County of Tuolumne, including Craig Pedro, Deborah Russell, and Larry
> Houseburg, for the purpose of achieving annexation of the land. Throughout this time,
> Plaintiff met with community groups who would be impacted by and supported the
> annexation of county land into TFD's territory, prepared and directed the completion of
> documentation necessary for annexation of the land, and attempted to build and maintain
> support of the community and community leaders, through outreach, personal advocacy,
> and through the media.

(TFD Ex. A5, Response to Interrogatory #4.)

Defendants are correct that Plaintiff cannot, without substantial justification, now rely on a new

theory of liability first raised in his Declaration. Fed. R. Civ. P. 37(c)(1) addresses failure to make

discovery disclosures:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or
> (e) [duty to supplement disclosures], the party is not allowed to use that information or
> witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was
> substantially justified or is harmless.

Plaintiffs' new theory of recovery was introduced for the first time in Oyarzo's Declaration, filed in

response to Defendants' motions for summary judgment on May 24, 2010.

A court may refuse to allow new theories in response to a summary judgment motion where doing so would deprive the defendant the right to conduct discovery on the claim or to make pretrial motions regarding the theory of liability. *Harry A. v. Duncan*, 351 F. Supp. 2d 1060, 1067 (D. Mont. 2005); *Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1082 (E.D. Cal.2010) ("[A] plaintiff cannot oppose summary judgment based on a new theory of liability because it would essentially blind side the defendant with a new legal issue after the bulk of discovery has likely been completed."). Although the operative complaint and discovery do raise First Amendment retaliation and deterrence claims, the factual basis for Plaintiff's "threat to speak after June 30, 2010" theory is entirely new, and was never disclosed in discovery. Defendants' discovery (including the questions posed at depositions) and opening motions papers focused on the disclosed evidence.

The Tenth Circuit succinctly articulated the problem with Plaintiffs' approach to this litigation:

> As a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." 5 C. Wright & A. Miller, Federal Practice & Procedure § 1219 at 194 (1990) [now § 1219 at 282-83 (2004) ]....We do not believe, however, that the liberalized pleading rules permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case. This practice, if permitted, would waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances.

*Zokari v. Gates*, 561 F.3d 1076, 1087 (10th Cir. 2009).

Plaintiffs have been on notice since at least May 24, 2013 that Defendants believed this was a new theory of liability. (Doc. 90 at 11 (Defendants, in consolidated Reply brief, arguing that Oyarzo's Declaration is a sham).) Yet, Plaintiffs have neither offered an excuse for failing to disclose this new theory of recovery nor any basis for a finding of harmlessness. *See also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001) (party seeking to offer undisclosed evidence bars the burden of proving the delay was harmless). To permit Plaintiffs to proceed on this previously undisclosed theory would reward Plaintiff for waiting until the last minute to refine the theories upon

which they intend to build their case and unfairly surprises defendants. Paragraphs 11 and 12 of

Oyarzo's declaration will therefore be excluded.

As a result, Plaintiff Oyarzo has no evidentiary foundation for his First Amendment retaliation

claim. Accordingly, Individual Defendants' motions for summary judgment on Oyarzo's First

Amendment claim are GRANTED.

### c. Hart's First Amendment Claims Based Upon Speech in Support of Oyarzo.

### (1) Did Hart Speak on a Matter of Public Concern?

Hart claims that in June 2010 Defendant Powers approached Hart for assistance in Powers'

"effort ... to force Mr. Oyarzo from his employment with the TFD." (Hart TFD Decl., Doc. 89-3, ¶ 3.)

Hart claims that he refused to assist Powers and informed Powers of his belief that such activity was

illegal. (*Id*. at ¶ 4.) Hart believed that Powers was retaliating against Oyarzo because Oyarzo disciplined

and reported firefighters for safety violations. (Hart Depo. at 171:9-15.) Hart told members of TFD's

board about his belief that Powers was improperly retaliating against Oyarzo because Oyarzo disciplined

and reported firefighters for safety violations. (*Id*. at 171:9-13.) In August 2010, Hart submitted a letter

in support of Oyarzo's continued employment to Virginia Van Bolt, Ben Orr, and Stephenie Burns, all

of whom were TFD Board Members. (Hart TFD Decl. ¶ 7.)

All Individual Defendants argue that Hart's speech on behalf of Oyarzo was not a matter of

public concern. (Doc. 66-3 at 17-18; Doc. 67-1 at 19-20; Doc. 69-3 at 17-18; Doc. 70-1 at 18-20.) The

Ninth Circuit has "not articulated a precise definition of 'public concern," but instead recognizes that the

inquiry "is not an exact science." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir.

2009) (internal citations omitted). In this Circuit, Courts must avoid "rigid multi-part tests that would

shoehorn communication into ill-fitting categories," and should instead rely "on a generalized analysis

of the nature of the speech." *Id*. The "essential question is whether the speech addressed matters of

'public' as opposed to 'personal' interest," and courts commonly examine "the content, form, and

context of a given statement, as revealed by the whole record." *Id*. (citing *Connick v. Myers*, 461 U.S.

138, 147 (1983)). Whether speech is a matter of public interest is "purely a question of law" on which

plaintiffs bear the burden of proof. *Id.* (internal citations omitted).

The Ninth Circuit has defined the "scope of the public concern element broadly and adopted a liberal construction of what an issue of public concern is under the First Amendment." *Id.* at 709-10 (internal citations and quotations omitted). "But there are limits. In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Id.* (internal citations and quotations omitted).

**(a)      Content of the Speech.**

The "content" element is the greatest single factor in the *Connick* inquiry." *Id.* at 710 (internal quotations omitted). To address a matter of public concern, the content of the speech must involve "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Id.* (internal quotation omitted); *see also Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989) (describing "matter[s] of political, social, or other concern to the community" as matters of public concern). "On the other hand, speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of 'public concern." *Id.* (internal quotations omitted). "The same is true of 'speech that relates to internal power struggles within the workplace,' and speech which is of no interest 'beyond the employee's bureaucratic niche.' " *Id.* (quoting *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996)).

In *Desrochers*, two veteran police officers filed an internal, informal grievance about their supervising Lieutenant, complaining about his management style. *Id.* at 705. According to the officer who adjudicated the grievance, there was "an ongoing and continuing issue relative to a difference of personalities." *Id.* Learning of the grievance, the supervising Lieutenant requested and was granted a voluntary transfer, but the two officers did not believe this sufficiently addressed their grievance, so they filed a formal grievance against the Lieutenant and two of his superiors. *Id.* at 706. Their formal

grievance again complained of the Lieutenant's management style, accusing him of, among other things, being "autocratic, controlling and critical." *Id*. One of the officers described several incidents in which the Lieutenant acted as a "micro-manager, who insults fellow officers [and] undermines efforts to develop team members." *Id*. Admitting that "taken individually" the incidents might "seem minor," the officer nonetheless thought the "incidents amount to added stress and distrust in the daily operations of the unit." *Id*. The formal grievance also asserted that the Lieutenant's superiors failed to take steps to remedy the "hostile work environment" created by the Lieutenant. *Id*. at 707. Repeatedly referencing the Lieutenant's "management style" in his grievance, the other officer believed complaining was "a necessary step forward in an attempt to change the culture of this police department and the way we treat each other." *Id*. The formal grievance was denied. *Id*.

Shortly thereafter, the two officers filed a confidential complaint with the municipality's human resources department. In addition to referencing their prior complaints, they raised concerns about the performance of the replacement Lieutenant, indicating they feared he would be used as a tool to retaliate against them. *Id*. The officers later amended their complaint, accusing the replacement Lieutenant of having a "long history of inappropriate and harassing comments given to coworkers, peers and subordinates," including making an offensive comment about one complainant's wife and, on another occasion, making a similar offensive comment as to the other complainant's daughter. *Id*.

Within weeks of filing their human resources complaint, one of the officers was transferred (an action he viewed as a demotion), while the other was suspended upon the conclusion of an internal affairs investigation involving a previous arrest. *Id*. at 705. Their lawsuit for First Amendment retaliation followed. *Id*. at 708. On appeal from a summary judgment ruling in favor of defendants, the officers attempted to "characterize their grievances as necessarily implicating issues such as the competency, preparedness, efficiency, and morale" of their department. *Id*. at 710 (internal quotations omitted). The Ninth Circuit rejected this rationale, reasoning that "a simple reference to government functioning" has never been held to "automatically qualif[y] as speech on a matter of public concern. To the contrary … the fact that speech contains passing references to public safety, incidental to the

message conveyed weighs against a finding of public concern." *Id.* at 711 (internal quotation omitted).

> For example, what if we judges prohibited our law clerks from taking coffee breaks? Suppose they responded with a memorandum complaining about the action. While they might assert-perhaps fairly-that caffeine deprivation would adversely affect their performance, morale, efficiency, and thus, their competency, no one would seriously contend that such speech addressed a matter of public concern. [citation] Similarly, the reality that poor interpersonal relationships amongst coworkers might hamper the work of a government office does not automatically transform speech on such issues into speech on a matter of public concern.

*Id.* Moreover, a court must "look to what the employees actually said, not what they say they said after the fact." *Id.* "[T]he plain language of the grievances" in *Desrochers* did "not directly address police competence … but rather indicates that [the officers] were involved in a personality dispute centered on [the Lieutenant]'s management style." *Id.* at 712.

> The speech in question is largely devoid of reference to matters we have deemed to be of public concern. There are no allegations of conduct amounting to "actual or potential wrongdoing or breach of public trust." *Connick*, 461 U.S. at 148.

*Id.* at 712. In sum, the Ninth Circuit concluded:

> [W]hen working for the government, saying one's boss is a bully does not necessarily a constitutional case make. "[T]he content of the communication must be of broader societal concern. [Our] focus must be upon whether the public or community is likely to be <u>truly interested</u> in the particular expression, or whether it is more properly viewed as essentially a private grievance." [*Roe v. City & County of S.F.,* 109 F.3d 578, 585 586 (9th Cir. 1997)] (emphases added). On the facts of this case, we cannot say that the public would be truly interested that two police sergeants believed their supervisor was a "micro-manager," "autocratic," and "controlling," or even that he dressed them down in front of their colleagues and neighboring police forces. Such speech, "if released to the public, would convey no information at all other than the fact that [two] employee[s were] upset with the status quo," *Connick*, 461 U.S. at 148, and is of no relevance "beyond the employee[s'] bureaucratic niche," Tucker, 97 F.3d at 1210.

*Id.* at 713.

A different outcome may be appropriate where an employee complains about or implicitly disapproves of unlawful conduct. In *Thomas v. City of Beaverton*, 379 F.3d 802, 806-07 (9th Cir. 2004), Thomas, a senior municipal court administrator with hiring power refused to follow the directives of a superior to deny a promotional opportunity to an African American clerk who previously filed (and prevailed in) a lawsuit challenging the court's failure to promote her. Later, the superior placed Thomas on probation for allegedly failing to perform adequately two aspects of her job, defects for which no

28

previous notice was given. *Id*. at 807. Thomas was later terminated. *Id*. She sued, arguing that her

superior retaliated against her for supporting the African American clerk's promotion. *Id*. Thomas

argued that she believed that the defendants were discriminating against the clerk because of that

employee's race and retaliating the clerk because of the clerk's prior lawsuit. *Id*. at 808.

Although the Ninth Circuit found the record to be "devoid of any evidence that Thomas explicitly or

implicitly expressed any concern that the defendants were treating the clerk unfairly because she was

African American, Thomas' speech does not have to be about racially disparate treatment in order to be

protected." *Id.* at 808-09. "Unlawful conduct by a government employee or illegal activity within a

government agency is a matter of public concern." *Id*. at 809 (citing *Ceballos v. Garcetti*, 361 F.3d

1168, 1174 (9th Cir. 2004) (holding that falsification of information in a search warrant affidavit was a

matter of public concern); *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1222-23 (9th Cir. 1996)

(concluding that an employee's complaints of illegal campaign activity and pressure to participate in it

were of public concern), reversed on other grounds by *Garcetti*, 547 U.S. 410; *Roth v. Veteran's Admin*.,

856 F.2d 1401, 1406 (9th Cir. 1988) (ruling that an employee's reports of safety regulation violations,

unethical conduct, misuse of public funds and mismanagement constituted speech of public concern)).

In *Thoma*s, the Ninth Circuit emphasized that the superior's treatment of the clerk "need not

have been actually unlawful for Thomas' opposition to be protected expression." *Id*. (citing *Ceballos*,

361 F.3d at 1179 (concluding that an assistant district attorney engaged in protected speech when he

alleged criminal wrongdoing by an officer even though those allegations proved to be erroneous);

*Johnson v. Multnomah County, Or*., 48 F.3d 420, 424 (9th Cir. 1995) (holding that an employee's

accusations of mismanagement and possible criminal conduct against her immediate supervisor

constituted speech of public concern even though they were recklessly false)). Nor must an employee

explicitly indicate to the defendant a belief that defendant's acts were unlawful; "[r]ather, she may

convey an implicit message of disapproval of the illegality of the activity through her conduct by

refusing to facilitate or participate in it." *Id*. (citing *Nunez v. Davis*, 169 F.3d 1222, 1227-28 (9th Cir.

1999) (holding that an employee's refusal to limit attendees at training seminars to those court

29

employees who had worked on her supervisor's re-election campaign was expressive conduct on a matter of public concern)). The Ninth Circuit concluded that there was sufficient evidence to create a genuine issue of material fact as to whether Thomas' refusal to acquiesce in the defendant's allegedly retaliatory treatment of the clerk was expressive conduct on a matter of public concern. *Id.* at 811.

Here, according to Hart's Declaration:

> 3.    In early June of 2010, Toney Powers requested that I assist him in his effort against Benjamin Oyarzo in an attempt to force Mr. Oyarzo from his employment with the TFD.
>
> 4.    I verbally refused to assist Mr. Powers in his effort against Mr. Oyarzo and further informed him that I would not participate in any attempt to force Mr. Oyarzo from his employment with the TFD. I also told him that I thought such an action was illegal based upon my experience in the U.S. Forest Service. I understood from my experience at the U.S. Forest Service that employees had rights in their employment. Mr. Powers stated that he believed they would be successful in forcing Mr. Oyarzo out and accused me of "playing both sides of the fence", which I interpreted to be an accusation of disloyalty.

(Hart TFD Decl. ¶¶ 3-4.) This is evidence that Hart explicitly refused to participate in what he believed to be unlawful conduct. Defendants' contention that Hart's speech was limited to concerns about internal discipline and morale (*see* Doc. 81 at 4) are unfounded. The record indicates that, among other things, Hart believed that Powers was retaliating against Oyarzo because Oyarzo disciplined and reported firefighters for safety violations. (Hart Depo. at 171:9-15.) Hart based this belief on comments Powers made to him. (*Id.* at 172: 7-8.) The record further indicates that Hart told members of TFD's board about his beliefs. (*Id.*) This goes beyond a personality dispute and raises issues of public concern. The conduct about which Hart complained need not actually be unlawful for it to qualify. *Thomas*, 379 F.3d at 809.

### (b)    Form of Speech.

Analysis of the form of the speech supports the conclusion that Hart spoke on a matter of public concern. In *Desrochers*, the fact that the speech took the form of an internal employee grievance "means that the public was never made aware of [the two officers'] concerns." 572 F.3d at 714. Likewise, although Thomas communicated to her immediate supervisor and other court employees her

30

disagreement with the allegedly unlawful treatment of the clerk, she did not "attempt to inform the general public about the allegedly retaliatory practices." *Thomas*, 379 F.3d at 810.

"That the employee expressed his views inside his office, rather than publicly, is not dispositive." *Desrochers*, 572 F.3d at 714 (quoting *Garcetti*, 547 U.S. 410) (internal modification incorporated); *Thomas*, 379 F.3d at 810. However, "[a] limited audience weighs against a claim of protected speech." *Desrochers*, 572 F.3d at 714 (internal quotation and citation omitted).

> Public speech is more likely to serve the public values of the First Amendment. Private speech motivated by an office grievance is less likely to convey the information that is a prerequisite for an informed electorate. Thus, though a private complaint may relate to a matter of public concern, our consideration of the form of speech adopted to convey their message helps us identify whether their speech is of public concern. [Where] the speech at issue took the form of internal employee grievances which were not disseminated to the public, this portion of the *Connick* test cuts against a finding of public concern.

*Id.* at 714-15 (internal quotations and citations omitted). Nevertheless, "[b]ecause content is the most important factor, we have concluded that speech about a matter of public concern may be protected even when made in a private context." *Thomas*, 379 F.3d at 810-11 (citing *Ceballos*, 361 F.3d at 1174 (holding that a memorandum given to the employee's supervisors was protected speech when the memorandum alleged criminal wrongdoing); *Ulrich* v. City and County of San Francisco, 308 F.3d 968, 979 (9th Cir. 2002) ("[T]he public employee does not forfeit protection against governmental retaliation because he chose to press his cause internally."); *Chateaubriand*, 97 F.3d at 1223 ("The form of the speech-complaints to staff and superiors rather than to the general public-does not remove it from the realm of public concern.")). It was enough that Thomas expressed "her disapproval of the allegedly retaliatory treatment [] to those responsible for deciding whom to promote to the vacant position, [thereby] air[ing] her views in an effective forum." *Thomas*, 379 F.3d at 811.

Here, Hart maintains that he complained about Powers' treatment of Oyarzo to Powers himself and to several members of the TFD Board, thereby airing his views in an effective forum.

### (c)    **Context of Speech.**

Finally, the context of the speech supports the conclusion that Hart spoke on a matter of public concern. "[I]n ascertaining when speech ... rises to a level of public concern," a court should also

31

examine "the context of the speech, particularly the point of the speech." *Id*. at 715 (internal citation and quotation omitted). This boils down to a question of motivation.

> In other words, why did the employee speak (as best as [the court] can tell)? Does the speech "seek to bring to light actual or potential wrongdoing or breach of public trust," or is it animated instead by "dissatisfaction" with one's employment situation?

*Id*. (quoting *Connick*, 461 U.S. at 148). "The question of whether the speech was made to further some purely private interest is relevant to that inquiry, as is a determination of whether the speech was made in the context of a workplace power struggle." *Id*. (internal quotations and citations omitted).

In *Desrochers*, the two officers argued that "the context in which their speech was uttered suggests that they were motivated, not by a personal vendetta against [their superior], but rather out of a concern for the well-being of the" police department as a whole. *Id*. While finding that the record contained some support for their claims of altruistic motivation, the undisputed evidence also indicated that the two offiers were motivated by their dissatisfaction with their employment situation brought on by "a difference of personalities between" them and their Lieutenant. *Id*. The Ninth Circuit concluded that the officers' speech was "merely an extension" of the running spat between the players. *Id*. at 716 (internal quotation and citation omitted). "The ultimate source of the grievances can be traced to the simple fact that the sergeants and [their Lieutenant] did not get along. They preferred a particular management style, and he employed another." *Id*. Accordingly, the speech was not a matter of public concern. *Id*

Here, assuming the truth of Hart's undisputed Declaration, Hart spoke out on Oyarzo's behalf believing that Oyarzo had been the victim of unlawful retaliation. This was not a purely internal grievance about management style.[17]

---

[17] Plaintiffs make much of the fact that there was some press coverage in mid to late 2010 about conflict within TFD over Oyarzo. However, there is no evidence that any of this coverage had anything to do with Hart's concern that Oyarzo was the victim of unlawful retaliation because Oyarzo had reported safety violations. Whether Hart's concerns were relayed to the media is relevant. *See Lambert v. Richard*, 59 F.3d 134 (9th Cir. 1995) (where the tension between staff and superiors is the subject of public discussion, the issue may be a matter of public concern). "[I]n a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not involve a matter of public concern." *Desrochers*, 572 F.3d at 718. Where the subject matter of the speech before us at best relates "only marginally" to issues of public concern, the grievances were motivated by a personal dispute, and the concerns were never

Accordingly, Individual Defendants' motions for summary judgment that Hart's speech on behalf of Oyarzo was not a matter of public concern are DENIED.

### (2)   Did Hart Speak As a Public Employee or as a Private Citizen?

Defendants do not argue that Hart spoke as a public employee, as opposed to as a private citizen. This is logical because "common sense dictates that [p]laintiff's remark that she would not participate in illegal activity was not within Plaintiff's job duties—employees are generally not paid to inform a superior that they will not participate in illegal conduct proposed by that superior." *Dowell v. Cnty. of Contra Costa*, 2013 WL 2181653 (N.D. Cal. May 20, 2013).

### (3)   Was Hart's Speech in Support of Oyarzo A Substantial or Motivating Factor in Adverse Actions Against Hart?

If a plaintiff spoke on a matter of public concern as a private citizen, rather than as a public employee, the next step is to determine "whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action." *Huppert*, 574 F.3d at 702. First, this requires inquiry into whether an adverse employment action took place. "To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden." *Coszalter v. City of Salem,* 320 F.3d 968, 975 (9th Cir.2003). "The proper inquiry is whether the action is 'reasonably likely to deter employees from engaging in protected activity.' " *Dahlia v. Rodriguez,* 689 F.3d 1094, 1107, reh'g en banc granted, 704 F.3d 1043 (9th Cir. 2012) (quoting *Coszalter,* 320 F.3d at 976).

To show that retaliation was a substantial or motivating factor behind an adverse employment action, a plaintiff can:

> (1) introduce evidence that the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) introduce

---

relayed to the press or the public. *Id*. Accordingly, the speech is "most accurately characterized as an employee grievance concerning internal office policy." *Id*. (quoting *Connick*, 461 U.S. at 154). Here, however, there is evidence indicating that Hart's speech went beyond a "marginal" connection to an issue of public concern by addressing allegedly unlawful conduct. This is sufficient to withstand summary judgment.

evidence that the employer expressed opposition to the speech; <u>or</u> (3) introduce evidence that the proffered explanations for the adverse action were false and pretextual.

*Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 750 (9th Cir. 2010) (emphasis added).

### (a)      **Hart's Retaliation Claim Against Powers**

Defendant Powers moves for summary judgment on Hart's retaliation claim. (Doc. 66-3 at 11-21.) Hart alleges Powers subjected him to various adverse employment actions, including: (1) removing Hart from a shift in which he would have served as duty officer in charge of the shift in Oyarzo's absence and transferring Hart to Powers' shift, while other less-qualified individuals were placed in charge of the remaining shifts as duty officers; (2) removing job responsibilities from Hart and transferring those responsibilities to interns; (3) encouraging other firefighters to mock an ostracize Hart; (4) forcing Hart to work each of his 48-hour shifts alone after Oyarzo was placed on medical leave; and (5) making no mention to Hart of the request that TFD be present at the funeral of a former chief with the expectation that Hart would be disciplined for failing to be present. (*See* Doc. 78 at 7-8.)

### (i)      **Removal From Duty Officer Position.**

It is undisputed that Powers was Hart's superior at TFD. (PSUF #8.) Hart refused to assist Powers' efforts to gather complaints against Oyarzo in June 2010. (Hart Decl. ¶¶ 3-4). At some point during that summer, Powers transferred Hart to Powers' own shift, austensibly so they could work together more "smoothly." (*Id*. at ¶¶ 5-6; Powers Depo. 132:3-143:3.) At the same time, two other firefighters, Nick Ohler and Jason Podesta, were each placed in charge of the remaining two shifts. (Powers Depo. 143:18-146:10; 147:17-148:15.) This, in effect, meant that Hart was removed from a shift on which he would have been the duty officer in Oyarzo's absence and moved to a shift where he was working under Powers' supervision, while two other firefighters were given "duty officer" responsibilities. There appears to be no dispute that these shift changes occurred. Transferring job duties from the target of alleged retaliation to others may constitute an adverse employment action. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

Because this shift change occurred in close proximity to Hart's speech, Hart has established

temporal proximity between his speech and the adverse action.

In addition, as discussed above, Hart has presented evidence that Powers requested Hart's assistance in the collection of complaints against Oyarzo. (Hart Decl. ¶ 3.) Hart refused to participate in the effort and indicated to Powers his belief that Powers' efforts were unlawful. (*Id*. at ¶ 4.) Powers then accused Hart of "playing both sides of the fence," which Hart interpreted as an accusation of disloyalty. (*Id*.; *see also* Hart Depo. 130:11-13.) For purposes of summary judgment this is sufficient proof that "the employer expressed opposition to [Hart's] speech." *Anthoine*, 605 F.3d at 750.

The burden then shifts to Defendants to demonstrate that they "would have reached the same adverse employment decision even in the absence of the employee's protected conduct." *Eng*, 552 F.3d at 1072.[18] "In other words, [they] may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action." *Id*. Powers claims Nick Ohler and Jason Podesta were given their own shifts because they had more experience and that Nick Hart was, at the time, the firefighter with the least experience, except in fighting wildfires. (*See id*.; *see also* Hart Depo. 58: 11-16 (admitting he was the "junior man").) But, this is disputed. Hart was thirty-six at the time of the events in this case, had been in fire protection for approximately eight years, and claimed to have possessed "qualifications, certifications and experience" that "exceeded those of Firefighters, Jason Podesta and Nicholas Ohler…." (Hart Decl., Doc. 78-5, ¶9; *see also* Powers Depo. 147:25-148:9 (admitting Podesta and Ohler were in their mid-twenties; *id*. at 146: 5-10 (admitting Hart had wildland firefighting experience).) Defendant Powers objects to the portion of Hart's declaration in which he states his qualifications and experience exceeded Podesta's and Ohler's on the grounds that Hart lacks personal knowledge or any foundation upon which to make such an assertion and that the statement contains impermissible lay opinion. (Doc. 81-1 at 7.) Defendants are correct that it is insufficient for Hart to merely state that he is more qualified than his former co-workers. To sustain his burden, he must show provide evidence, not "bare assertion[s]" regarding competing colleagues. *Barefield v. Bd. of*

---

[18] This is technically the fifth step in the *Eng* test, but Defendants have not even attempted to satisfy their burden under the alternative fourth *Eng* step, namely, demonstrating that it would prevail under the *Pickering* balancing test. *See Eng*, 552 F.3d at 1071-72.

*Trustees of CA State Univ., Bakersfield*, 500 F. Supp. 2d 1244, 1264-65 (E.D. Cal. 2007), on

reconsideration sub nom., 2007 WL 3239288 (E.D. Cal. Nov. 2, 2007).  However, it is <u>Defendant</u>

<u>Powers</u>', not Hart's, burden to establish that Hart's speech was not the but-for cause of the adverse

action. Defendant has pointed to no evidence of Podesta and Ohler's qualifications relative to Hart. The

evidence cited by Defendant only demonstrates that Hart was "junior" in terms of the number of years

he had with TFD, not that he was less qualified than Podesta or Ohler. (Hart Depo. 58:11-16; Podesta

Depo. 19:9-15; Oheler Depo. 55:18-56:8.) Defendant has not satisfied its burden to prove it would have

reached the same decision about shift assignments absent Hart's speech.

Therefore, Defendant Powers' motion for summary judgment on this alleged adverse action is

DENIED.

**(ii)     <u>Transfer of Job Responsibilities to Interns.</u>**

Hart also claims that some of his job duties were transferred to Interns. Specifically, on calls Hart

previously would sit in the passenger seat, where he would talk on the radio to dispatch and use maps to

get the firefighters to a scene. (Hart Depo. at 1374: 138:9.) Hart claims that after his falling out with

Powers, Powers gave those responsibilities to an intern. (*Id.*)

Viewing the evidence in a light most favorable to Powers, a finder of fact could conclude that

Powers transferred a job responsibility from Hart to others, which arguably constitutes an adverse

action. *Yartzoff*, 809 F.2d at 1376. Again, because all of this occurred in close temporal proximity to

Hart's speech, Hart has satisfied his burden to establish an adverse action that is causally connected to

his First Amendment activities.

Defendant does not dispute these facts. Instead Defendant argues that because it was undisputed

that Powers was Hart's superior, Powers was "in charge when they went on calls together" and it was

"reasonable for Powers to allow an intern to take the captain's seat and the duties that come along with

that position for training purposes." (Doc. 81 at 8.) However, Defendant cites no evidence or caselaw in

support of this assertion. The record does not even reflect that Powers claimed this shift in

responsibilities was for training purposes. This is insufficient to sustain Defendant Powers' burden under

36

the fifth *Eng* step.

Defendant Powers' motion for summary judgment is DENIED as to this asserted adverse action.

### (iii)    Mocking and Ostracization.

Hart also claims he was mocked and ostracized by his co-workers at Powers' direction. Hart's evidence in support of this assertion is vague and non-specific. The most specific assertion he makes is that other firefighters would roll their eyes and shrug when he gave input or suggestions. (Hart Depo. at 162:15-163:1.) Yet, there is no substantive evidence connecting Powers to this conduct. Hart did testify that Powers commented to other firefighters that Hart was "playing both sides of the fence," but there is no evidence that Powers suggested or even implied to the other firefighters that they should mock or ostracize Hart.

Moreover, being scolded and or bad-mouthed by others in the workplace does not constitute an adverse action. *Nunez*, 147 F.3d at 875. Defendants Powers' motion for summary judgment is GRANTED as to this asserted adverse action.

### (iv)    Forcing Hart to work 48-Hour Shifts Alone.

Hart complains that he was forced to work 48-hour shifts on his own while Oyarzo was on medical leave beginning in September 2010. This appears to be undisputed. Kenneth Hockett admits that he was unable to assign any other firefighter to Hart's shift because "we didn't have the staffing for that and folks weren't willing to work with [Hart]." (Hockett Depo. 157:12-18.)

However, there is no evidence connecting Powers to this conduct. Powers' motion for summary judgment as to this asserted adverse action is GRANTED.

### (v)    Failure to Communicate Request to Attend Funeral.

Around the time of the other asserted adverse actions discussed above, Defendant Hockett instituted the use of a "passdown log" at the TFD firehouse, whereby certain daily activities would be logged in writing to ensure better communication when shifts changed. (*See* Hockett Depo. 93:18-20.) Hockett claims the procedure was designed simply to improve communication. (*Id.*) Defendant Powers believed use of the passdown log was meant to simulate the verbal communications that would normally

37

occur between shifts; because the firefighters were not all getting along, the passdown log meant that they "didn't have to talk to one another." (Powers Depo. 176:3-7.) Powers also explained that firefighters were supposed to read the entries made by the shift immediately preceding their own. (*Id*. 178:15-20.)

On October 21, 2010, a community member contacted TFD to request that the District be present at the funeral of a former volunteer fire chief on Monday, October 25, 2010. (Podesta Depo. 98:9-99:9.) Jason Podesta, the duty officer in charge that day, recorded the phone call in the passdown log. (*Id*. 99:14-17.) Powers relieved Podesta on October 22, 2010 and worked through the morning of October 24, 2010. (Pltf. Ex. D11 (TFD 3440-41.) Powers recorded entries for October 22, 2010 and October 23, 2010, but made no mention of the funeral request in the entry immediately preceding Hart's shift. (*Id*.)

Plaintiffs assert that Powers deliberately omitted the funeral request from the passdown log entry just prior to Hart's shift, expecting that Hart would be disciplined if he failed to show up to represent the Department. The evidence cited in support of this assertion establishes only that Powers believed the next shift was only responsible for reading entries from the shift before, (Powers Depo. 178:17-20), and that Powers believed there should be some discipline for a firefighter who failed to show up at a location when required to do so, (*id*. 197:15-22). This fails to support, even circumstantially, the assertion and speculation that Powers' deliberately failed to communicate the funeral request to Hart. The fact that others may have disciplined Hart for his failure to make the appearance does not in any way connect Powers to this asserted adverse action.

Powers' motion for summary judgment as to this asserted adverse action is GRANTED.

### (b)    Hart's Retaliation Claim Against Hockett.

Defendant Hockett moves for summary judgment on Hart's retaliation claim. (Doc. 66-3 at 11-21; Doc. 67-1 at 20-21.) Hart asserts that Hockett: (1) joined in the retaliation against Hart; (2) forced Hart to work his shifts alone while Oyarzo was on medical leave; and (3) disciplined Hart for allowing Nick Burns to volunteer at TFD; and (4) disciplined Hart for failing to attend the funeral on October 25, 2010.  (*See* Doc. 82 at 20-23.)

**(i)**      **"Joining" in the Retaliation Against Hart.**

Hart complains that "[d]espite having been informed by both Oyarzo and Hart of the retaliatory campaign instituted against Hart by TFD employees, [Hockett] took no action to protect Hart" and instead "joined in the retaliation against Hart." (Doc. 82 at 20-21.) First, although there may be a cause of action for failure to prevent certain types of harassment, *Fuller v. City of Oakland*, 47 F.3d 1522, 1528 (9th Cir.1995); *see also Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir.1994) (when employee is sexually harassed, the "only question is whether [the employer] is relieved of liability for [the harasser's] actions because it took sufficient disciplinary and remedial action in response to [ the employee's] complaints."), the Court is unaware of any authority that would render the supervisor himself personally liable under a failure to prevent theory, *cf Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1326 (1996) ("Mere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting.... More specifically, a supervisor is not liable to third parties for the acts of his or her subordinates."); *see also Hanson v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989) ("A supervisor may be liable [under 42 U.S.C. § 1983] if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.").

Hart's generic accusation that Hockett "joined in the retaliation" against Hart cannot be sustained. Hockett's conduct must be examined based upon Hockett's own affirmative conduct.

**(ii)**      **Requiring Hart to Work 24-Hour Shifts Alone.**

As described above, it is undisputed that Hart was required to work 48-hour shifts on his own while Oyarzo was on medical leave beginning in September 2010. Kenneth Hockett admits that he was unable to assign any other firefighter to Hart's shift because [TFD] "we didn't have the staffing for that and folks weren't willing to work with [Hart]." (Hockett Depo. 157:12-18.)

Defendants argue that placement of Hart on a shift by himself cannot possibly constitute an adverse action because he did not object to being assigned to the shift on his own. Although Hart initially informed Hockett via email that Hart was "not worried" about working alone and would "do

1  fine" on a shift by himself (Hockett Exhibit B5), Hart stated in his declaration filed in response to TFD's

2  motion for summary judgment that he later complained to both Hockett and Stephenie Burns about the

3  "hazardous environment" that resulted from working alone and responding to emergency calls alone,

4  (Hart TFD Decl. ¶ 20).[19] Being given more strenuous or more dangerous work than others can constitute

5  an adverse action. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090 (9th Cir. 2008); *Coszalter v. City of*

6  *Salem*, 320 F.3d 968, 976 (9th Cir. 2003) (even being given an "unpleasant work assignment" can

7  constitute an adverse action for First Amendment retaliation purposes).

8      Hart has also satisfied his initial burden of demonstrating circumstantial evidence that this

9  adverse action was motivated by his protected speech because he was assigned to work shifts on his own

10  starting in September 2010, after Oyarzo left on medical leave. (*See* Hart Decl., Doc. 82-5, ¶8.) This was

11  in very close proximity to Hart complaining to Hockett in August 2010 that he was being retaliated

12  against for supporting Oyarzo. (*Id*. ¶8.)

13      Defendant Hockett's motion for summary judgment is DENIED as to this asserted adverse

14  action.

15              **(iii)  Disciplining Hart for Permitting Nick Burns to**
                        **Volunteer at TFD.**

16

17      Hart asserts that Hockett disciplined him for allowing a volunteer firefighter, Nick Burns, to

    volunteer with him at the firehouse; Hockett "contacted Hart by telephone and interrogated him for

18  approximately 30 minutes before threatening Hart with discipline" for allowing Nick Burns to volunteer;

19  and placed a written reprimand in Hart's file. (Doc. 82 at 21-22.)

20      It is undisputed that on October 12, 2010, Nick Burns, Board Member Stephenie Burns' son,

21  volunteered at TFD during Hart's shift. (*See* MSUF # 126; Hockett Ex. B8.) In a letter, Hart admits that

22

23

24  [19] TFD objects to Paragraph 20 of Hart's Declaration on the ground that it impermissibly contradicts his prior deposition testimony. (*See* Doc. 95-1 #8.) But, the deposition excerpts cited by Defendants do not contradict Hart's declaration. At the most, Hart was questioned about whether he ever complained in <u>writing</u> about working alone. (*See* Hart Depo. at 338-340.)

25  His declaration indicates that he complained orally to the Board members. There is no conflict between his declaration and prior testimony. Nor can Hart's Declaration be excluded on the ground that it contradicts his emails to Hockett. The sham affidavit rule does not apply to unsworn statements or documents. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir.

26  1999); *Moore v. Computer Associates Int'l, Inc.*, 653 F. Supp. 2d 955, 970 (D. Ariz. 2009).

on October 12, Nick Burns came by the firehouse and told Hart that he had turned in an application to volunteer but "never heard back." (Hockett Ex. B9.) Despite this, Hart simply "issued him a set of turnouts" (i.e., protective clothing) and permitted Hart to stay the night in the firehouse. (*Id.*) According to Hart's version of events, when Hockett learned of this, Hockett told Hart that no one could "be hired or fired" at that time, and that "we need to get our ducks in a row" by making sure Nick had a physical and was covered by TFD's insurance. (*Id.*) Hockett told Hart to call Burns to tell him not to come back to the firehouse "because of the 'duck in a row' issues." (*Id.*)

On October 18, 2010, while Hart was on his next shift, Stephenie Burns called Hart to let him know that Nick Burns had his physical and that Nick Burns, who had "every right to volunteer" would be down to help on his shift. (*Id.*) On October 20, when Hockett found out that Nick Burns was once again volunteering at the firehouse, they had a conversation about the "hire and fire process" during which Hart explained that he didn't understand that using a volunteer was part of the "hire and fire process" and that he apparently misunderstood his instructions about not permitting Nick Burns to volunteer. (*Id.*) Hart claims to have been confused by the conflicting instructions from the various board members. (*Id.*)[20]

Hockett wrote up a formal "Record of Discussion" on the incident, Dated November 1, 2010, that was added to Hart's personnel file. (Hockett Ex. B8.) Issuance of a formal letter of reprimand is an adverse action for First Amendment/Section 1983 purposes. *See Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) (warning letter or negative review can be an adverse employment action).

Plaintiff Hart has satisfied his initial burden of demonstrating circumstantial evidence that this adverse action was motivated by his protected speech because the issuance of the letter on November 1, 2012 was in close proximity to Hart complaining to Hockett in August 2010. (*See* Hart Decl. ¶8.) *See Coszalter*, 320 F.3d at 977 ("three to eight months is easily within a time range that can support an

---

[20] It is also undisputed that Nick Burns had previously been allowed to resign from TFD in lieu of being terminated for coming to work smelling of alcohol. (MSFU #128.) However, there is no evidence that Hart was aware of Burns' prior conduct.

inference of retaliation"); *Salem v. Terhune*, 72 F. App'x 670, 672 (9th Cir. 2003) (where protected activity took place in May and retaliation occurred between August and October of the same year, temporal proximity sufficient to survive summary judgment).

The burden then shifts to Defendants to "that it would have reached the same adverse employment decision even in the absence of the employee's protected conduct." *Eng*, 552 F.3d at 1072. "In other words, it may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action." *Id*. (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)):

> This question relates to, but is distinct from, the plaintiff's burden to show the protected conduct was a substantial or motivating factor. It asks whether the adverse employment action was based on protected and unprotected activities, and if the state would have taken the adverse action if the proper reason alone had existed.

*Id*. (internal quotations and citation omitted). Summary judgment would be appropriate only if the public entity established "without dispute by the plaintiff, that it would have made the same employment decisions even absent the questioned speech." *Id*.

Here, it is undisputed that Hockett believed Hart's conduct in connection with Nick Burns was insubordination. (Hockett Ex. B8.) However, Hart has presented evidence tending to call into question Hockett's justification for reprimanding Hart over the incident in the form of Hart's own, contemporaneous letter in response to Hockett's "Record of Discussion," which recounts his own version of the events. (Hockett Ex. B9.) If Hart's version is believed, Hart simply misunderstood Hockett's instructions and/or received conflicting instructions from another TFD board member. Accordingly, Defendants' motion for summary judgment on this asserted adverse action is DENIED.

### (iv)    Disciplining Hart for Failure to Attend Funeral.

As described above, around the time of the other asserted adverse actions, Defendant Hockett instituted the use of the passdown log. It appears to be undisputed that there was no mention of the request to appear at the October 25, 2010 funeral service in the passdown log for the shift immediately prior to Hart's. The evidence also indicates that at least some of the firefighters believed one was only

responsible for reading the passdown log entries for the shift immediately prior to one's own. (Powers Depo. 177:11-179:3.) Despite the fact that there was no mention of the funeral in the portion of the passdown log Hart was responsible for reviewing, Hockett disciplined Hart for failing to show up at the funeral by entering a "Formal Warning" into his personnel file. (Hockett Ex. B10.)

Defendants do not question whether this constitutes an adverse action. As with the Nick Burns "Record of Discussion," this constitutes a disciplinary action. *See Fonseca,* 374 F.3d at 847. Likewise, this disciplinary action was taken less than three months after Hockett was informed by Hart and Oyarzo of their belief that Hart was suffering retaliation for supporting Oyarzo. *See Coszalter*, 320 F.3d at 977; *Salem*, 72 F. App'x at 672.

The burden again shifts to Defendants to establish that Hart's protected speech was not the "but-for" cause of the disciplinary action. Defendants appear to suggest that the action was otherwise justified and therefore that they would have taken the action despite the speech, but the record calls this assertion into dispute. Among other things, Ben Orr, another Board member, testified to his belief that Hockett's insistence upon disciplining Hart for this incident was "petty." (Orr Depo at 242: 19-25; 243:9-11 ("I have no idea what [Hockett] was thinking.  I just didn't like it.  I wasn't comfortable with it.").) The record does not permit a finding that Defendant Hockett is entitled to summary judgment as to this asserted adverse action.

Defendant Hockett's motion for summary judgment as to this asserted adverse action is DENIED.

### (4)      Qualified Immunity.

The Individual Defendants maintain that even if summary judgment is not warranted on Hart's First Amendment claims, they are entitled to qualified immunity because they reasonably believed their actions were lawful. (Doc. 66-3 at 13-16, 21; Doc. 67-1 at 14-17, 22; Doc. 69-3 at 13-16, 22; Doc. 70-1 at 13-17, 22.)

### (a)      General Qualified Immunity Standard.

Qualified immunity shields government officials performing discretionary functions from

43

liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Anderson v. Creighton*, 483 U.S. 635, 638–40 (1987). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001)(internal quotation omitted), abrogated on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009). This privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 200–01. Thus, the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 201 (internal quotation omitted). *Saucier* established a two-step inquiry for determining whether an official is entitled to qualified immunity. *See Pearson*, 555 U.S. at 232; *Saucier*, 533 U.S. at 201. First, the court was directed to consider whether, "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right." *Saucier,* 533 U.S. at 201. If a constitutional right would have been violated were the allegations established, the Saucier Court instructed lower courts to next examine whether the right was clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201–02. If an officer is reasonably mistaken as to what the law requires, the officer is entitled to immunity. *Id.* at 202–03. "The doctrine of qualified immunity safeguards 'all but the plainly incompetent or those who knowingly violate the law.... [If] officers of reasonable competence could disagree on th[e] issue [of whether a chosen course of action is constitutional], immunity should be recognized.' " *Lytle v. Wondrash*, 182 F.3d 1083, 1086-87 (9th Cir. 1999) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Supreme Court subsequently determined that "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory." *Pearson*, 555 U.S. at 236. Instead, lower courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

To determine whether the law was clearly established, courts in the Ninth Circuit must first look to binding precedent. *Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013) "If none is on point, we may consider other decisional law." *Id*. A court "need not find that the very action in question has previously been held unlawful, but, rather, [] whether a reasonable officer would have had fair notice that the action was unlawful, and that any mistake to the contrary would have been unreasonable." *Id*. at 1056-57.

### (b)  Qualified Immunity Applied to Hart's First Amendment Claim.

Defendants point to *Lytle v. Wondrash*, 182 F.3d 1083, 1985 (9th Cir. 1999), in which a teacher claimed her school district employer retaliated against her for previously filing a lawsuit. In the previous lawsuit, she alleged the district transferred and disciplined her for publically criticizing a school education program. *Id*. She prevailed in that lawsuit and was reinstated. *Id*. The plaintiff later claimed that after she returned to work she was again retaliated against for filing that lawsuit. *Id*. at 1085-86. The key question was whether her right to file the previous lawsuit was outweighed by "any adversely affected interest of the public employer in promoting efficient delivery of public services." *Id*. at 1088. This required application of the *Pickering* balancing test, which calls upon a court to consider the

> balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering*, 391 U.S. at 568.

The *Lytle* court found that several of the *Pickering* factors favored defendants, including the "employer's need to maintain an efficient and cohesive school environment" and "preventing disruption spawned by Lytle's prior litigation." *Lytle*, 182 F.3d at 1088. Finding that Lytle's prior litigation "created … disharmony," the Ninth Circuit also found that the employer had an interest in preventing expression that disrupted a harmonious work environment. *Id*. at 1089. "[P]roof of actual disruption is not required: an employer need only show that the public employee's expression caused reasonable predictions of disruption." *Id*. (internal quotation and citation omitted). Lytle's prior litigation "created a

45

rift between her and both her coworkers and her superior." *Id*. Where "close working relationships require mutual trust and respect to be successful … a wide degree of deference to the employer's judgment is appropriate." *Id*. Although some factors favored Lytle in the balance, the Ninth Circuit found that the *Pickering* balance did "not provide clear-cut results" such that the "outcome of the balance does not so clearly favor Lytle that it would have been patently unreasonable for the school officials to conclude that the First Amendment did not protect her litigation." *Id*. (internal quotation and citation omitted).

Defendants argue that a similar result is warranted here because at the time of Hart's speech and the alleged retaliatory acts, TFD was "an organization experiencing a near mutiny." (*See* Doc. 66-3 at 21 (qualified immunity arguments leveled against Oyarzo's claims); Doc. 67-1 at 22 (relying on the same arguments to attack Hart's claims).) Defendants assert that the discord within TFD concerned the complaints levied against Oyarzo by interns and other employees. (MSUF # 44.) Hart's protected speech was allegedly made in support of Oyarzo. However, Hart has elicited evidence that at least arguably demonstrates that he spoke out because he believed the treatment of Oyarzo by others at TFD was unlawful. "A series of cases in the Ninth Circuit establish[] that the public's interest in learning about illegal conduct by public officials and other matters at the core of the First Amendment protection outweighs a [public] employer's interest in avoiding a mere potential disturbance to the workplace." *Keyser v, Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 748 (discussing previous holdings).

Individual Defendants' motions for summary judgment as to Hart's First Amendment claims on qualified immunity grounds are DENIED.

### 3.   **Deterrence Claims.**

To succeed on a claim for deterrence of protected speech, a plaintiff "must provide evidence showing that by his actions the defendant deterred or chilled the plaintiff's political speech and such deterrence was a substantial motivating factor in the defendant's conduct." *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999). A plaintiff need not "demonstrate that his speech was actually inhibited or suppressed." *Id*. Rather, plaintiff is only required to demonstrate that

46

defendants "intended to interfere" with his or her First Amendment Rights. *Id.* (internal citations and quotations omitted). Intent to inhibit speech can be demonstrated either through direct or circumstantial evidence. *Id.* at 1300-01. "Because it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity, ... the proper inquiry asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* at 1300 (internal citations and quotations omitted).

Plaintiffs do not clearly distinguish between the retaliation and deterrence claims in this case, citing the same evidence in support of both groups of claims. (Doc. 78 at 9; Doc. 82 at 23-24.)[21] Defendants' motions focus on the retaliation claims and only spend a few paragraphs challenging the deterrence claims. One of Defendants' arguments merits some discussion. In their reply brief, Defendants suggest that Hart should not be permitted to maintain a deterrence claim because all of the adverse actions he claims to have suffered post-date Oyarzo's "hour of need." (Doc. 90 at 22.) In other words, Defendants maintain that by the time Hart suffered any adverse action, Oyarzo had succeeded in returning to his job and was off on medical leave. It follows, according to Defendants' argument, that there was no need for Hart to make any further speech on Oyarzo's behalf and therefore that Hart's

---

[21] As one district court in this Circuit recently explained, "retaliation" and "chilling" (otherwise referenced as "deterrence") "are simply two different ways of proving a § 1983 claim for a First Amendment violation more generally…." *Rayford v. Omura*, 400 F. Supp. 2d 1223, 1229 (D. Haw. 2005).

To succeed on his claim that a government official chilled his First Amendment rights, [a plaintiff] "must provide evidence showing that [the defendant] 'deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.' " *Menotti v. City of Seattle*, 409 F.3d 1113, 1155 (9th Cir. 2005) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994))….The Ninth Circuit has set forth a slightly different standard for a First Amendment retaliation claim, however …. In the typical retaliation case involving a governmental employee or contractor, the plaintiff must demonstrate that "(1) it engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against it; and (3) its expressive conduct was a substantial or motivating factor for the adverse action." [*Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004)]....

The test in retaliation cases is therefore similar to the test discussed *supra* (for a non-retaliation claim) in that both tests require that a government official act and do so with the intention of stifling protected speech.… In short, § 1983 permits [a plaintiff] to recover … if the Defendants infringed upon his First Amendment rights regardless of whether [plaintiff] labels the violation as "chilling" or "retaliation." [Plaintiff] must prove that the Defendants infringed upon his rights and that the Defendants intended to do so; to prove infringement, [plaintiff] can prove either that he was actually harmed by the Defendants' actions or that the Defendants' actions would chill a person of ordinary firmness from speaking against the Defendants in the future.

*Id.* at 1229-31.

47

claim of deterrence is nonsensical.

Hart claims to have spoken out on Oyarzo's behalf during the summer or early fall of 2010. (*See* Hart Depo. 150:13-21, 171:9-15, 186:15-188:15.) The latest actual date Hart gives for any such speech is in late August 2010. (Hart Depo at 187:17-18.) Oyarzo was returned to his job at the rank of Captain on September 6, 2010. (MSUF # 9.) From September 27, 2010 through December 11, 2010, Oyarzo was on medical leave. (MSUF #11.) There is no suggestion in the record that Oyarzo's job status was in danger during his medical leave. However, the general standard for deterrence inquires whether a defendant's "acts would chill or silence a person of ordinary firmness from <u>future First Amendment activities</u>." *Mendocino Envtl. Ctr.*, 192 F.3d at 1300 (emphasis added). Defendants do not identify and the Court cannot locate any authority limiting "future First Amendment activities" to speech on the very same subject about which plaintiff may have previously spoken.

Having been presented with no legal bases upon which to reach different conclusions as to the retaliation and deterrence claims, those claims rise and fall with the retaliation claims. Where there is proof of an adverse action, the Court does not see any reason why this would not also serve as proof of an action that would "chill or silence a person of ordinary firmness from future First Amendment activities." Individual Defendants' motions for summary judgment as to Plaintiffs' retaliation claims are GRANTED IN PART AND DENIED IN PART. Those deterrence claims that parallel surviving retaliation claims also survive summary judgment.

**B.    FEHA Claims.**

The Thirteenth Cause of Action is for "harassment" under California's Fair Employment & Housing Act, Cal. Gov. Code §§ 12940, et seq. This claim is brought by Oyarzo against Defendants Turner and Hutchins and by Hart against Defendants Hockett and Powers.

**1.    Oyarzo's FEHA Claim Against Turner and Hutchins.**

The FEHA Claim alleges that "Defendants Turner and Hutchins intentionally subjected [Oyarzo] to pervasive and harmful, annoying, humiliating, and distressing treatment on the basis of his age and marital status with the intent to annoy, threaten, or offend him." (SAC ¶ 130.) Defendants Turner and

48

Hutchins move for summary judgment on this claim. (Doc. 69-3 at 22-24; Doc. 70-1 at 22-24.) Oyarzo does not oppose these motions because "discovery in this case has demonstrated that while animus regarding Oyarzo's age and marital status played a role in Turner's and Hutchins' willingness to terminate Oyarzo's employment, Turner's and Hutchins' repeated retaliatory acts against Oyarzo stemmed from their anger with Oyarzo for his actual and anticipated annexation efforts," meaning that "the harassment to which Oyarzo was subjected by Turner and Hutchins was not motivated by Oyarzo's protected status under Government Code §12900 et seq." (Doc. 82 at 28.) Accordingly, Turner's and Hutchins' motions for summary judgment on Oyarzo's FEHA claim are GRANTED.

### 2.     Hart's FEHA Claim Against Powers and Hockett.

The FEHA claim alleges, among other things, that Defendant Powers "subjected him to pervasive and harmful, annoying, humiliating, and distressing treatment on the basis of his association with Mr. OYARZO who was harassed and discriminated against based on his age and marital status with the intent to annoy, threaten, or offend him." (SAC ¶ 131.)

Powers moves for summary judgment on this claim. (Doc. 66-3 at 21-23.) Hart does not oppose the motion because "discovery in this case has demonstrated that the associational harassment Hart suffered at the hands of Powers stemmed from Powers' anger with Oyarzo for having reported safety violations rather than from Powers' discriminatory animus toward Oyarzo's age or marital status." (Doc. 78 at 12.)

Defendant Hockett also moves for summary judgment on this claim. (Doc. 67-1 at 22-24.) For the same reason, Hart does not oppose this motion. (Doc. 82 at 28.)

Accordingly, Defendant Hockett's and Defendant Powers' motions for summary judgment on Hart's FEHA claim are GRANTED.

### C.     Punitive Damages.

### 1.     Oyarzo's Claims Against Powers.

Powers moves for summary judgment as to Oyarzo's prayer for punitive damages against him. Oyarzo does not object to this motion. (Doc. 78 at 13.) Accordingly, and because Oyarzo's first

amendment claims do not survive summary judgment, Powers' motion for summary judgment as to

Oyarzo's punitive damages prayer against him is GRANTED.

## 2.   Remaining Punitive Damages Prayers Against the Individual Defendants.

All of the Individual Defendants move for summary judgment that Oyarzo and Hart cannot

sustain claims for punitive damages as to any of their remaining claims. (Doc. 81 at 10; Doc. 90 at 25.)

To recover punitive damages against an individual officer in a § 1983 case, a plaintiff must show that

the officers' conduct is "motivated by evil motive or intent" or "involves reckless or callous indifference

to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983). The Ninth Circuit has

further explained that "[t]he standard for punitive damages under § 1983 mirrors the standard for

punitive damages under common law tort cases," which extends to "malicious, wanton, or oppressive

acts or omissions." *Dang v. Cross,* 422 F.3d 800, 807 (9th Cir. 2005) (citing *Wade,* 461 U.S. at 49, 54).

Punitive damages may be available in a § 1983 suit "even in the absence of a compensable injury";

indeed, "[i]n such situations 'punitive damages may be the only significant remedy available.' " *Mendez*

*v. Cnty. of San Bernardino,* 540 F.3d 1109, 1122 (9th Cir. 2008) (quoting *Wade,* 461 U.S. at 55 n. 21).

The standard for awarding punitive damages under California law is similar. Under California

law, punitive damages may be appropriate "where it is proven by clear and convincing evidence that the

defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. Malice may be shown

where the defendant exhibits "the motive and willingness to vex, harass, annoy, or injure," *Nolin v. Nat'l*

*Convenience Stores, Inc.,* 95 Cal. App. 3d 279, 285 (1979) (internal quotation marks omitted), or a

"conscious disregard of the rights and safety of others," *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.

4th 965, 1000 (1993). A plaintiff may establish malice "by indirect evidence from which the jury may

draw inferences." *Taylor v. Superior Court,* 24 Cal. 3d 890, 894 (1979).

Defendants argue that there is no evidence to support punitive damages claims in this case

because there is no evidence any of the Individual Defendants acted with an evil motive or reckless

indifference to rights. This argument ignores the balance of authority indicating that if a plaintiff is able

to establish intentional discriminatory conduct (an element of both retaliation and deterrence First

50

Amendment claims), that plaintiff "would by definition have satisfied the requirement for showing the 'reckless indifference' required for an award of punitive damages." *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 324 (N.D. Cal. 1992); *see also Lucid v. City & Cnty. of San Francisco*, 774 F. Supp. 1234, 1240 (N.D. Cal. 1991) (refusing to grant defense motion regarding punitive damages in First Amendment case where plaintiffs contended defendants harassed plaintiffs and threatened plaintiffs with termination). Evidence of retaliation can satisfy the standard. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1199 (9th Cir. 2002) (punitive damages award withstood challenge where defendants excluded plaintiffs from decision making process and harassed plaintiffs after they filed a discrimination complaint); *Johnson Consumer Prods., Inc.,* 212 F.3d 493, 514-516 (9th Cir. 2000) (evidence of retaliation was "unquestionably sufficient" to satisfy the "malice or reckless indifference" standard for punitive damages under Title VII).

Because none of Oyarzo's claims against Individual Defendants have survived summary judgment, the remaining Individual Defendants are entitled to summary judgment on Oyarzo's punitive damages prayer against them.

Because, based upon the undisputed evidence and Hart's evidence viewed in a light most favorable to him, a finder of fact might reasonably find that Powers and/or Hockett retaliated against Hart for protected speech, a finder of fact might also find that Powers and/or Hart acted with malice or reckless disregard of Hart's rights. Powers and Hockett's motions for summary judgment as to Plaintiffs' punitive damages prayers against them are DENIED.

## V. TUOLUMNE FIRE DISTRICT'S MOTIONS

**A.     Claims/Issues Regarding TFD No Longer in Dispute.**

    **1.     Oyarzo's Claim of Retaliation Based Upon His Validation Action.**

Oyarzo's Third Cause of Action for retaliation is based in part on Oyarzo's July 2010 validation action. (SAC ¶ 78.) TFD moved for summary judgment on this issue, arguing there is no evidence to support this theory of relief. (Doc. 71-2 at 12.) Oyarzo does not oppose this argument. (See supra, Part IV.A.d.) Accordingly, TFD's motion for summary judgment as to Oyarzo's First Amendment retaliation

51

claim based upon his validation action is GRANTED.

**2.      Hart's Claims of Deterrence and Retaliation Based Upon His Participation in Annexation.**

TFD moves for summary judgment on Hart's claims for First Amendment deterrence and retaliation based on his participation in in the annexation effort. (Doc. 71-2 at 8.) Hart did not respond to these arguments, and maintains only that Hart was deterred and retaliated against based upon his support for Oyarzo. (*See* Doc. 82 at 20-24.) TFD's motion for summary judgment on any First Amendment claim based upon Hart's annexation effort theory of liability is GRANTED.

**3.      Oyarzo and Hart's Claim of Deprivation of a Liberty Interest.**

Oyarzo and Hart's Fifth Cause of Action for violation of Due Process against TFD is based in part on the allegation that Oyarzo and Hart were deprived of a liberty interest in their employment. (SAC ¶¶ 86-87.) TFD moved for summary judgment on this claim. (Doc. 71-2 at 12-13; Doc. 72-1 at 14-15.) Neither Hart nor Oyarzo opposed this argument. Accordingly, TFD' motions for summary judgment as to any deprivation of a liberty interest claim are GRANTED.

**4.      Oyarzo and Hart's Claim That TFD Acted in Conformance with an Official Policy or Practice.**

Oyarzo and Heart's Sixth Cause of action under 42 U.S.C. § 1983 against TFD is premised in part on the existence of a TFD official policy, custom, or practice of tolerating, encouraging and/or approving violations of employee's constitutional rights to engage in political activity and to due process of law. (SAC ¶ 94.) TFD moved for summary judgment on this issue, arguing there is no evidence to support this theory of liability. (Doc. 71-2 at 15-16; Doc. 72-1 at 16-18.) Oyarzo and Hart fail to contest this argument. (Doc. 88 at 20-22 (asserting only theories of ratification and longstanding practice)). Accordingly, TFD's motions for summary judgment as to any Section 1983 claim based upon official policy, custom, or practice are GRANTED.

//

//

//

**B.      Remaining Claims Against TFD.**

      **1.      Oyarzo's FLSA Claim.**

The First Cause of action arises under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and is brought by Plaintiffs Oyarzo and Hart against TFD to obtain relief for hours worked without compensation. (FAC ¶¶ 65-69.) Hart and TFD have reached a settlement on Hart's FLSA claim (Doc. 74), leaving only Oyarzo's claim for uncompensated hours worked.

      **a.      Failure to Include Challenge to FLSA Claim in Notice of Motion.**

Federal Rule of Civil Procedure 7(b)(1) provides: "A request for a court order must be made by motion. The motion must ... (B) state with particularity the grounds for seeking the order; and (C) state the relief sought." Plaintiffs complain that Defendants failed to include in their notice of motion any request or grounds for summary judgment as to Oyarzo's first cause of action, but admit that such a request, along with legal argument, was presented in the accompanying legal memorandum. (Doc. 88 at 12.) The Court can find no support for applying Rule 7 to bar Defendants from challenging Oyarzo's FLSA claim. Omission from the notice of motion of an argument contained within the contemporaneously filed memorandum in support cannot possibly prejudice Plaintiffs in any way. *See Wallace v. Am. Tel. & Tel. Co., Inc.*, 460 F. Supp. 755, 758 n.5 (E.D.N.Y. 1978) (considering argument even though it was not set forth in the notice of motion where it was raised in the memorandum of law and reply).

      **b.      Notice of Unpaid Overtime Hours.**

The relevant standards are well established. Under the FLSA, an employer must play employees for all "hours worked." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902 (9th Cir. 2003) (citing 29 U.S.C. § 207). "Work not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. The words "suffer" and "permit" mean "with the knowledge of the employer." *Fox v. Summit King Mines, Ltd.*, 143 F.2d 926, 932 (9th Cir. 1944). An employer who "knows or should have known that an employee is or was working" without compensation must comply with the provisions of the FLSA. *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1981); 29 C.F.R. § 785.12 (If an "employer knows or

has reason to believe that the work is being performed," the employer must "count the time as hours worked.").

"However, where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of [the FLSA]." *Forrester*, 646 F.2d at 414. In *Forrester*, the defendant employer was entitled to summary judgment where the employee "deliberately omitted" to include overtime hours in a time sheet "even though he admittedly knew that he would have been paid for those hours." *Id*. This is the case even though the employer may have known that the worker was putting in extra hours; to violate the FLSA, the employer must have knowledge (actual or constructive) that the time was unreported. "The relevant knowledge is not 'I know that the employee was working,' but 'I know the employee was working and not reporting his time.'" *Raczkowski v. TC Const. Co., Inc*., 8 F.3d 29, *1 (9th Cir. 1993) (applying *Forrester* to bar FLSA claim even though employer "might have seen [employee] while he as allegedly working on unreported time).

In *Forrester*, the employee was aware that overtime was supposed to be recorded and knew that his employer regularly paid for reported overtime. *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 475 F. Supp. 630, 631 (D. Or. 1979). Although the store manager observed Forrester on occasions when Forrester later claimed he had been working uncompensated overtime, there was no evidence that the manager was aware that those hours were uncompensated. *Id*. Had the manager even known of Forrester's normal work schedule, any inquiry into Forrester's wage records would have shown that he was being paid for approximately sixteen hours of overtime each pay period. *Id*. Nothing put the employer on notice that Forrester might have been working more than he claimed in overtime. *Id*.

During the relevant time period, Oyarzo was compensated on an hourly basis. Although the Board expressed an intention to make Oyarzo a salaried employee, this never happened, and he was paid at the hourly rate of $21.00 per hour from the time of his promotion to Chief through the end of his employment with TFD. (JSF ## C, F, T; Plaintiffs' Consolidated Response to TFD's Statement of

Undisputed Material Fact ("CTFDSUF") #68.[22]) All TFD employees, including Oyarzo, were obligated

to fill out a time sheet for each day worked. (TFD Ex. A10, TFD Policies & Procedures Manual § 4.00B,

at OH 000483). Each employee was obligated to ensure that his timesheet was accurate and recorded all

time worked. (*Id.* § 400.C, D). In addition, it was the Fire Chief's[23] responsibility to "verify that the

hours recorded are the same as the hours worked." (*Id.* § 4.00A.) However, an employer "cannot hide

behind a policy of having employees keep their own time to avoid compensating the employees for all

overtime hours worked, including unrecorded hours. *Skelton v. Am. Intercontinental Univ. Online*, 382

F. Supp. 2d 1068, 1071 (N.D. Ill. 2005); see also *Humana, Inc. v. Shook,* 798 F.2d 469, *1-3 (6th Cir.

1986) (unpublished) (per curiam) (holding that employee testimony that a supervisor was aware an

employee started work before her shift and continued working after it ended created genuine issues of

material fact as to asserted unpaid overtime work, the reasons underlying the alleged under-reporting on

time records, and the employer's knowledge of the unpaid overtime, even though the employee admitted

no supervisor had ever asked her to perform the off-the-clock work, and it was the employer's policy to

mark down all extra time); 29 C.F.R. § 785.13 ("[I]t is the duty of the management to exercise its

control and see that the work is not performed if it does not want it to be performed. It cannot sit back

and accept the benefits without compensating for them. The mere promulgation of a rule against such

work is not enough. Management has the power to enforce the rule and must make every effort to do

so.").

Oyarzo presents evidence that members of TFD's board had certain knowledge that he was putting in

extra hours at the firehouse. (Hutchins Depo. 143:22-144:2 (Oyarzo reported to the Board that he was at

the firehouse "all the time"), 145:12 –150:18 (recounting conversation with Oyarzo about him "being

there 24/7" and her belief that this was "going to burn him out really fast"; also explaining her

---

[22] For the sake of efficiency, the Court will refer to Plaintiffs' Consolidated Response to TFD's Statement of Undisputed Material Fact, Doc. 91, rather than the individual statements of fact filed in connection with each of TFD's motions.
[23] As discussed above, *supra* Part IV.A.2.b(2)(a)-(c), Oyarzo's contention that he was not the Fire Chief during the relevant period of time is without legal support.

impression that Oyarzo was a salaried employee).)[24] Although Oyarzo has no direct evidence that TFD

or any member of its Board knew he was working without pay, there is some authority to suggest that an

FLSA claim should survive summary judgment where there is evidence of employer knowledge that an

employee was working overtime and reasonable diligence would have revealed that the employee was

not being paid for that overtime. *Ketchum v. City of Vallejo*, 523 F. Supp. 2d 1150, 1163-64 (E.D. Cal.

2007) *modified on reconsideration*, 2007 WL 4356137 (E.D. Cal. Dec. 11, 2007) (citing *Reich v. Dep't*

*of Conservation & Natural Res., State of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994) ("An employer's

knowledge of overtime hours worked is measured in accordance with his duty to inquire into the

conditions prevailing in his business. This duty cannot be avoided simply because the business precludes

his personal supervision and compels reliance on subordinates. In reviewing the extent of an employer's

awareness, a court need only inquire whether the circumstances were such that the employer either had

knowledge of overtime hours being worked or else had the opportunity through reasonable diligence to

acquire such knowledge.")); *see also Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775, 781 (8th Cir.

2009)("Because constructive knowledge of overtime work is sufficient to establish liability under the

FLSA, if the [employer], through reasonable diligence, should have acquired knowledge that Plaintiffs

were working in excess of their scheduled hours, the jury would have been empowered to find the

[employer] liable.").

Oyarzo presents some evidence that the Board tracked TFD's finances. (Turner Depo. 70:5-

70:18.) Stephenie Burns, in testimony cited by Plaintiffs, states that she repeatedly requested payroll

records, but her requests were resisted by Turner and Hutchins. She was eventually permitted to review

some records, although it is unclear whether any of those records would have revealed that Oyarzo was

working extra hours without compensation. (Burns Depo. 52:4-53:4 (describing her persistent efforts to

view payroll records at a board meeting); 190:22-192:5 (explaining that because of her insistence,

payroll records were presented to the board on one occasion, but she was never permitted to see "who's

---

[24] Oyarzo claimed in his deposition that the board members "had full knowledge" that he was "work[ing] for free in order to help out the department." (Oyarzo Depo., 85:19-24.) But, this conclusory assertion does not establish that any member of the board knew or had reason to know that Oyarzo was not being compensated for the time he spent at the firehouse.

making what.").) With reasonable diligence (such as by complying with Stephenie Burns' request to see more detailed payroll records), TFD should have acquired knowledge of how many hours Oyarzo was claiming on his timesheets. In light of TFD Board members' undisputed knowledge that Oyarzo was working more than his regularly scheduled hours, Oyarzo has presented sufficient evidence for his FLSA claim to survive summary judgment.

TFD's motion for summary judgment on Oyarzo's FLSA claim is DENIED.

**2.       Section 1983 Claims Against TFD.**

The FAC contains three independent First Amendment claims (Second Cause of Action for unlawful deterrence by Oyarzo and Hart against all Defendants; Third Cause of Action for Retaliation by Oyarzo against all Defendants; Fourth Cause of Action for Retaliation by Hart against all Defendants) and a Fourteenth Amendment (due process) claim by Oyarzo and Hart against TFD. There is no private right of action permitting claims directly under any constitutional provision; such claims must be brought pursuant to 42 U.S.C. § 1983. *Azul–Pacifico, Inc. v. Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992) ( A "[p]laintiff has no cause of action directly under the United States Constitution.... [A] litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983."). Section 1983 creates a cause of action "against any person acting under color of law who deprives another of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). Here, the Sixth Cause of Action, brought by Oyarzo and Hart, directly alleges that Defendant TFD violated Plaintiffs' "right to engage in political activity and expression and to the due process of law." (SAC ¶¶ 91-94.)

Defendant TFD moves for summary judgment as to all of the federal constitutional claims, arguing (1) that the underlying constitutional claims fail as a matter of law; and (2) Plaintiff has failed to satisfy the requirements of *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978).

**a.       Underlying First Amendment Claims.**

**(1)       Oyarzo's First Amendment Claims.**

As discussed above, *supra* Part IV.A.2.b(s)(d), Oyarzo's First Amendment claims do not survive

57

summary judgment. Because his Section 1983 First Amendment claims against TFD is derivative of his underlying First Amendment claim, TFD is entitled to summary judgment on Oyarzo's Section 1983 First Amendment Claims and his stand-alone First Amendment Claims.

### (2)     Hart's First Amendment Claims.

TFD's challenges to the merits of Hart's First Amendment Claims mirror those presented by the Individual Defendants. Because Hart's underlying First Amendment claims have survived summary judgment, *see supra* Part IV.A.2.c, TFD is not entitled to summary judgment that Hart's underlying First Amendment claims fail as a matter of law.

### b.     Underlying Due Process Claims.

### (1)     Protected Property Interest.[25]

The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). To have a property interest in a governmental benefit, including employment, an individual must have an entitlement to the benefit. *Id.* at 577. Such entitlements are created by "rules or understandings" that stem from an independent source, such as relevant statutes, regulations, and ordinances, or express or implied contracts. *Id.* ("the procedural due process protections of the Fourteenth Amendment apply only to deprivations of property interests, the existence and dimensions of which are defined by existing rules or understandings that stem from an independent source such as state law.").

To determine whether a protected property interest exists in a given instance, courts look to state law. *WW Techs, Inc. v. Miller*, 80 F.3d 1315, 1318 (9th Cir. 1996) ("We look to state law to define the dimension of a protected property interest."). The presumption in California is that all employees are at-will employees. Cal. Lab. Code § 2922. At-will employees are those who can be fired with or without cause, subject only to limits imposed by public policy. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654,

---

[25] Oyarzo and Hart failed to oppose TFD's summary judgment motion on their alternative theory that TFD violated their protected liberty interest in employment. (*See supra* Part V.A.3.)

665 (1988). If an employee is one who can be fired with or without cause, that employee does not have an expectation of continued employment. "A mere expectation that employment will continue does not create a property interest. If under state law, employment is at-will, then the claimant has no property interest in the job." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993) (internal citations omitted). "There is no right [solely] under the substantive due process clause to be terminable only for cause." *Id.* at 902 n. 1.

A public employee in California who can establish the existence of rules and understandings, promulgated and fostered by state officials, that justify his legitimate claim to continued employment absent sufficient cause, has a property interest in such continued employment within the purview of the due process clause. *Skelly v. State Personnel Board*, 15 Cal. 3d 194, 207 (1975) (state civil servant who achieved "permanent employee" status had property interest protected by due process). Caselaw affirmatively establishes that a "California police officer has a protected property right in his or her employment [that] derives largely from Cal. Gov. Code § 3304(b)." *Barberic v. City of Hawthorne*, 669 F. Supp. 985, 989 (C.D. Cal. 1987) (emphasis added). Section 3304(b) provides that "[n]o punitive action, nor denial of promotion on grounds other than merit, shall be undertaken by any public agency against any public safety officer who has successfully completed the probationary period that may be required by his or her employing agency without providing the public safety officer with an opportunity for administrative appeal." Plaintiffs point out, correctly, that the parallel Government Code provision applicable to firefighters provides essentially identical protections. *See* Cal. Gov. Code § 3254 ("Punitive action or denial of promotion on grounds other than merit shall not be undertaken by any employing department or licensing or certifying agency against any firefighter who has successfully completed the probationary period without providing the firefighter with an opportunity for administrative appeal."). This Chapter of California's Government Code, otherwise known as the Firefighters Procedural Bill of Rights ("FPBOR"), defines "punitive action" to mean "any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." Cal. Gov. Code § 3251(c). Pursuant to these provisions, as a general rule, a

California Firefighter has a property interest in continued employment.

### (2)    Oyarzo's Asserted Property Interest in Employment.

Defendants correctly point out that the FPBOR contains provisions specifically addressing the rights of Fire Chiefs. Among other things, section 3254(c) provides that "[n]othing in this subdivision shall be construed to create a property interest, if one does not otherwise exist by rule or law, in the job of fire chief." Accordingly, a Fire Chief has no property interest in continued employment. This is of little moment to Oyarzo's claims in this case because, even if one credits Oyarzo's evidence regarding his promotion to the rank of Fire Chief, it is undisputed that he was returned from leave to the rank of Captain, at which rank he remained until his final day of employment with TFD. Oyarzo's only due process allegation concerns his alleged constructive termination from the rank of Captain. Therefore, the FPBOR's specific provision regarding the rank of Fire Chief is not dispositive of the property interest inquiry for Oyarzo due process claims.[26]

### (3)    Hart's Asserted Property Interests.

#### (a)    Hart's Asserted Interest in Not Being Disciplined.

Hart claims that he was deprived of a protected property right when Hockett placed into Hart's personnel record a "Record of Discussion" following Hart's involvement with permitting Nick Burns to volunteer at the firehouse and a "Formal Warning" following Hart's failure to attend the October 2010 funeral. (*See* Doc. 88 at 19.) However, Plaintiffs cite no authority for the proposition that merely placing a disciplinary record in a personnel file amounts to a deprivation of a property interest protected by the due process clause of the Fourteenth Amendment. Rather, available authority suggests placement of a reprimand letter in a personnel file does not, on its own support a due process claim. *Lowe v. Kansas City Bd. of Police Com'rs*, 841 F.2d 857, 858 (8th Cir. 1988) (placing in a police officer's personnel file a letter of reprimand, which did not result in any loss of rank or pay, did not deprive the officer of a constitutionally protected interest); *Linhart v. Glatfelter*, 771 F.2d 1004, 1008-09 (7th Cir. 1985); *see*

---

[26] Oyarzo does not claim that his forced three-week vacation, time which was eventually credited back to him, was a deprivation of a property interest. (Doc. 88 at 19-20.)

*also Bloodworth v. City of Phoenix*, 26 F. App'x 679, 682 (9th Cir. 2002) (unpublished) (relying on

*Lowe* and *Linhart*).[27] Hart has adduced no evidence that even suggests the placement of these letters in

his personnel file resulted in any loss of rank or pay. TFD is entitled to summary judgment as to any due

process claim based upon the Record of Discussion or Formal Warning.

### (b)      Hart's Asserted Interest in Not Being Terminated.

As discussed above, Hart did have a protected property interest in his employment as a

firefighter. Defendants have not pointed to any possible basis for exempting Hart from this general rule.

### (4)      What Process is Due?

"Once it is determined that due process applies, the question remains what process is due." *Ass'n*

*for Los Angeles Deputy Sheriffs v. Cnty. of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011).  To

determine "what process is due," the Court balances three factors:

> First, the private interest that will be affected by the official action; second, the risk of
> erroneous deprivation of such interest through the procedures used, and the probable
> value, if any, of additional or substitute procedural safeguards; and finally, the
> Government's interest, including the function involved and the fiscal and administrative
> burdens that the additional or substitute procedural requirements would entail.

*Brewster v. Board of Educ. of Lynnwood Unified School Dist.*, 143 F.3d 971, 983 (9th Cir. 1998)

(quoting *Matthews v. Eldridge*, 424 U.S. 319, 335, (1976)). Stated a simpler way, due process requires

that "a person deprived of property be given an opportunity to be heard at a meaningful time and in a

meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Defendants make several complex arguments why no pre-termination hearing was required, why

the legislative process satisfied any entitlement to a pre-termination hearing, and/or why Plaintiffs' due

process claims should fail because they did not request either a pre-termination or post-termination

hearing. In the interest of efficiency and to avoid ruling on unnecessary questions of law, the Court

---

[27] It is of no moment that the FPBOR provides a procedure for appealing any "punitive action," which includes written
reprimands. Not every procedural protection related to employment creates a constitutionally cognizable property interests.
*Clemente v. United States*, 766 F.2d 1358, 1364 (9th Cir. 1985). "To hold otherwise would immediately incorporate virtually
every regulation into the Constitution." *Id.* "A constitutionally protected interest has been created only if the procedural
requirements are intended to be a significant <u>substantive</u> restriction on decision making." *Id.* at 1365 (internal citation and
quotation omitted)(emphasis added). No such substantive restriction is created by the procedural provisions in the FPBOR
concerning written reprimands.

1   declines to address these arguments because Plaintiffs' have failed to satisfy *Monell*.[28]

2       c.      *Monell.*

3       The question then becomes whether Plaintiffs have elicited any *Monell* evidence in connection

4   with their surviving constitutional claims. *Monell*, 436 U.S. at 690-91, provides that a municipality

5   cannot be liable under § 1983 on a *respondeat superior* theory (i.e., simply because it employs someone

6   who deprives another of constitutional rights). Rather, liability only attaches where the municipality

7   itself causes the constitutional violation through a "policy or custom, whether made by its lawmakers or

8   those whose edicts or acts may fairly be said to represent official policy." *Id*. at 694. Therefore,

9   municipal liability in a § 1983 case may be premised upon: (1) an official policy; (2) a "longstanding

10  practice or custom which constitutes the standard operating procedure of the local government entity;"

11  (3) the act of an "official whose acts fairly represent official policy such that the challenged action

12  constituted official policy"; or (4) where "an official with final policy-making authority delegated that

13  authority to, or ratified the decision of, a subordinate." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).

14  Plaintiffs advance both "pattern and practice" and "ratification" theories. (Doc. 88 at 20-21.)

15              (a)      **Pattern & Practice.**

16      To prevail on a pattern and practice claim, plaintiff must prove "the existence of a widespread

17  practice that ... is so permanent and well settled as to constitute a 'custom or usage' with the force of

18  law." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (quoting *City of St. Louis v. Praprotnik*,

19  485 U.S. 112, 127 (1988)).

20      Plaintiffs offer two examples of prior incidents they claim demonstrate a "widespread pattern

21  and practice." First, according to Plaintiffs' evidence, former Chief Rex Buthmann was called before the

22  Board three times in 2007, each time to receive some form of "performance evaluation," and each time

23  "with no notice that punitive actions may be taken against him." Following the final session, Buthmann

24

25  _____

26  [28] Plaintiffs name no individual defendants in their due process claims, presumably because the Individual TFD Board members have been found to be absolutely immune from liability for their legislative acts, including their votes in favor of reorganization.

1  was terminated. (*See* Doc. 88 at 21 (citing Buthmann Depo. 70-76, 82-86)). None of these incidents can

2  form the basis for a pattern of Due Process violations, because Buthmann, whose rank was Chief at the

3  time, had no protected property interest in his continued employment. (*See supra* Part V.B.2.b(2)

4  (discussing Cal. Gov. Code § 3254(c)).)

5  The remaining example offered by Plaintiffs concerns the treatment of former TFD Captain

6  James Rafferty. According to Plaintiff's evidence, Rafferty was disciplined by the TFD Board and later

7  placed on administrative probation without notice or a hearing. (*See* Doc. 88 at 21-22 (citing Rafferty

8  Depo. 15-16, 24-27, 34-35).) Even assuming, arguendo, that Rafferty's placement on administrative

9  probation without notice or a hearing violated Rafferty's due process rights, evidence of only one prior

10  incident does not raise a triable fact as to whether there was a "pattern and practice" of unconstitutional

11  conduct. *See Meehan v. County of Los Angeles,* 856 F.2d 102, 107 (9th Cir. 1988). TFD is entitled to

12  summary judgment as to any pattern and practice basis for a due process retaliation claim against TFD.

13  Neither the Buthmann nor the Rafferty examples even arguably support a pattern and practice of

14  First Amendment retaliation, as there is absolutely no evidence that the Board's treatment of either was

15  preceded by any protected activity. Accordingly, TFD is also entitled to summary judgment as to any

16  pattern and practice basis for a First Amendment retaliation claim against TFD.

17  **(a)**     **Ratification.**

18  To show ratification, a plaintiff must prove that an "authorized policymaker[] approve[d] a

19  subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)

20  (quoting *Praprotnik*, 485 U.S. at 127); *see also Lytl*e, 382 F.3d at 987.

21  > There must, however, be evidence of a conscious, affirmative choice on the part of the
   > authorized policymaker. A local government can be held liable under § 1983 only where
22  > a deliberate choice to follow a course of action is made from among various alternatives
   > by the official or officials responsible for establishing final policy with respect to the
23  > subject matter in question.

24  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010) (internal citations and

25  quotations omitted)

26  There is no ratification evidence presented regarding Hart's First Amendment claims. (*See* Doc.

63

1   88 at 20-22.) Therefore, TFD is entitled to summary judgment as to any ratification theory for Hart's

2   First Amendment claims.

3        Plaintiffs assert that their ratification evidence comes in the form of "explicit ratification by the

4   ultimate policymaker, the Board of Directors through the experiences of former employees Chief Rex

5   Buthmann and Captain James Rafferty." (Doc. 88 at 21.) Plaintiffs misunderstand the nature of a

6   ratification claim, which is concerned with whether the Board ratified the allegedly unlawful conduct of

7   a subordinate at issue in this case, not whether they ratified prior incidents.

8        Plaintiffs advance no other *Monell* theories. Accordingly, Defendants are entitled to summary

9   judgment on Plaintiffs' Section 1983 due process claims against TFD.

10  **C.**   **California Labor Code § 6310.**

11       Hart alleges that TFD retaliated against him for reporting safety violations in violation of

12  California Labor Code ("CLC") § 6310. (SAC ¶ 97.) CLC § 6310 prohibits discharge or discrimination

13  against an employee who "[m]ade any oral or written complaint to the division, other governmental

14  agencies having statutory responsibility for or assisting the division with reference to employee safety or

15  health, his or her employer, or his or her representative." CLC § 6310(a)(1). Subsection (b) prohibits

16  retaliation:

17           Any employee who is discharged, threatened with discharge, demoted, suspended, or in
             any other manner discriminated against in the terms and conditions of employment by his
18           or her employer because the employee has made a bona fide oral or written complaint to
             the division, other governmental agencies having statutory responsibility for or assisting
19           the division with reference to employee safety or health, his or her employer, or his or her
             representative, of unsafe working conditions, or work practices, in his or her employment
20           or place of employment, or has participated in an employer-employee occupational health
             and safety committee, shall be entitled to reinstatement and reimbursement for lost wages
21           and work benefits caused by the acts of the employer….

22  CLC § 6310(b).

23       "To establish a prima facie case of retaliation, a plaintiff must show that [1] []he engaged in a

24  protected activity, [2] that [he] was  thereafter subjected to adverse employment action by [his]

25  employer, and [3] there was a causal link between the two." *Muller v. Auto. Club of So. California*, 61

26  Cal. App. 4th 431, 451 (1998), disapproved on other grounds by *Colmenares v. Braemar Country Club,*

*Inc.*, 29 Cal. 4th 1019 (2003), superceded by statute on other grounds as recognized by *Bryan v. United Parcel Serv., Inc.*, 307 F. Supp. 2d 1108, 1113 (N.D. Cal. 2004) (internal citation and quotation omitted).

An activity is "protected" if it is "tethered to fundamental policies that are delineated in constitutional or statutory provisions." *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 71 (1998) (internal citation and quotation omitted).

### 1.   Oyarzo's CLC § 6310 Claim.

#### a.   Protected Activity.

Oyarzo states in his declaration that he reported safety violations to the TFD Board:

> In March 2010, I discovered that two self-contained breathing apparatuses (SCBAs) had not been properly tested by the firefighting staff and posed a safety risk to the firefighters. After discovering that the units had not been inspected as required by the firefighting members, I verbally admonished the firefighting staff and reported the safety violation to the TFD Board.

(Oyarzo TFD Decl., Doc. 89-4, ¶ 36.)

TFD argues that any reports Oyarzo made to the Board on this subject do not constitute "protected activity" for purposes of § 6310 because all such alleged safety violations were Oyarzo's direct responsibility and therefore cannot constitute "whistleblowing" activity under the Labor Code. (Doc. 72-1 at 19.) In support of this assertion, TFD cites *Muniz v. United Parcel Serv.*, 731 F. Supp. 2d 961, 969 (N.D. Cal. 2010) and *Edgerly v. City of Oakland*, 211 Cal. App. 4th 1191, 1207 (2012). *Muniz* concerned retaliation claims under California Labor Code § 98.6 and § 1102.5. Section 98.6 prohibits retaliation against employees who engage in a variety of protected conduct, while Section 1102.5 prohibits retaliation against employees who "disclos[e] information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." *Muniz*, a manager, was responsible for ensuring that employees complied with legal requirements. 731 F. Supp. 2d at 963. She suspected supervisors were falsifying timecards to cover up violations of federal and state wage and hour laws. *Id.* She communicated these concerns internally to management, which resulted in

65

an internal audit and a warning being issued to supervisors. *Id*. Muniz remained concerned that the

conduct was continuing, so she again raised the issue with her superiors and requested a second audit.

*Id*. at 964. She alleged that she suffered adverse employment actions as a result of her reports. *Id*. at 964-

67. The employer argued that she should not benefit from protection under either § 98.6 or § 1102.5

because she was simply doing her job when she reported the timecard irregularities. *Id*. at 969. The

*Muniz* court concluded that Muniz could not maintain a retaliation claim under either § 98.6 or § 1102.5

because reporting timekeeping violations was part of her job duties. *Id*. at 969-70.

  *Muniz* relied on *McKenzie v. Renberg's Inc*., 94 F.3d 1478, 1486 (10th Cir. 1996), a case about

the FLSA's retaliation prohibition, 29 U.S.C. 215§ (a)(3), which extends to employees who file a

"complaint" or institute a "proceeding" or otherwise participate in such processes, *see* 29 U.S.C. §

215(a)(3). In *McKenzie*, the Tenth Circuit found that "it is the assertion of statutory rights (*i.e.*,

the *advocacy* of rights) by taking some action adverse to the company--whether via formal complaint,

providing testimony in an FLSA proceeding, complaining to superiors about inadequate pay, or

otherwise--that is the hallmark of protected activity under § 215(a)(3)." 94 F.3d at 1486. Because

"McKenzie never crossed the line from being an employee merely performing her job as personnel

director to an employee lodging a personal complaint about the wage and hour practices of her employer

and *asserting* a right adverse to the company, McKenzie did not initiate a FLSA claim against the

company on her own behalf or on behalf of anyone else." *Id*. Rather, "in her capacity as personnel

manager, she informed the company that it was at risk of claims that might be instituted by others as a

result of its alleged FLSA violations." *Id*.  In order to engage in protected activity under § 215(a)(3), the

employee must "step outside his or her role of representing the company and either file (or threaten to

file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or

otherwise engage in activities that reasonably could be perceived as directed towards the assertion of

rights protected by the FLSA." *Id*. at 1486-87.

  Likewise, in *Edgerly*, 211 Cal. App. 4th at 1206-07, an employee's refusal to honor

reimbursement requests she believed were inappropriate did not constitute protected conduct under §

1102.5, which makes it unlawful for an employer to, among other things, retaliate against an employee

"for refusing to participate in an activity that would result in a violation of state or federal statute, or a

violation or noncompliance with a state or federal rule or regulation." Absent a showing of conduct that

fell outside her normal work involvement, *Edgerly* did not engage in protected conduct. *Id.* at 1207.

Here, CLC § 6310 protects employees who "ha[ve] made a bona fide oral or written complaint ...

to his or her employer." While Oyarzo states that he "reported the safety violation to the Board," he

never made a "complaint" to the Board about those violations. It was Oyarzo's responsibility to monitor

and address such safety violations. Section 6310 is meant to protect employees who believe it is

necessary to "complain" about safety conditions and then suffer adverse actions as a result of such

complaints. According to the evidence submitted by Oyarzo, he did nothing more than keep the Board

informed of his management activities. He did not engage in activity protected by § 6310.

Accordingly TFD's motion for summary judgment on Oyarzo's § 6310 claim is GRANTED.

## 2.   Hart's CLC § 6310 Claim.

### a.   Protected Activity.

It is undisputed that when Oyarzo went on leave, Hart worked some shifts on his own. Hockett

testified that this occurred because TFD "didn't have the staffing" to place someone else on Hart's shift

and because "folks weren't willing to work with [Hart]." (Hockett Depo. 157:17-18). This was despite

the fact that Hockett didn't believe Hart was capable of working a shift on his own. (*Id*. at 156:12-14.)

Although Hart initially informed Hockett via email that Hart was "not worried" about working alone and

would "do fine" on a shift by himself (Hockett Exhibit B5), Hart stated in his declaration that he later

complained to both Hockett and Stephenie Burns about the "hazardous environment" that resulted from

working alone and responding to emergency calls alone. (Hart TFD Decl. ¶ 20.)[29] This constitutes a

"bona fide oral or written complaint … with reference to employee safety or health … [to Hart's]

employer … of unsafe working conditions, or work practices, in [Hart's] employment or place of

---

[29] *See* supra n. 19.

employment….” under CLC § 6310(b), and is therefore protected conduct.

### b.   Causal Link.

Hart states in his declaration that he complained to Hockett and Burns about working alone in mid-October 2010. Less than two months later, he was subject to disciplinary action. Hockett created the “Record of Discussion” concerning the Nick Burns incident on or about November 1, 2011 and the “Formal Warning” concerning the funeral on or about December 11, 2010.  (Hockett Exhs. B8 & B10.) Soon thereafter, Hart was laid off, ostensibly as part of the reorganization that took place in December 2010. (TFDMSUF, Doc. 91, #63.) For the purposes of their motion for summary judgment on Hart’s § 6310 claim, TFD does not dispute that these were adverse actions. In addition, Hart may establish causation by inference derived from circumstantial evidence, “such as the employer’s knowledge that the employee engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.” *Fisher v. San Pedro Peninsula Hospital,* 214 Cal. App. 3d. 590, 615 (1989) (internal citation and quotation omitted). Hart has shown temporal proximity between his protected activity and an adverse action. TFD’s motion for summary judgment as to Hart’s § 6310 claim is DENIED.

### D.   California Labor Code § 1102.5 Claim.

Both Oyarzo and Hart claim they were also retaliated against in violation of CLC § 1102.5 (SAC ¶¶ 102-108), which makes it unlawful for an employer to “retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of noncompliance with a state or federal rule or regulation.”

Defendants move for summary judgment on the ground that Plaintiffs have admitted they failed to exhaust their administrative remedies. Whether exhaustion is required under CLC §1102.5 has been much debated in the caselaw. The underlying argument for exhaustion is derived in part from *Campbell v. Regents of University of California*, 35 Cal. 4th 311 (2005), which required a plaintiff to exhaust the University of California’s own internal grievance procedures before proceeding to suit under CLC §

1102.5.

Plaintiffs maintain that exhaustion is not required, and cite a number of more recent cases, including a Second Appellate District decision in *Lloyd v. County of Los Angeles*, 172 Cal. App. 4th 320 (2009), which found that exhaustion of administrative remedies before the Labor Commissioner before filing suit for statutory violations of the Labor Code is not required under California law. This Court has addressed this dispute in detail in previous decisions. *Toth v. Guardian Indus. Corp.*, 2012 WL 1076213 (E.D. Cal. Mar. 29, 2012), reviewed many of the cases cited by the Parties, along with numerous others, on this issue:

> The parties dispute whether exhaustion of administrative remedies is necessary prior to bringing a § 1102.5 claim. Plaintiff's argument relies chiefly on *Creighton v. City of Livingston*, 2009 WL 3246825, (E.D. Cal. Oct. 7, 2009) (*Creighton II*) and *Lloyd v. County of Los Angeles*, 172 Cal. App. 4th 320, 90 (2009), both of which found that "[e]xhaustion of administrative remedies before the Labor Commissioner before filing suit for statutory violations of the Labor Code is not required under California law." *Creighton II*, 2009 WL 3246825 at * 12.
>
> Defendant, however, points to *Hanford Exec. Mgmt. Emp. Ass'n v. City of Hanford*, 2012 WL 603222 (E.D. Cal. Feb. 12, 2012), which found that *Creighton II* was an outlier case and *Lloyd* lacked sufficient analysis, while the majority of federal district court cases have found exhaustion necessary. *Id*. at * 15–17.
>
> *Handford* fully examines the same cases and issues raised here:
>
>> [In *Creighton II*, an order on reconsideration of *Creighton I*,] [t]he court observed the decisions it had relied upon in dismissing the plaintiff's claim in *Creighton I* were all federal district court decisions relying on [the seminal case] *Campbell [v. Regents of University of California*, 35 Cal. 4th 311 (2005)] to conclude that exhaustion of administrative remedies is required before the Labor Commissioner.' *Id*. at * 12. After systematically reviewing the California precedents on Labor Code administrative exhaustion, including Campbell, the court further observed:
>>
>>> No California decision requires as a prerequisite to suit for statutory violation of the Labor Code exhaustion of administrative remedies before the Labor Commissioner. California case law is to the contrary. By its terms, *Campbell* only held that exhaustion of *internal* administrative remedies is required; there is no discussion in Campbell of exhaustion of administrative remedies before the Labor Commission.
>>
>> *Id*. (emphasis [in] original). The court then held exhaustion of administrative remedies with the Labor Commissioner was not a prerequisite to filing suit for statutory Labor Code violations and denied the defendants' motion to dismiss. *Id*. In the Court's view, *Creighton II* is anomalous and unpersuasive.

69

*Campbell*, a unanimous decision by the California Supreme Court, involved a plaintiff, Janet Campbell, who ... brought an action against [Defendant Regents of the University of California ("Regents")] for retaliatory discharge in violation of California Government Code § 12653 and Labor Code § 1102.5, alleging she had exhausted all administrative remedies or was not required to exhaust them. *Id.* at 319. The Regents demurred to the complaint, arguing Campbell's refusal to avail herself of [UCSF's internal] complaint resolution process ... constituted a failure to exhaust administrative remedies.... Campbell [rejoined that] "the Legislature's statutory language, allegedly authorizing direct access to the court," implied the Legislature intended to abrogate the general rule of exhaustion of administrative remedies for section 1102.5 claims. *Id.* at 322. The court disagreed. After discussing the statute's legislative history, the court concluded exhaustion of administrative remedies was a prerequisite to filing suit for a statutory 1102.5 violation. *Id.* at 329–33.

*Creighton II* correctly observes that *Campbell* only required the plaintiff to allege exhaustion of internal UCSF administrative remedies before filing a section 1102.5 action; *Campbell* does not mention exhaustion of administrative remedies with the Labor Commissioner. Problematically for Plaintiffs, nothing suggests the *Campbell* court intended to limit its holding to require the exhaustion of only internal remedies, and no California decision has interpreted *Campbell* as narrowly as *Creighton II*. Furthermore, the *Campbell* court reasoned that the plaintiff was required to exhaust the administrative remedies available to her under UCSF's policies and procedures in part because they provide[d] a comprehensive system of administrative enforcement' over the claims she had asserted against the Regents. *Campbell, supra*, 35 Cal.4th at 328–29....

Plaintiffs further direct the Court to another case discussed in *Creighton II*, *Lloyd v. County of Los Angeles*, 172 Cal. App. 4th 320 (2009), wherein the Second District of the California Court of Appeal held that Labor Code § 98.7(a) merely provides the employee with an additional remedy, which the employee may choose to pursue,' and concluded there was no reason to ... impose an administrative exhaustion requirement on plaintiffs seeking to sue for Labor Code violations.' *Id.* at 331. *Lloyd*, however, did not distinguish *Campbell*, and the Court finds *Lloyd* to be unpersuasive for all of the reasons set forth in *Adams v. Robert Mondavi Winery Woodbridge*, 2009 WL 3166669 (Cal. App. 3d Dist. 2009) (unpublished), at *7–*9.

*Handford*, 2012 WL 603222 at * 15–17; *accord, Dolis v. Bleum USA, Inc.*, 2011 WL 4501979, * 2 (N.D. Cal. Sept. 28, 2011) (stating *Creighton II* is overly narrow, *Lloyd* lacks a full analysis, and finding exhaustion necessary); *Ferretti v. Pfizer Inc.*, 2012 WL 694513, * 5 (N.D. Cal. Feb. 29, 2012) (same); *see also, Reynolds v. City and County of San Francisco*, 2011 WL 4808423, * 1–2 (N.D. Cal. Oct.11, 2011) (finding exhaustion necessary, citing *Campbel*l ); *Chacon v. Housing Authority of County of Merced*, 2011 WL 2621313, *4 (E.D. Cal. Jun. 29, 2011) (same); *Cartwright v. Regents of University of California*,  2009 WL 2190072, * 7–8 (E.D. Cal. Jul. 22, 2009) (same); *Neveu v. City of Fresno*, 392 F. Supp. 2d 1159, 1180 (E.D. Cal. 2005) (same).

Adams found *Lloyd* "problematic" because it did not mention the seminal California Supreme Court case, Campbell, or many of the federal court cases which discuss the

issue. *Adams*, 2009 WL 3166669, *9. Further, Adams found that the cases Lloyd relied upon were unpersuasive. *Id*. For example, *Lloyd* cites *Daly v. Exxon Corp*., 55 Cal. App. 4th 39, 41–42 (1997). *Id*. Daly is a California appellate case which predates the California Supreme Court case Campbell by almost a decade and therefore is not the foremost authority. *Id*. Further, while Daly stated that there was no requirement that a plaintiff exhaust her administrative remedies, it did not provide any analysis; Daly simply made the statement and cited two cases from the 1980's. *Id*. The court finds the reasoning in *Handford*, *Adams*, and the vast majority of the other district court cases which have uniformly found exhaustion necessary, persuasive.

*Toth v. Guardian Indus. Corp*., 2012 WL 1076213 (E.D. Cal. Mar. 29, 2012) (parallel citations omitted); *see also LaCava v. Merced Irr. Dist*, 2012 WL 913697 (E.D. Cal. Mar. 16, 2012).

The Court has reviewed the other recent, out-of-District cases cited by Plaintiffs, including *Mango v. City of Maywood*, 2012 WL 5906665, *13 (C.D. Cal. Oct. 5, 2012), and *Ortiz v. Permanente Med. Grp., Inc*., 2013 WL 1748049, *4-5 (N.D. Cal. Apr. 23, 2013), and find the reasoning therein to be too cursory to warrant a conclusion different than that reached in *Toth* and *LaCava*. Exhaustion is required. It is undisputed that Plaintiffs failed to do so. TFD is entitled to summary judgment on its § 1102.5 claim.

**E.**     **Firefighters Procedural Bill of Rights.**

It is undisputed that Plaintiffs are both "firefighters" protected by the Firefighters Procedural Bill of Rights ("FPBOR"), Cal. Gov. Code. § 3250, *et seq*. It provides Firefighters with a variety of procedural protections against disciplinary action.[30] Plaintiffs allege their rights under this statute were violated in a variety of ways.

**1.**     **Investigation/Interrogation Rights.**

The FPBOR provides procedural protections that apply "[w]hen any firefighter is under investigation and subjected to interrogation by his or her commanding officer, or any other member designated by the employing department or licensing or certifying agency, that could lead to punitive action…" Cal. Gov. Code § 3253.

---

[30] The Legislative Counsel's Digest explained that: "The bill would prescribe rights related to, among others, political activity, interrogation, punitive action, and administrative appeals, with specified requirements imposed upon the employing agency and the imposition of a civil penalty for a violation thereof." *Int'l Assn. of Firefighters Local Union 230 v. City of San Jose*, 195 Cal. App. 4th 1179, 1187-88 (2011).

**a.** **Was Oyarzo Subjected to an Investigation/Interrogation?**

TFD argues that the Board meetings attended by Oyarzo cannot constitute an interrogation, but rather qualify as "routine … contact with, a supervisor or any other firefighter" which is exempted from coverage under § 3253. *See* Cal. Gov. Code § 3253(i). This contention finds no support in the law. Cases interpreting the parallel (and substantively similar) Peace Officers Procedural Bill of Rights ("POPBOR") provide some guideposts. The relevant cases are summarized and applied in *Paterson v. City of Los Angeles*, 174 Cal. App. 4th 1393, 1402-04 (2009):

> In *Steinert [v. City of Covina* (2006) 146 Cal. App. 4th 458]*, the Covina Police Department believed that Officer Steinert made a small mistake ("user error") while conducting a legitimate records search. That is, although the search was conducted when taking a vandalism report, Steinert did not input the crime report number, but designated the search as a training search. Steinert's supervising officer, Curley, spoke to her about this mistake and told her how the search should have been designated. He then asked one more question: whether she had disclosed any of the criminal history information to the victim of the vandalism. Steinert said that she had not.
>
> Crime report audits were part of Curley's job: he would audit two reports a week by contacting the person who reported the crime and asking whether the officer had responded courteously and appropriately. Because he had already reviewed Steinert's vandalism report, he used that report for one of his weekly audits. During the audit, the victim reported that Steinert had disclosed information from the records search. An internal investigation was launched, and Steinert was ultimately dismissed.
> Steinert sued for violation of the Act, contending that it applied to her conversation with Curley. The trial court found that the conversation was a routine communication between supervisor and officer, and the Court of Appeal found substantial evidence for the ruling. The conversation came about not because Steinert was suspected of wrongdoing, but because her supervisors believed that she had made a common mistake in the way she designated an entirely proper search. The purpose of the conversation was training, and nothing more. The Act did not apply.
>
> *City of Los Angeles [Superior Court*, (1987) 57 Cal.App.4th 1506, 1515] considered very different facts. There, supervising officers heard a citizen report that a male Filipino officer in a City car had driven past the site of a traffic accident, and gone to a doughnut shop, without stopping to render assistance, a serious offense. The supervising officers checked the duty log and questioned the owner of the doughnut shop, and learned that Officer Labio was the only male Filipino officer on duty that night, that a male Filipino officer had been to the doughnut shop, and that Labio did not have permission to use a City vehicle that night. Labio was then called in and questioned about his whereabouts that night and his use of the City car.
>
> Labio was terminated from his position, based on allegations that he used a City vehicle without authorization, failed to stop at the scene of an accident, made an unauthorized detour to a doughnut shop, made false and misleading statements related to his actions to his supervising officer, and on other grounds. (*City of Los Angeles v. Superior Court,*

72

*supra,* 57 Cal. App. 4th at p. 1511.) He sued, claiming that the Act applied to the questioning. The trial court and the Court of Appeal agreed. The Court of Appeal held that "the second paragraph of section 3303, subdivision (i) <u>is intended to cover innocent preliminary or casual questions and remarks between a supervisor and officer. It was included to avoid claims that almost any communication is elevated to an 'investigation.'</u> The subdivision excludes routine communication within the normal course of administering the department. There probably are cases in which routine questions and remarks begin to shade into an investigation to which subdivision (i) does not apply. We need not decide just where that point is reached because it is clear that under our test an investigation was underway in this case." (*Id.* at p. 1514, 67 Cal.Rptr.2d 775.)

The facts [in *Paterson,* 174 Cal. App. 4th at 1402-04, were] much more like *City of Los Angeles* than they are like *Steinert*. Garvin suspected [Paterson was falsely requesting sick leave], and sent Legaspi to investigate. Legaspi's first statements to Garvin ("Guess what ... he's not at home. I have it all on tape") are not the kind of statements which are made about a routine communication, a training session, or a call "to see whether an officer is okay." The statements say that Garvin and Legaspi set out to confirm a suspicion, indeed, to catch R. Paterson in a lie. That is precisely the kind of conduct to which the Act applies.

We cannot agree with the City that on these facts, only innocent or preliminary questions took place, and that Legaspi stopped her questioning as soon as she thought a serious offense, a false statement to a supervising officer, had taken place.

Notably, *City of Los Angeles* rejected the City's argument that the Act applies only to investigations conducted by internal affairs units, an argument similar to the one the City makes here. *City of Los Angeles* found that "the City's position is contrary to the legislative purpose of the Act to protect police officers from abuse or arbitrary treatment. [Citation.] If an officer under investigation for a violation of law or department rules could be interrogated by his commanding officer outside the procedural protections of the Act, the protections afforded to police officers in the Act would be eviscerated." (*City of Los Angeles v. Superior Court, supra,* 57 Cal. App. 4th at p. 1515.) We echo the sentiment. If we were to allow the kind of questioning which the facts before us demonstrate, and hold the procedural protections of the Act only applied after Legaspi obtained what she considered to be false statements, we would eviscerate the Act.

(Parallel citations omitted) (emphasis added).

The TFD Board placed the following item on the agenda for June 8, 2010: "Closed Session – Chief's Evaluation (Chief Oyarzo present)." (*See* Plaintiffs TFD Ex. A1, Doc 89-1.) The June 28 meeting identified its second agenda item as "Closed session – Personnel Evaluation," and the July 13, 2010 agenda announced yet another "Closed Session," this time about "Public Employee Discipline/Dismissal/Release (Authority GC54957) – Fire Chief." (*Id.*) At least one of these meetings, the June 8 session, Oyarzo was questioned about the complaints leveled against him by other TFD employees and interns. (Oyarzo TFD Decl. ¶¶ 20-21.) This is not routine communication between a

73

1  Board of Directors and the Chief of a fire department covered by § 3253(i); this was an "investigation"

2  as that term is defined in FPBOR.[31]

3      TFD next argues that FPBOR does not apply to Oyarzo because at the time of the June 8, June

4  28 and July 13 Board meetings, Oyarzo was the commanding officer and no one on the Board was

5  "designated" to interrogate him. Specifically, Defendants argue that the fact that "more than two Board

6  members questioned Oyarzo at these meetings" demonstrates no single individual was designated to

7  interrogate Oyarzo. The Parties cite no authority related to the definition of "designated" in section 3253

8  and the Court has been unable to locate any relevant cases. Yet, it cannot be disputed that the Board was

9  Oyarzo's direct supervisor. To permit a group of supervisors to escape the requirements of FPBOR

10  simply because the individual members acted in concert would circumvent the purpose of the statute.

11  The Board designated itself to interrogate Oyarzo when it noticed "disciplinary hearings" on its agenda

12  for the June 8, June 28, and July 13 Board meetings. Nothing in the FPBOR suggests only one

13  individual may be so designated, and TFD does not dispute that Oyarzo was questioned during these

14  hearings.

15      TFD's motion for summary judgment that FPBOR does not apply to questioning during a TFD

16  Board meeting is DENIED.

17          **b.    Other Aspects of Oyarzo's Investigation/Interrogation Claim.**

18      Oyarzo's FPBOR claim alleges in part that "Defendant, through its actions and omissions,

19  violated Mr. OYARZO's rights to be informed of investigations into his activities, to be informed of the

20  identity of the individual conducting the investigations, to be compensated for time during which he was

21  interrogated, to be provided the opportunity to obtain representation, and to view the complaints lodged

22  against him." (SAC ¶ 113.)

23      TFD's motion for summary judgment only challenged this claim on the ground discussed above

24  (i.e. by arguing Oyarzo was not interrogated within the meaning of that term as used in § 3253). For the

25

26  [31] This renders meritless TFD's argument that Oyarzo cannot benefit from the protections of the FFBOR because he was not under "investigation" and therefore there could have been no "interrogation."  (Doc. 95 at 20.)

first time in reply, TFD argues that there is no evidence to support Oyarzo's assertion that he was not

compensated for the time he spent in interrogation and/or that Oyarzo was aware of who the presiding

Board members were, so did not need to be informed about who would be present. (Doc. 95 at 21.) The

Court will not consider an argument raised for the first time in reply, *United States v. Romm*, 455 F.3d

990, 997 (9th Cir. 2006) ("Arguments not raised by a party in its opening brief are deemed waived.");

*Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir.2007) (A "district court need not consider arguments

raised for the first time in a reply brief."), particularly given the extensive briefing that accompanied

Defendants' seven separate motions for summary judgment in this case, which provided ample

opportunity for Defendants to raise relevant arguments.

### c.   Did TFD Investigate or Interrogate Hart?

Hart asserts he was interrogated on two occasions by Hockett. The first occurred during a half-

hour telephone call on October 20, 2010, during which time Hockett questioned Hart about the Nick

Burns incident. (*See* Plaintiffs' TFD Ex. A1 (TFD 147-150)). That conversation ended with the threat of

disciplinary action. (*Id.* at TFD 150.) Soon thereafter, Hockett placed a "Record of Discussion" in Hart's

personnel file (*Id.* at TFD 147-48.) Hart also references an October 26, 2010 phone call during which

time Hockett questioned Hart about the Burns funeral incident. (Hart Depo. 284: 14-285:11.) This

conversation also ended with a threat of discipline. (*Id.* at 288:9-288:12.) Again, soon thereafter,

Hockett placed a written reprimand in Hart's Personnel file. (Plaintiff's TFD Ex. A1 (TFD 146)).

TFD argues that these communications constituted "counseling, instruction, or informal verbal

admonishment by, or other routine or unplanned contact with, a supervisor, or any other firefighter,"

Cal. Gov. Code § 3253, and therefore that the communications were not covered by FPBOR. As was the

case in *Paterson*, 174 Cal. App. 4th 1393, where a supervisor seeks to confirm a suspicion of improper

conduct, any communication that follows is covered by the FPBOR, here, both conversations followed

Hockett's receipt of information from third parties that made Hockett suspect Hart had acted improperly.

If the FPBOR is to have any meaning, it must apply to such situations.

TFD's motion for summary judgment on this ground is DENIED.

75

2.      **Punitive Action.**

TFD argues that it is entitled to summary judgment on any FPBOR claim based upon the theory that TFD's reorganization was a punitive action because Plaintiffs failed to include this allegation in any discovery response. Hockett's Interrogatory #7 asked Hart to "Describe in detail each act and/or omission of TFD to which [Hart] refer[red] in paragraph 114 of the complaint."[32] Hart answered:

> Defendant Tuolumne Fire District is responsible for the acts of the members of the Tuolumne Fire District Board of Directors that were carried out in violation of Plaintiff s rights under the Firefighter's Procedural Bill of Rights.
>
> In September or October 20 10, Defendant Hockett instituted an investigation into me and told me that he had done so only after the fact. Defendant Hockett said he was investigating me for allowing Nick Burns to come and work at the firehouse so that I would not have to work alone on the B-shift after Ben went out on leave. Defendant Hockett called me while I was off-duty at least two times and interrogated me about Nick Burns. Defendant Hockett threatened me with disciplinary action both times, and I was not paid for any of the time Defendant Hockett interrogated me.
>
> In October 2010, Defendant Hockett started another investigation into me without telling me and again informed me of the investigation only after he had instituted the investigation. This time, Defendant Hockett said the investigation was because no one from the Tuolumne Fire District had appeared at the funeral of a former fire chief, Donald Burns. Defendant Hockett again called me while I was off duty two separate times and told me that I would probably be disciplined as a result of the investigation he had opened.

(TFD Hart Ex. A19.)  This clearly identifies only the two telephone conversations between Hockett and Hart discussed above, omitting any mention of the restructuring of TFD. Likewise, to the same question, Oyarzo responded by listing numerous events from June 8 through December 3, 2010, but never mentioning the restructuring of TFD. (Pltf. TFD Ex. A7.)

It is impermissible for Plaintiffs to assert for the first time in opposition to TFD's motions for summary judgment that TFD violated their rights under the FPBOR by laying them off in December 2010, ostensibly as part of a reduction in force. (*See supra* Part IV.A.2.b(2)(d).) Defendant is entitled to summary judgment as to any FPBOR claim based upon this conduct.

---

[32] Paragraph 114 of the SAC, part of the FPBOR claim, alleges: "Defendant, through its actions and omissions, violated Mr. HART's rights to be informed of investigations into his activities, to be informed of the identity of the individual conducting the investigations, to be compensated for time during which he was interrogated, and to be <u>free from threats of disciplinary action</u>." The emphasized language is a clear invocation of the FPBOR's protections against punitive actions.

**3.      Placement of Comments Adverse to Plaintiffs' Interest in Their Personnel Files.**

One section of the FPBOR provides procedures that must be followed whenever "any comment adverse to [the firefighter's] interest is entered in [that firefighter's] personnel file":

> A firefighter shall not have any comment adverse to his or her interest entered in his or her personnel file, or any other file used for any personnel purposes by his or her employer, without the firefighter having first read and signed the instrument containing the adverse comment indicating he or she is aware of the comment. However, the entry may be made if after reading the instrument the firefighter refuses to sign it. That fact shall be noted on that document, and signed or initialed by the firefighter.

Cal. Gov't Code § 3255. Plaintiffs each assert that their rights under this provision were violated. Defendants move for summary judgment on the ground that Plaintiffs have failed to adduce evidence in support of these assertions.

### (1)      Hart's § 3255 Claim.

Hart's § 3255 claim concerns the Record of Discussion and Formal Warnings discussed above. It is undisputed that Hart had an opportunity to review the Record of Discussion, as he eventually filed a response to the document. However, the document itself is not signed by Hart nor does it bear any indication of his refusal to sign along with his initials. (Plaintiff's TFD Ex A1 (TFD 147-48.)) As to the Formal Warning issued December 11, 2010, while there is an indication on the warning that Hart refused to sign it, that fact is not signed or initialed by Hart. (*Id*. at TFD 146.) Essentially, Hart's complaint is totally procedural. The documents do not bear his initials where the statute says they must. Neither TFD's motion nor its reply addresses whether such a purely technical omission can make out a claim under § 3255. TFD's motion for summary judgment on this ground is DENIED. The Court questions, however, whether any remedy of any significance would be warranted in response to such a technical violation. *De minimis non curat lex.*

### (2)      Oyarzo's § 3255 Claim.

Oyarzo's § 3255 claim is premised on his assertion that his personnel file was improperly tampered with by Hutchins and Ben Ohler, who, according to Oyarzo, placed a forged disciplinary write up in Oyarzo's file. In support of this claim, Oyarzo cites Exhibit 21 (TFD 1173-74) to the Deposition of

Darleen Hutchins,[33] an email exchange between Darlene Hutchins and Marcie Wells, Ms. Wells later forwards on to Virginia Van Bolt. In the original exchange between Hutchins and Wells (which bears the subject line "Ben is back to his old tricks..."), Hutchins discusses her recollection of the handling of Oyarzo's personnel file. The tenor and content of these recollections do not appear to be particularly important for the present analysis. More important is the content of Ms. Wells' email to Ms. VanBolt, in which Ms. Wells describes her recollection that Hutchins asked Ben Ohler to put a disciplinary document into Oyarzo's file the night of one of the Board meetings. (*Id*. at TFD 1173). This event is confirmed by Ben Ohler, who testified that Darlene asked him to put something into Oyarzo's file, although Ohler did not know what it was because he didn't read it. (Ohler Depo, 203:25-204:17.) Oyarzo contends that the document was a "borderline disciplinary document," but in his deposition did not recall the nature or content of the document. (Oyarzo Depo. 201:6-20.) Plaintiffs, who bear the burden of proof on this claim, have not presented the document in question to the Court. Nor has Plaintiff presented testimony that describes the content of the document. This is a failure of proof. The Court cannot determine if the document was a "comment adverse to [Oyarzo's] interest entered in his or her personnel file," thereby triggering § 3255, without any knowledge of the content of the document.

TFD's motion for summary judgment as to Oyarzo's § 3255 is GRANTED.

**4.**     **Malice.**

The FPBOR provides that if a court "finds that the employing department or licensing or certifying agency has violated any of the provisions of [the FPBOR], the court shall render appropriate injunctive or other extraordinary relief to remedy the violation and to prevent future violations of a like or similar nature, including, but not limited to, the granting of a temporary restraining order or preliminary or permanent injunction prohibiting the employing department or licensing or certifying agency from taking any punitive action against the firefighter." Cal. Gov. Code § 3260(c)(1).

If the court finds "that a fire department, its employees, agents, or assigns, with respect to acts

---

[33] Plaintiffs' consolidated opposition to TFD's motions for summary judgment actually references this as "Hutchins Email taking Fall," which appears to be a reference to this document, referenced elsewhere in the record. (*See* Doc. 88 at 38:12-13.)

taken within the scope of employment, <u>maliciously</u> violated any provision of [the FPBOR] <u>with the intent to injure the firefighter,</u> the fire department shall, for each and every violation, be liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) to be awarded to the firefighter whose right or protection was denied and for reasonable attorney's fees as may be determined by the court." § 3260(d)(emphasis added). If malice is found, "and there is sufficient evidence to establish actual damages suffered by the firefighter whose right or protection was denied, the fire department shall also be liable for the amount of the actual damages." *Id.*

TFD moves for summary judgment as to any damages remedy on the ground that there is no evidence of malice in this record. Although malice is not defined in the FPBOR, the legislative history of POPBOR suggests that "malice" in that statute was meant mirror the definition set forth in in California Civil Code § 3294. *See San Diego Cnty. Deputy Sheriff's Ass'n v. Cnty. of San Diego*, 2006 WL 1493772 (Cal. Ct. App. May 31, 2006) (citing Cal. Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1516 (2001-2002 Reg. Sess.) as amended Apr. 18, 2002). California Civil Code § 3294 defines malice to mean "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." In *San Diego County Deputy Sheriff's Association*, that County's Sheriff's Department reviewed POPBOR and concluded that it was appropriate to use "documents of discussion" to criticize a deputy's performance. *See San Diego Cnty.,* 2006 WL 1493772 at *4. These documents would be kept for a year and then destroyed. *Id.* Although this was found to violate a deputy's POPBOR rights, there was no evidence that the department implemented the practice specifically to harm the plaintiff. Absent such evidence, there was no basis for a finding that the department maliciously violated POPBOR or that it did so with any intent to injure the plaintiff. *Id.* at *10.

Here, in contrast to *San Diego* where the conduct in question was not targeted at the individual plaintiff, there is evidence that the conduct that forms the basis for Plaintiffs' remaining investigation/interrogation and punitive action FPBOR claims was targeted at Plaintiffs. For example, if Plaintiffs' evidence is credited, the alleged interrogations were targeted at gathering information that

79

could be used to discipline Plaintiffs. Although the record is not robust on this issue, it is sufficient to permit the question of malice to go to the finder of fact. In contrast, there is absolutely no evidence of malice in connection with Hart's remaining § 3255 claim, as there is no suggestion in the record that this violation was anything other than an accidental omission.

TFD's motion for summary judgment on any damages claim under the FPBOR is GRANTED as to Hart's § 3255 claim and DENIED as to all other remaining FPBOR claims.

**F.    Legitimate Non-Discriminatory, Non-Retaliatory Reason for Actions.**

Plaintiffs' opposition contains a lengthy section arguing that TFD's "Legitimate Non-Discriminatory, Non-Retaliatory Reason" was pretext for carrying out actions motivated by retaliatory and/or discriminatory animus. Plaintiffs raise pretext in the context of their due process claims (*see* Doc. 88 at 19-20, 22), but those claims fail on other grounds. Although evidence of pretext also might be relevant to Hart's California Labor Code § 6310 claim, Defendants have not yet raised any defense that involves a legitimate, non-discriminatory, non-retaliatory basis for its action in the context of that claim, so there is no reason to consider pretext in that context. (*See* Doc. 88 at 26-27.) Moreover, even if this argument is directed at the merits of Plaintiffs' First Amendment claims, Oyarzo's First Amendment Claim fails on other grounds and Hart's First Amendment claims survive summary judgment for other reasons.

**G.    56(d) Continuance.**

In the event the Court believes additional evidence is needed in support of Plaintiffs' "pattern and practice" allegation under *Monell* and/or Plaintiffs' theory that Hart's termination was pretextual, Plaintiffs request a Federal Rule of Civil Procedure 56(d) continuance. Rule 56(d) permits a court to defer consideration of or deny a motion for summary judgment in order to allow time for Plaintiff to obtain additional evidence, but only if Plaintiff has "shown by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" without that additional evidence.

As to Plaintiffs' "pattern and practice" theory, Plaintiffs wish to have additional time to present evidence from Captain Rafferty's personnel file, presumably to demonstrate that his treatment was

analogous to TFD's treatment of Plaintiffs. Such evidence would not change the outcome of the Court's "pattern and practice analysis," as the single example Captain Rafferty's single disciplinary event would not be sufficient to support a *Monell* pattern and practice claim. (*See supra* Part V.B.2.)

As to Plaintiffs' theory that Hart's termination was pretextual[34], the Court has already made a finding that Hart's due process claims against TFD cannot survive summary judgment because Plaintiffs have failed to satisfy *Monell*. Additional evidence about pretext on this claim is irrelevant.

Plaintiffs' request for a Rule 56(d) continuance is therefore DENIED.

## VI. <u>CONCLUSION</u>

For the reasons set forth above:

- Defendant Hutchins' motion for summary judgment, Doc. 70, is GRANTED IN ITS ENTIRETY;

- Defendant Turner's motion for summary judgment, Doc. 69, is GRANTED IN ITS ENTIRETY;

- Defendant Powers' motion for summary judgment, Doc. 66, is GRANTED IN PART AND DENIED IN PART;

- Defendant Hockett's motion for summary judgment, Doc. 67, is GRANTED IN PART AND DENIED IN PART,

- Defendant TFD's motions for summary judgment are GRANTED IN PART AND DENIED IN PART.

The pretrial conference is reset for July 31, 2013 at 8:15am.

SO ORDERED
Dated: July 1, 2013

/s/ Lawrence J. O'Neill
United States District Judge

---

[34] The section of Plaintiffs' opposition to TFD's motions which requests a Rule 56(d) continuance does not clearly articulate which claim is associated with this "pretext" argument. However, the Court assumes Plaintiffs are referencing the Hart's due process claim, as Hart only raises the concept of pretext in the context of that claim. (*See* Doc. 88 at 19-20, 22.) Although evidence of pretext also might be relevant to Hart's Cal. Lab. Code § 6310 claim, Plaintiffs have not raised the issue of pretext in the context of that claim. (*See* Doc. 88 at 26-27.)