Shannon Seibert (State Bar No. 240317)
Joe Bautista (State Bar No. 255708)
SEIBERT & BAUTISTA
18711 Tiffeni Drive #17-129
Twain Harte, California 95383
Telephone:  209.586.2890
Facsimile:  209.583.5424

Attorneys for Plaintiffs BENJAMIN C. OYARZO
and NICHOLAS HART

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA – FRESNO DIVISION

| | |
|---|---|
| BENJAMIN C. OYARZO, NICHOLAS HART,<br><br>          Plaintiffs,<br><br>     vs.<br><br>TUOLUMNE FIRE DISTRICT (A.K.A. "TUOLUMNE FIRE PROTECTION DISTRICT"), JOSEPH TURNER, in his individual and official capacities, KENNETH HOCKETT, in his individual and official capacities, BRIAN MACHADO, in his individual and official capacities, DARLENE HUTCHINS, in her individual and official capacities, TONEY POWERS, in his individual and official capacities, and DOES 1 THROUGH 20, Inclusive,<br><br>          Defendants. | **CASE NO. 1:11-CV-01271-SAB**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE**<br><br>Hearing Date:  October 15, 2013<br>Time:               2:30 p.m.<br>Courtroom:      9, 6th Floor<br><br>Trial Date:       October 31, 2013<br>Time:               8:30 a.m.<br>Courtroom:      9, 6th Floor |

Plaintiffs Benjamin C. Oyarzo and Nicholas Hart submit the following opposition to Defendants' Motions in Limine.

////

/////

/////

1

## I.    OPPOSITION TO MOTION TO EXCLUDE DAVID MOORE'S TESTIMONY OR ANY OTHER REFERENCE CONCERNING FORAGED DOCUMENTS OR FORAGED SIGNATURES (No. 1)

The testimony of David Moore is relevant to Hart's First Amendment claims against Powers and Hockett for Hart's refusal to engage in unlawful retaliation against Oyarzo and for Hart's continued support of Oyarzo. Defendants are expected to assert that any retaliation against or animosity toward Oyarzo ceased after Oyarzo returned from administrative leave in September 2010 and, therefore, any retaliation against Hart would also have ceased at that time. However, contrary to Defendants' assertion, the efforts to harm Oyarzo continued through to December 2010 – a fact that will be supported through the testimony of David Moore. Evidence that the efforts against Oyarzo continued throughout the fall of 2010 is directly relevant to Hart's claim for retaliation based upon his continued support of and refusal to engage in retaliation against Oyarzo during this time. Fed. R. Evid. 401, 402, 403.

Joe Turner, who had served as chairman of TFD's Board of Director since December 2007, resigned on August 3, 2010. On November 17, 2010, Plaintiffs' counsel requested copies of Oyarzo's complete employment file. On December 3, 2010, a copy of Oyarzo's employment file was sent to Plaintiffs' counsel. Included in the file was a handwritten note from the TFD secretary Marcie Wells 'explaining' that documents had been removed from Oyarzo's personnel file and that she had attached copies of missing documents, which she said were available because Turner had kept a copy of them. Included in the copies of the 'missing' documents (which referenced or reflected the actions taken against Oyarzo during the summer of 2010) was a letter dated September 10, 2010 addressed to Oyarzo and signed by Joe Turner on behalf of the TFD Board of Directors – a letter that Oyarzo never received and that was dated more than a month after Turner has resigned from the Board.

Mr. Moore will provide testimony regarding the genuineness of the signatures on the documents signed by Turner and which were included in Oyarzo file by Wells, who was an integral member of the TFD and who, as is discussed more fully in Sections III, V, and VI below, was involved with personnel and administrative matters and decisions made by Hockett and other board members in the fall of 2010 (Exh. A; Defendants' Exh. 3, TFD 1173 – 1174; Defendants' Exh. 5, TFD 1173 – 1174; Defendants' Exh. 3, TFD 1157a, 1158; Defendants' Exh. 5, TFD 1157a, 1158.)

2

The documents were included in Oyarzo's employment file in December 2010 in an attempt to harm Oyarzo by ensuring that documents reflecting the actions taken against him in summer 2010 would remain as part of his permanent file, despite the fact that the documents had been removed by Tuolumne County Counsel in September 2010.

Moore's testimony will assist in demonstrating that contrary to Defendants' assertion that retaliation against Oyarzo and by implication Hart ceased in September 2010, the retaliation continued into December 2010. Mr. Moore's testimony will support Plaintiffs' contention that the retaliation against Hart for his support of Oyarzo continued well after Oyarzo's reinstatement to the TFD in September 2010 and continued until his termination by the TFD in December 2010. Additionally, Mr. Moore's testimony will be offered to demonstrate the genuineness of documents signed by Turner, Wells, and/or Hutchins in the event any of them challenge the authenticity of documents Plaintiffs assert were signed by them. For these reasons, Plaintiffs request that the Court deny Defendants' motion in limine as to the testimony of Mr. Moore.

## II. OPPOSITION TO MOTION TO EXCLUDE EVIDENCE OF HUTCHINS' LETTER TO HOCKETT DATED MARCH 19, 2011 (No. 2)

To prevail on his claims under the First Amendment and Labor Code 6310, Hart must prove a causal connection between his protected activity and the adverse actions taken against him – that is, he must prove that Defendants were motivated by the fact that Hart had engaged in or was engaging in protected activity. Absent a direct admission, which Defendants have not made in this case, Hart must establish Defendants' motivation through circumstantial evidence in support of Hart's theories of liability.

Darlene Hutchins was a TFD board member from approximately 2005 until August 31, 2013, when she abruptly resigned the day after the Board voted to return Plaintiff Oyarzo to work. Hutchins was directly involved in what Hart believed to be illegal actions against Oyarzo throughout the summer of 2010. Hutchins was re-elected to the Board in November 2010, and sworn in on December 13, 2010 – the same evening that Hart and Oyarzo were terminated through what Defendants attempt to characterize as a "reorganization."

To establish Defendants' liability, Hart must prove the connection between his refusal to retaliate against and/or continued support of Oyarzo and the adverse actions taken against him

throughout the summer and fall of 2010 that culminated in his termination. Among the allowable methods of establishing the truth of Hart's allegations is establishing that Defendants' proffered explanations for the adverse actions taken against Hart are false or pretextual; one way to do so is to establish that the defendants' testimony – or those of witnesses who support Defendants' version of events – lacks credibility. Fed. R. Evid. 607.

Included in Hutchins' letter are numerous facts and issues that are directly relevant to establishing Hart's claims or to Hockett's credibility.[1] In addition to the personal matters cited by Defendants, Hutchins states the following in her letter:

1. "I was dismissed immediately that evening because I interjected something into a conversation you were having with Nick Hart." Exh. B, p. 1.

    **Relevance:** The conversation between Hockett and Hart referenced by Hutchins occurred on December 13, 2010 at the board meeting at which Hart was terminated.

2. "When I decided to resign [in August 2010]….and was then re-elected to the Board, I decided to come to you and discuss concerns that I had with you and wanted to know what concerns you had with me…the day we had the phone conversation, I allowed you to say…" Exh. B, p. 2.

    **Relevance:** The phone conversation between Hockett and Hutchins occurred during the period between November 2, 2010, when Hutchins was reelected, and December 13, 2010, when she was re-seated on the Board and Hart and Oyarzo were terminated. Hockett denies knowledge of having spoken with newly elected board members about TFD prior to the December 13, 2010 meeting at which they were sworn in and Hart and Oyarzo were terminated. (Exh. H, Hockett Depo. 231:1 – 231:6)

3. "You told me that you knew I had tampered with the personnel files...I allowed you to go on and tell me that you knew I had, because I had given you the documents that were in Ben [Oyarzo's] file……" Exh. B, p. 2.

    **Relevance:** Hockett denies ever speaking with Hutchins about Oyarzo's personnel file. (Exh. H, Hockett Depo. 229:7 – 229:10.)

---

[1] Defendants declined to include Hutchins' complete letter as their Exhibit 2. Hutchins' complete letter is attached hereto as Exhibit B.

4

Defendants offer no explanation of how Hutchins' letter could possibly be prejudicial let alone how the probative value of the letter could be "substantially outweighed" by a danger of prejudice or confusion of the issues. *See* Fed. R. Evid. 403. Nevertheless, the probative value of the letter clearly outweighs any potentially prejudicial or confusing effect because the letter provides circumstantial evidence necessary to establish Defendant Hockett's motivation and is directly relevant to the credibility of the testimony provided by Hockett. *See* Fed. R. Evid. 401, 402, 403, 607. Therefore, Plaintiffs request that the Court deny Defendants' second motion in limine.

III.   **OPPOSITION TO MOTION TO EXCLUDE EVIDENCE OF HUTCHINS' EMAIL CORRESPONDENCE REGARDING OYARZO IN THE FALL OF 2010 AND REFERENCE TO HUTCHINS' ANIMOSITY TOWARD OR OPINIONS OF OYARZO OR HART (No. 3)**

As discussed in Section II, above, Hutchins was a TFD Board member from approximately 2005 through August 31, 2010 – the day after the Board voted to return Oyarzo to work from administrative leave – and was seated after reelection to the Board on December 13, 2010 – the night that the Board voted to terminate Hart and demote Oyarzo. Despite no longer being seated on the Board, Hutchins remained in active communication with numerous people at TFD, including Powers and Hockett, and continued devising methods to harm Oyarzo, a fact demonstrated by the very emails that Defendants seek to exclude:

- **TFD 1155 – 1156:** An email received by Marcella Wells from Darlene Hutchins and forwarded to Virginia Van Bolt on November 11, 2010.

    **Relevance:** In the email, Hutchins included a "note" she sent to Kenneth Hockett on November 11, 2010 – one week after being reelected and one month prior to being seated on the Board – complaining about Oyarzo and Hart because Hutchins "could stand it NO MORE!!" (Defendants' Ex. 3, TFD 1155.) This is directly relevant to establishing motivation as part of Hart's retaliation claims.

    **Relevance:** In the "note" to Hockett, Hutchins states that "the [Policies & Procedures] manual the department has voted on and is place was last[] completely updated in August of 2006." (Defendants' Ex. 3, TFD 1155.) At issue – and hotly disputed by the parties – is which version of TFD's Policies & Procedures manual was in effect from 2008 through the termination of Oyarzo and Hart in December 2010. (Defendants' Ex. 3, TFD 1155.) This is directly relevant to Plaintiff's argument that the 2006 version was indeed the version in effect at the relevant times.

5

- **TFD 1173 – 1174:** An email received by Marcella Wells from Darlene Hutchins and forwarded to Virginia Van Bolt on September 26, 2010.

  **Relevance:** In the email, Hutchins describes placing improperly altered documents in Oyarzo's file in September of 2010 with the assistance of <u>all</u> of TFD's full-time employees except Plaintiff Hart. Hutchins explains that she "told [Ohler] that [Hutchins] would make sure that [Firefighter Nicholas Ohler], [Firefighter Jason] Podesta, [Wells], and [Defendant Toney Powers] would not be implicated in any changes to the personnel files….[Hutchins' husband, TFD Volunteer Firefighter Bill Hutchins] said to make sure [Wells is] covered and that we will take the heat….I promise I will make sure you will not be involved in the stuff that got put back in his personnel file….*Should we all just deny knowing anything about this? What are they going to do if none of us will 'fess up' to putting the documentation back in his file*?" (Defendants' Exh. 3, TFD 1173 – 1174 (emphasis added)). This clearly shows that Powers was working in conjunction with the full-time employees and at least one board member against Oyarzo in the summer of 2010. Hart was the only full-time employee who refused to assist these efforts, and Hart was singled out for adverse action after refusing to do so. The fact that all full-time employees other than Hart assisted in the effort against Oyarzo is directly relevant to establishing the motivational element of Hart's claims because Hart alone refused to participate and Hart alone was singled out for retaliation.

- **TFD 1684 – 1686:** An email from Darlene Hutchins to Kenneth Hockett on November 13, 2010.

  **Relevance:** In the email, Hutchins and Hockett are attempting to agree upon a time and date to meet <u>before</u> the December 13, 2010 Board meeting. This email is directly relevant to proving that Hockett met with members of the newly elected board prior to the December 13, 2010 board meeting at which the board members were sworn in and voted to terminate Hart and demote Oyarzo.

Hutchins' animosity toward Oyarzo is directly relevant to Hart's claim for retaliation based on his support of Oyarzo, as the animosity of TFD employees and board members toward Oyarzo is the very basis of Hart's claim for retaliation. As is demonstrated by Hutchins' emails that Defendants seek to exclude through their motion, Hutchins remained in active communication with Powers and Hockett and, as such, her animosity toward and communications regarding Oyarzo and Hart are relevant to Defendants' motivation when subjecting Hart to adverse action. Because the emails and Hutchins' animosity toward and opinions of Oyarzo and Hart are relevant to Hart's retaliation claims, and because Defendants have provided no facts to support their assertion that the

6

emails or evidence of Hutchins' feelings would in any way prejudice the Defendants or confuse the issues, Plaintiffs request that Defendants' third motion in limine be denied. *See* Fed. R. Evid. 401, 402, 403.

IV.    **OPPOSITION TO MOTION TO EXCLUDE ANY REFERENCE TO DOCUMENTS PLACED IN OYARZO' S PERSONNEL FILE IN THE FALL OF 2010 (No. 4)**

As is explained in Section I., above, Defendants have argued that Hart could not have been retaliated against in the fall of 2010 because any negative actions – retaliatory or otherwise – against Oyarzo stopped after Oyarzo's return to work on September 8, 2010. As explained in Section II., above, Darlene Hutchins was a TFD board member from approximately 2005 until August 31, 2013, when she abruptly resigned the day after the Board voted to return Plaintiff Oyarzo to work. Hutchins was not only directly involved in what Hart believed to be illegal actions against Oyarzo throughout the summer of 2010, she continued to assist and encourage retaliatory actions against Oyarzo through the fall of 2010, including the placing of negative documents in Oyarzo's personnel file. (See Exh. B; Defendants' Exh. 3, TFD 1173 – 1174; Defendants' Exh. 5, TFD 1173 – 1174.) Because the retaliation against Hart was based on his refusal to engage in these efforts against Oyarzo, evidence of Hutchins actions carried out *in cooperation with Powers* to place documents harmful to Oyarzo in Oyarzo's personnel file is directly relevant to Hart's claim for retaliation against Powers based on Hart's refusal to assist in these efforts.

Because the continued efforts to harm Oyarzo are relevant to Hart's retaliation claim based on his continued support of Oyarzo, because Powers was directly involved in placing harmful documents in Oyarzo's personnel file, and because Defendants have provided no facts to support their assertion that reference to documents improperly placed in Oyarzo's personnel file would in any way prejudice the Defendants or confuse the issues, Plaintiffs request that Defendants' fourth motion in limine be denied. *See* Fed. R. Evid. 401, 402, 403.

V., VI., VII.    **CONSOLIDATED OPPOSITION TO MOTIONS TO EXCLUDE ANY REFERENCE TO VAN BOLT'S, WELLS' AND OHLER'S ANIMOSITY TOWARD OR OPINIONS OF OYARZO AND HART (Nos. 5 – 7)**

Through their fifth, sixth, and seventh motions in limine, Defendants seek to exclude evidence of the animosity directed toward Oyarzo and Hart by Virginia Van Bolt, Marcie Wells, and Nicholas

7

Ohler, respectively. Defendants' motions should be denied because evidence of the continued animosity toward and targeting of Oyarzo, and then Hart for his support of and refusal to retaliate against Oyarzo, is directly relevant to establishing the causation/motivation element of Hart's claims for retaliation and to providing context for Hart's understanding of the actions taken against Oyarzo which he refused to support. Fed. R. Evid. 401, 402, 403.

Hart's claims for First Amendment retaliation are centered on the fact that Hart alone refused to participate in what he believed was retaliation against Oyarzo following Oyarzo's annexation efforts and Oyarzo's reporting of various TFD employees for having committed workplace safety violations.[2] Initially spearheaded by a few, the effort against Oyarzo was joined by most employees and Board members of the TFD through the summer and fall of 2010. All full-time employees were assured in fall 2010 that their jobs would be protected, while Hart was singled out for adverse action throughout summer and fall of 200 and, ultimately, his termination.

The actions taken and opinions expressed about Oyarzo by and from non-party employees and Board members is directly relevant to establishing the "public concern" element of Hart's First Amendment claims by placing Hart's understanding of those actions in context, and the animosity directed toward Oyarzo by employees and Board members of the TFD provides context for Hart's retaliation claim based on his continued support of Oyarzo. Further, the animosity directed toward Hart by employees and Board members, through establishing these employees' and Board members' connection to the named defendants and animosity toward Oyarzo, is directly relevant to establishing that the actions taken against Hart by Defendants were motivated by his support for and refusal to participate in illegal actions against Oyarzo.

**(V.)    Van Bolt's Animosity Toward or Opinions of Oyarzo and Hart (Defendant's Motion in Limine No. 5)**

Virginia Van Bolt was appointed as a Board member on August 17, 2010 and remained an active member until December 13, 2010, when the new Board was seated. Though the email chains

---

[2] The Court dismissed Oyarzo's retaliation claims at summary judgment. However, whether the activities carried out against Oyarzo actually constituted illegal retaliation is of no consequence; Hart must only prove that he believed the actions to be illegal. *See Johnson v. Multnomah County, Or.,* 48 F.3d 420, 424 (9th Cir. 1995).

8

cited by Defendants in their fifth motion in limine have little if anything to do with Van Bolt's feelings toward Oyarzo or Hart, the documents themselves are clearly relevant to Hart's claims and present no risk of prejudice to Defendants:

- **TFD 1155 – 1156:** An email received by Marcella Wells from Darlene Hutchins and forwarded to Virginia Van Bolt on November 11, 2010.[3]

  **Relevance:** In the email, Hutchins included a "note" she sent to Kenneth Hockett on November 11, 2010 – one week after being reelected and one month prior to being seated on the Board – complaining about Oyarzo and Hart because Hutchins "could stand it NO MORE!!" (Defendants' Exh. 3, TFD 1155.) This is directly relevant to establishing motivation as part of Hart's retaliation claims.

  **Relevance:** In the "note" to Hockett, Hutchins states that "the [Policies & Procedures] manual the department has voted on and is place was last[] completely updated in August of 2006." (Defendants' Exh. 3, TFD 1155.) At issue – and hotly disputed by the parties – is which version of TFD's Policies & Procedures manual was in effect from 2008 through the termination of Oyarzo and Hart in December 2010. (Defendants' Exh. 3, TFD 1155.) This is directly relevant to Plaintiff's argument that the 2006 version was indeed the version in effect at the relevant times.

- **TFD 1173 – 1174:** An email received by Marcella Wells from Darlene Hutchins and forwarded to Virginia Van Bolt on September 26, 2010.

  **Relevance:** In the email, Hutchins describes placing improperly altered documents in Oyarzo's file in September of 2010 with the assistance of all of TFD's full-time employees except Plaintiff Hart. Hutchins explains that she "told [Ohler] that [Hutchins] would make sure that [Firefighter Nicholas Ohler], [Firefighter Jason] Podesta, [Wells], and [Defendant Toney Powers] would not be implicated in any changes to the personnel files….[Hutchins' husband, TFD Volunteer Firefighter Bill Hutchins] said to make sure [Wells is] covered and that we will take the heat….I promise I will make sure you will not be involved in the stuff that got put back in his personnel file….*Should we all just deny knowing anything about this? What are they going to do if none of us will 'fess up' to putting the documentation back in his file*?" (Defendants' Exh. 3, TFD 1173 – 1174 (emphasis added)). This clearly shows that Powers was working in conjunction with the full-time employees and at least one board member against Oyarzo in the summer of 2010. Hart was the only full-time employee who refused to assist these efforts, and Hart was singled out for adverse

---

[3] Plaintiffs have repeated arguments regarding these documents to the extent that Defendants have sought to exclude identical documents through multiple motions.

action after refusing to do so. The fact that all full-time employees other than Hart assisted in the effort against Oyarzo is directly relevant to establishing the motivational element of Hart's claims because Hart alone refused to participate and Hart alone was singled out for retaliation.

- **TFD 1157a – 1158:** An email chain between Van Bolt and Hockett on November 9, 2010.

    **Relevance:** In the email, which was written one week after the November election and the day after Hockett had proposed to demote Oyarzo one full rank during a Board meeting, Van Bolt urges Hockett to contact the new board and ask them "to come prepared to discuss the items [Hockett] feel[s] need to be addressed….encouraging the new people to get involved 'now' is really an important step to accomplishing the goal you have in mind. I really don't think last night they were prepared for the question." (Defendants' Exh. 5, TFD 1157a, 1158.) In response, Hockett wrote, "Yet again, good advice from you. I/we will be worse off without you! I think you are right that we should prepare them for agenda topics ahead of time. I'll get together with Marcie to plan that out." (*Id.*) At the next meeting, the Board voted to terminate Hart, demote Oyarzo, and promote two full-time firefighters who assisted in the efforts against Oyarzo in which Hart refused to engage. This document further illustrates the relevance of Van Bolt's animosity by providing evidence that she collaborated with and influenced Hockett with regard to the decisions he made and provides evidence of Hockett's motivation relevant to Hart's claims.

An additional email between Van Bolt and Hockett provides further support for the relevance of both Van Bolt's animosity and the insight provided by conversations between her and Hockett relevant to Hockett's motivation:

- **TFD 1159:** Van Bolt emailed Hockett on October 29, 2010 stating, "I was sorry to hear you had not written up Hart as yet…..Mr. Hart's conduct seems to me to be something that needs continual scrutiny…" Hockett replied, ""Sorry for disappointing you by not having the record of discussion completed and placed in Harts file already." (Exh. C.) This email, which references Van Bolt's animosity toward or opinion of Hart, is directly relevant to Hockett's state of mind with regard to an adverse action underlying Hart's claims for retaliation.

Finally, it is unclear why Defendants have requested the exclusion of **TFD 1684 – 1686** in their motion regarding Van Bolt's animosity toward Oyarzo and Hart. **TFD 1684 – 1686** is a string of emails between Darlene Hutchins and Kenneth Hockett regarding scheduling of a time to meet in person before the December 13, 2010 board meeting. (*See* Defendants' Exh. 5.) Not only is this email

10

directly relevant to proving that members of the newly elected board <u>did</u> meet prior to the December 13, 2010 board meeting at which they were sworn in and voted to terminate Hart and demote Oyarzo, the document has nothing whatsoever to do with Van Bolt's opinions of Oyarzo or Hart and, therefore, was improperly included in Defendants' motion in limine.

Because Van Bolt's hostility toward Oyarzo and Hart is directly relevant to Hart's claim for retaliation based on his continued support of Oyarzo, because the documents cited by Defendants are largely irrelevant to Van Bolt's intentions but do provide direct evidence of Hockett's motivations and the pretextual nature of explanations provided by Hockett to explain the adverse actions against Hart, and because Defendants have provided no facts to support their assertion that evidence of Van Bolt's feelings would in any way prejudice the Defendants or confuse the issues, Plaintiffs request that Defendants' fifth motion in limine be denied. *See* Fed. R. Evid. 401, 402, 403.

### (VI.)   Wells' Animosity Toward or Opinions of Oyarzo and Hart (Defendants' Motion in Limine No. 6)

Marcie Wells was the secretary of the TFD during the final three years of Oyarzo's employment and during the entirety of Hart's employment. Throughout this time, Wells and Hart maintained a cordial relationship until she joined the campaign against Oyarzo that, because of Hart's refusal to join, expanded to include Hart in the summer and fall leading up to Hart's termination. Evidence regarding not only Wells' animosity toward Oyarzo and Hart as a result of his support of Oyarzo but her influence on Hockett is directly relevant to establishing Hockett's motivation when carrying out adverse actions against Hart.

For example, in an October 5, 2010 email between Hockett and Wells, Hockett wrote: "Marcie, I just want to let you know that I am an advocate of your position at the department and while I am on the board I will not be voting to eliminate it." Exh. D, TFD 1171 – 1172. Wells forwarded the email to Van Bolt the same day, stating, "I still say Nick Hart was the last one hired, but they'll probably never agree to let him go or reduce Ben's pay." (*Id.*) Of course, terminating Hart while reducing Oyarzo pay (and rank) was precisely the action taken three months later, purportedly for strictly budgetary purposes. As discussed above, Wells also took part in a joint collaboration to place altered documents in Oyarzo's file in September 2010. (*See* Exh. B; Defendants' Exh. 3, TFD

11

1173 – 1174; Defendants' Exh. 5, TFD 1173 – 1174.). Finally, as evidenced by the email chain discussed at Section V., above, Hockett worked in collaboration with Wells to "plan" out how to "prepare" the new board to "accomplish the goal [Hockett had] in mind," when the new board was seated. (*See* Defendants' Exh. 5, TFD 1157a – 1158.)

Evidence of Wells' animosity toward Oyarzo and Hart for Hart's refusal to assist in the efforts against Oyarzo that Wells herself had joined is directly relevant to providing context to the retaliation Hart believed Oyarzo was suffering and the motivation for the adverse actions taken against Hart. Because Wells' animosity toward and opinions of Oyarzo and Hart are clearly relevant to providing context and support for Hart's retaliation claims and because Defendants have provided no facts to support their assertion that evidence of Wells' feelings would in any way prejudice the Defendants or confuse the issues, Plaintiffs request that the Defendants' sixth motion in limine be denied. *See* Fed. R. Evid. 401, 402, 403.

### (VII.)   Ohler's Animosity Toward or Opinions of Oyarzo and Hart (Defendants' Motion in Limine No. 7)

Throughout Hart's employment with TFD, three individuals were employed as full-time Firefighters: Nicholas Ohler, Jason Podesta, and Nicholas Hart (in addition to Powers as Engineer and Oyarzo as Chief/Captain). Following the annexation attempt and reporting of safety violations by Oyarzo, all full-time fire personnel except Hart joined in the effort to retaliate against Oyarzo. Ohler was particularly vocal in his animosity toward Oyarzo and Hart, due to Hart's support of Oyarzo, throughout the summer and fall of 2010.

As discussed above, Ohler worked with Defendant Powers, Firefighter Jason Podesta, Darlene Hutchins, and Marcella Wells to place altered documents into Oyarzo's personnel file. Though Ohler is not a named defendant in this matter, his participation in and assistance of Powers' targeting of Hart is directly relevant to establishing not only that Hart was subjected to adverse action from Powers, who worked closely with Ohler, but to the motivational force behind the adverse actions. Finally, Ohler, along with all other full-time employees who joined in the efforts against Oyarzo, and who was ranked the same as though less qualified than Hart, was <u>promoted</u> at the same time that Hart was terminated.

Ohler, as a similarly situated individual who was <u>rewarded</u> for engaging in the very activity Hart was retaliated against for refusing to engage in against Oyarzo makes Ohler's animosity toward and opinions of Oyarzo and Hart directly relevant to Hart's retaliation claims. Because evidence of Ohler's animosity toward Oyarzo and Hart is directly relevant and because Defendants have offered no facts to support their assertion that evidence of Ohler's feelings would in any way prejudice the Defendants or confuse the issues, Plaintiffs request that the Defendants' seventh motion in limine be denied. *See* Fed. R. Evid. 401, 402, 403.

## VIII.   OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF' EXPERT BETH DE LIMA (No. 8)

Plaintiffs' expert Beth De Lima is clearly qualified under the *Daubert* standard to provide testimony on the issue of whether the TFD failed to meet human resources standard of care by failing to use due care in following their own policies for implementing progressive discipline against Hart and whether the TFD followed a human resources standard of care in implementing a Reduction in Force. Ms. De Lima's testimony will demonstrate that Defendants failed to follow their own policies and procedures in disciplining Hart and eventually terminating him under the guise of a reduction in force, thereby illustrating that in fact Defendants were motivated by a desire to retaliate against Hart as opposed to proper management of the TFD. Thus Ms. De Lima's testimony will demonstrate that the pretextual nature of defendants purported justification for the actions against Hart.

Ms. De Lima has extensive experience in the area of Human Resources as is indicated in her curriculum vitae. (Exh I, De Lima CV). Ms. De Lima clearly stated in her testimony regarding progressive discipline, investigations and reduction in force are based upon human resources standards as represented in Ms. De Lima's education, experience, and knowledge in the area of human resources as contained in her curriculum vitae. (Exh. J, De Lima Depo., 45:8-46:20) When questioned by Defendants on one of these certifications, Ms. De Lima indicated the source of the certification and testing she was required to complete. Exh. J, De Lima Depo., 93:11-21, 94:6-13.)

Additionally, Ms. De Lima testified to her significant experience in working for local government agencies such as TFD in formulating policies and procedures for said agencies that are similar in size and scope as the TFD. (Exh J., De Lima Depo.; 17:14-19:20).  Thus Ms. De Lima also

has experience and therefore skill in working with local organization such as the TFD. The issues of progressive discipline of employees in conformance with that organizations Policies and Procedures and whether said discipline is in conformance with human resources standards is not unique to a local fire protection agency. Nor is whether a reduction in force is done in conformance with human resources standards unique to a local fire protection agency. It is conceivable that the size of an agency will have an impact on the correct course of action, and in this case as noted above, Ms. De Lima has experience formulating policies and procedures with regard to small local agencies.

Defendants' attempt to mischaracterize Ms. De Lima's testimony in their motion in limine on the issues of the validity or appropriateness of Hart's actions with regards to Nick Burns volunteering at the TFD. Ms. De Lima's expert testimony does not concern the appropriateness of Hart's action but rather whether or not Hockett properly followed the TFD's policies and procedure and human resources standards in his insistence on the discipline of Hart. When taken in conjunction with Hockett's failure to consider the opinions of Board member Ben Orr (who shared management responsibilities with Hockett) and board member Stephanie Burns, Ms. De Lima's testimony on the appropriateness of Hockett's discipline of Hart in light of the TFD's Policies and Procedures and Human Industry Standards is relevant and will assist the jury in determining the pretexual nature of defendants purported justification for the discipline against Hart. (Exh. I, De Lima Report; Exh. J., De Lima Depo. 68:20-69:3) Similarly, Ms. De Lima's testimony regarding the methodology used by the TFD in engaging in a reduction in force can assist the jury in determine whether the justification used by the TFD was pretexual in nature given the clear failure on the part of the TFD to use any sort of appropriate methodology in approaching the reduction in force in December 2010. (Exh. I, De Lima Report; Exh. J, De Lima Depo. 85:10-86:15, 87:1-21, 90:3-91:1, 91:13-92:5)

For these reasons, Ms. De Lima clearly meets the *Daubert* standard since she in an expert in the field of Human Resources and has properly based her opinions upon the her specialized skill, knowledge, experience and education in the area of human resources as it pertains to the issues upon which she will testify. Therefore, Plaintiffs' request that Defendants motion in limine to exclude Ms. De Lima be denied.

////

## XI.    OPPOSITION TO MOTION TO LIMIT TESTIMONY OF EXPERT PAUL STEIN (No. 9)

Plaintiffs oppose Defendant's request to limit the testimony of Plaintiffs' expert Paul Stein. Mr. Stein has 31 years of service in the Fire Industry and is clearly qualified to provide expert testimony on matter concerning the fire service in the areas of organization design, hierarchy, methodology and firefighting strategy and tactics. (Exh. L, Stein Depo., 6:4-10) Mr. Stein has experience in both large fire protection districts such as Santa Monica to smaller districts such as Lakeside Fire Protection District. (Exh. L, Stein Depo. 23:13-24:24). Mr. Stein was also the division chief training officer for Santa Monica Fire Department and as such has extensive experience judging the qualifications of firefighters. (*Id.*, Exh. K, Stein Report and CV)

Mr. Stein is clearly qualified to review the qualifications of the three firefighters at the time of the reduction in force in December 2010 as is indicated by his extensive experience in the area of training and his significant years in the industry. Further, Mr. Stein should be allowed to testify as to Cal-Osha regulations (Title 8, Section 5144(g)(4), Federal Regulations 29 CFR 1910.134 and the 2-in/2-out policy because while this policy does not specifically govern the staffing of a fire station, the policy effectively sets the standard for engaging in an interior attack on a structure fire. When taken in conjunction with NFPA 1500: Standard on Fire Department Occupational Safety and Health Program, Section 8.5.17, there is a danger that where there is an eminent danger to life of persons contained within the structure on fire, a firefighter may have a duty to engage in interior attack despite the 2-in/2-out standard.

Additionally, Mr. Stein is expected to testify to the issue of Firefighter Safety as it pertains to the safety issues reported by Hart and the danger that Hart was placed in as a result of being forced to work alone by Hockett from late September 2010 to Early December 2010. Mr. Stein is also expected to testify on the relative qualifications of these firefighters and the propriety of letting the most qualified person go, namely Hart, while allowing less qualified personal to remain, Ohler and Podesta and also granting the remaining firefighters a promotion to engineer despite the fact that they did not complete the requisite task books. Mr. Stein's testimony on this issue goes to the pretexual nature of defendants purported  justification for the actions against Hart.  For these reasons, Plaintiff's request that Defendants Motion in limine be denied.

X.     **OPPOSITION TO MOTION IN LIMINE TO LIMIT TESTIMONY OF EXPERT CHARLES MAHLA, PH.D. (No. 10)**

A.     **BENJAMIN OYARZO'S FLSA CLAIM**

Plaintiffs anticipate that Charles Mahla will testify as to Oyarzo's claims for non-payment of wages by Defendant TFD from March 18, 2008 to June 8, 2010.[4] Defendants have based their argument that Dr. Mahla should not be permitted to testify on Oyarzo's wage loss calculations for the period of March 18, 2008 to February 28, 2009 on the assertion that such a claim is not contained within Plaintiffs' Amended Complaint.  Defendants rely upon a California State case, *Foster v. Keating*, for the assertion that relevancy at trial should be determined by the complaint. *Foster v. Keating*, 120 Cal. App. 2d 435, 451 (Cal. App. 1953). However, the Court in *Forster* makes no such determination. Regardless, the operative pleading at this stage of litigation is the Pretrial Order. Fed. R. Civ. Proc. 16(d)(e); *Eagle v. American Tel. & Tel. Co.*, 769 F.2d 541, 548 (9th Cir. Cal. 1985) Additionally, Pretrial Orders have the effect of amending the pleadings, thus an omitted claim that was fully litigated prior to the pretrial order may be cured by incorporation into the Pretrial Order. *Ryan v. Illinois Dep't of Children & Family Servs.*, 185 F.3d 751 (7th Cir. Ill. 1999)

In this case, Defendants have been on notice of Oyarzo's claim for unpaid wages prior to March 1, 2009 since Oyarzo's April 2012 deposition. In fact, Defendants specifically questioned Oyarzo on this matter and Oyarzo testified that he had worked uncompensated hours before March 1, 2009 and was asserting a claim on this basis. (Exhibit E, Oyarzo Depo., 73:5 – 73:16, 74:13 – 74:15.) Following Oyarzo's first deposition, Defendant submitted an interrogatory specifically inquiring for the time period for which Oyarzo was claiming uncompensated hours. Oyarzo's answer to this interrogatory specifically stated that Oyarzo's uncompensated hours covered the period from March 18, 2008 to June 7, 2010. (Exh. F., Interrogatory No. 7.) In December 2012,  Defendants took a second deposition of Oyarzo in December 2012 and yet failed to take the opportunity to make any inquiries into this claim. It is also important to point out that throughout the course of litigation, Defendants have possessed all of the documents that would readily show the number of

---

[4] Plaintiffs are seeking to present evidence for Oyarzo's FLSA losses for the period of March 18, 2008 to June 8, 2010. Therefore Plaintiff's do not dispute this motion in limine to the extent it covers the period from June 8, 2010 to December 31, 2010.

uncompensated hours Oyarzo worked, such as payroll records and station logs. Thus it is difficult to see how Defendants were taken by surprise by this claim or lacked the opportunity to conduct discovery or even review their own records after being placed on notice of this claim. Most importantly as it pertains to Dr. Mahla's testimony on this matter, Dr. Mahla's report and his testimony at deposition covered the period from March 2008 to June 2010 and Defendants had an opportunity to review Dr. Mahla's findings, take Dr. Mahla's deposition, and obtain their own expert in the field, Mr. Craig Enos, whose report contains a summary that starts in March 2008 and continues until December 2010. (Exh. G, Excerpt of Enos Report (Enos Exhibit F).) Taken together, Defendants can hardly claim lack of notice regarding Oyarzo's claim for unpaid wages from March 18, 2008 to February 2009.

Further,  Plaintiffs indicated in the Joint Pretrial Statement a desire to amend the complain to conform to the issues raised and litigated in discovery, specifically including an amendment of Oyarzo's FLSA claim to cover the period from March 18, 2008 to February 28, 2009. (Dkt. No. 140, 28:15-16, Ex. B)  Indeed, Defendant's initial contentions in the Pretrial Statement indicated that Defendants disputed that Oyarzo's FLSA claim that began in March 18, 2008 and whether the failure of Defendant TFD to pay compensation to Oyarzo was willful. (Dkt. No. 140, 6:22-7:5) While Defendants subsequently modified 'March 18, 2008' to read 'March 1, 2009', Defendants did not modify the issue of willfulness on the part of Defendant TFD. (Dkt. No. 149, 1:23-26)  This disputed fact is only relevant to Oyarzo's FLSA claim to the extent that it would provide for the additional third year of damages, in this case March 18, 2008 to February 28, 2009, allowed by operative statute governing the FLSA. 28 U.S.C. § 255(a)  Thus it would appear that Defendants' were well aware of Oyarzo's claim for FLSA damages beginning in March 18, 2008, which would of course make sense since Defendants have been on notice of this claim since April 2012.

For these reasons stated above and later stated in Plaintiff's opposition to Defendants Motion in Limine No. 11 below, Plaintiff's request that the Court deny Defendants request to limit Dr. Mahla's expert testimony on Oyarzo's FLSA claim from March 1, 2009 to June 8, 2010.

**B.      NICHOLAS HART'S FIRST AMENDMENT CLAIMS**

Defendants' argument that Dr. Mahla's testimony should be limited based on the Court's summary judgment ruling is misplaced. At summary judgment, courts must determine whether the

moving party has demonstrated "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). To survive summary judgment, the opposing party need only "make a showing sufficient to establish the existence" of "specific facts showing that there is a genuine issue for trial." *Celotex Corp v. Catrett*, 477 U.S. 317, 322 – 324 (1986). Defendants implicitly argue, through contorting the Court's summary judgment order, that evidence cannot be offered at trial unless the evidence was presented and ruled upon at summary judgment – a conclusion wholly unsupported in American jurisprudence.

Defendants are similarly incorrect in their assertion that the Court "limited" the adverse actions for which Powers or Hockett can be held liable to those that survived summary judgment and have grossly mischaracterized the ruling of this Court in making this assertion. As explained in more detail in Sections 13.C and 13.D., below, the Court did rule that Powers could not be held liable for other employees' and interns' mocking and ostracization of Hart, for Hockett's forcing Hart to work 48-hour shifts alone, or for Powers' failure to inform Hart that TFD's presence was requested at a funeral, while finding that Powers' placing of Hart under Powers' direct supervision and transferring of Hart's responsibilities to interns <u>could</u> be offered as examples of adverse action by Powers against Hart. (MSJ Order, Dkt. 107, 34:14 – 38:20.) Similarly, the Court held that Hockett could not be held liable for "joining" in retaliation against Hart but could be held liable for forcing Hart to work a 48-hour shift alone, disciplining Hart for allowing a volunteer to work at the firehouse, and disciplining Hart for TFD's failure to appear at a funeral to defeat summary judgment as to these issues with regard to Hockett. (MSJ Order, Dkt. No. 107, 39:9 – 43:19.)

However, nowhere in the Court's ruling on Defendants' motions for summary judgment did the Court state that Hart was in any way limited to the evidence presented in his oppositions to Defendants' summary judgment motions. Instead, the Court issued rulings on the evidence brought before it at the summary judgment stage. While the Court may grant summary judgment based on insufficient evidence to raise a triable issue of material fact, nowhere is authority provided that would allow a court to exclude evidence at trial because it wasn't presented at summary judgment.

In a misguided effort to limit Hart's ability to seek future damages, Defendants have misrepresented the rulings of this Court and, based on that misrepresentation, have asked the Court to

18

impute a prohibition from the Court's summary judgment ruling that was not created in the ruling and for which no authority exists.

### C.    NICHOLAS HART'S CAL. LABOR CODE § 6310 CLAIMS

In the event that Plaintiffs show that Defendants' violated Hart's rights under Cal. Gov. Code § 6310, Dr. Mahla's should be permitted to provide testimony on the issue of future lost income because a careful reading of the language of Cal. Lab. Code § 6310 and the public policy law interpreting restitution as a remedy to retaliation/discrimination claims will indicate that future damages are a proper remedy for violations of Cal. Lab. Code § 6310.

Cal. Lab. Code § 6310 notes:

"Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because the employee has made a bona fide oral or written complaint to the division…shall be entitled to reinstatement **and** reimbursement for lost wages and work benefits" Cal. Lab. Code § 6310 (emphasis added)

The plain meaning of the statute clearly lays out two separate remedies for employees whose rights have been violated by employers. These are 1) reinstatement and 2) reimbursement for lost wages and work benefits. Had the California Legislature, in enacting Cal. Lab. Code § 6310, intended to limit the remedy to past wages, as asserted by Defendants, then the Legislature would have clarified this issue indicating past wages. However, the plain meaning of the language of the statute notes that an employee is entitled for wages and work benefits lost as a result of the employer's violation of Cal. Lab. Code § 6310. Conceivably, if a prevailing plaintiff could not be reinstated or as a result of the violation of Cal. Lab. Code § 6310 the impact resulted in continuing income loss extending into the future, then these would be wages and benefits lost as a result of the actions of the violating employer. Therefore, a jury could determine that as a result of employer's violation of Cal. Lab. Code § 6310, an employee lost wages and work benefits that extended to include future wages, then the plain meaning of the statute would allow the jury to so determine.

Further, a prevailing plaintiff on a Cal. Lab. Code § 6310 could conceivably be made whole by an award of reinstatement coupled with an award of the plaintiff's to date lost wages and work benefits. Under California law, reinstatement is the return of the employee to a former position with the restoration of the employee's title, salary, duties, and responsibilities. *Norton v. San Bernardino City Unified School Dist.*, 158 Cal.App.4th 749, 762 (2008). But reinstatement may not be feasible

in all cases, either because the position is not available at the time of judgment or the relationship between the parties may have been so damaged by animosity that reinstatement is impracticable. *Cancellier v. Federated Department Stores*, 672 F.2d 1312, 1319 (9th Cir.), cert. denied, 459 U.S. 859, 74 L. Ed. 2d 113, 103 S. Ct. 131 (1982) In such circumstances, the remedial purpose of the statute allowing for reinstatement would be thwarted and plaintiff would suffer irreparable harm if front pay (i.e. future wages) were not available as an alternate remedy to reinstatement. *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir. 1984). In such case, a front pay award is the monetary equivalent of the equitable remedy of reinstatement. *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 383 (3d Cir. N.J. 1987) (Overturned on other grounds, but affirmed at to the front pay issue). Had the legislature intended, as Defendants contend, that only past wage loss would be recoverable, then the Legislature would not have included reinstatement as a remedy to violations of Cal. Lab. Code § 6310. Instead, the legislature in enacting this code, provided remedies of both reinstatement and lost wages and work benefits, signaling an intention to allow a prevailing party the possible remedy of future wage loss.

The only rational that Defendants have provided for not permitting Dr. Mahla to testify on the issue of future damages is an argument that Cal. Labor Code § 6310 does not provide for future wage loss and that Defendants cannot find case law on the issue. However, as noted above, the plain meaning of the statute suggest that future wage loss is within the plain meaning of the statute. More importantly, a careful study of the public policy behind the remedy of restitution clearly suggests that future wage loss would be appropriate as a remedy in cases like the one before the Court, where animosity between the parties makes restitution an impossibility and therefore future wage loss is the appropriate remedy. For these reasons, Dr. Mahla should be allowed to testify on the issue of lost future wages as it pertains Hart's losses as a result of Defendants violation of Cal. Labor Code § 6310 and Defendants' motion in limine on this issue should be denied.

## XI.   OPPOSITION TO MOTION TO EXCLUDE EVIDENCE OF OYARZO'S UNCOMPENSATED TIME BEYOND THE PERIOD OF MARCH 1, 2009 TO JUNE 8, 2010 (No. 11)

Plaintiffs should be permitted to introduce evidence of uncompensated time for the period from March 18, 2008 to June 8, 2010  because such evidence is relevant to the Jury's calculation of

damages in the event that it is determined that Defendants' failure to pay Oyarzo was willful. 29 U.S.C. § 255(a) (permitting up to three years of compensation of unpaid wages where the violation was willful.)

Contrary to any assertion by Defendants that they were unaware of a claim by Oyarzo for uncompensated time from prior to March 1, 2009, Defendants have been on notice of the existence of a claim for uncompensated time prior to March 1, 2009 since at least the April 25, 2012 deposition of Oyarzo. (Exhibit E, Oyarzo Depo., 73:5 – 73:16, 74:13 – 74:15.) In Oyarzo's April 2012 deposition, Defendants questioned Oyarzo regarding uncompensated hours he worked prior to March 1, 2009. Defendants specifically inquired as to whether Oyarzo was raising a claim for unpaid wages prior to March 1, 2009, to which Oyarzo indicated that he was in fact making such a claim. Defendants where thus on notice of this claim as far back as April 2012. Defendants have had ample opportunity to conduct discovery on this issue and have at all stages of litigation possessed all of the documentation such as payroll records, station logs and other documents which would indicated the uncompensated hours that Oyarzo worked prior to March 1, 2009. In fact, Defendants served interrogatories on this issue in November 2012 requesting the inclusive dates of the approximately 3,350 uncompensated hours Oyarzo worked, to which Oyarzo stated that the dates for which he worked approximately 3,350 uncompensated hours was "March 18, 2008 to June 7, 2010. (Exh. F., Interrogatory No. 7.)). Additionally, Defendants had another opportunity to further question Oyarzo regarding these uncompensated hours in his second deposition in December 2012 but failed to inquire into the subject matter, and had an opportunity to depose Dr. Mahla on the matter. Finally, as noted above, Defendants obtained their own expert, Mr. Enos, who conducted his own analysis of the data at defendants request and prepared a report that covered the period from March 2008 to December 2010. (Exh. G, Excerpt of Enos Report (Enos Exhibit F).) Therefore, it is difficult to imagine a scenario either where Defendants were unaware of these claims or lacked an opportunity to conduct full discovery on this issue.

Further, Plaintiffs' noted in the pretrial statement their intention to seek uncompensated time from March 18, 2008 to March 1, 2009 and included a draft amended complaint that clearly indicates such a revision. (Dkt. No. 140, 28:15-16, Ex. B)  Indeed, Defendant's initial contentions in the Pretrial Statement indicated that Defendants disputed that Oyarzo's FLSA claim that began in

March 18, 2008 and whether the failure of Defendant TFD to pay compensation to Oyarzo was willful. (Dkt. No. 140, 6:22-7:5) While Defendants subsequently modified 'March 18, 2008' to read 'March 1, 2009', Defendants did not modify the issue of willfulness on the part of Defendant TFD. (Dkt. No. 149, 1:23-26)  Whether Defendant TFD's failure to pay Oyarzo as required under the FLSA was willful is a matter that goes directly to the issue of additional damages under 29 U.S.C. § 255(a) for the period of March 18, 2008 to February 28, 2010. This suggests that Defendants have been at all stages of litigation since April 2012 aware of Oyarzo's claim for uncompensated wages prior to March 1, 2009.

Additionally, Plaintiffs requested at the Pretrial Conference to be permitted to amend their complaint and specifically mentioned Plaintiffs' intention to include Oyarzo's lost income from March 18, 2008 to February 28, 2009 should Plaintiffs prove that Defendants' FLSA violations were willful. However the Court in reaching its decision to deny leave to amend the complaint noted that the pretrial order would govern the scope to trial. (Dkt. No. 160) It is well settled law that the pretrial conference order supersedes the complaint for the purposes of trial. *Eagle v. American Tel. & Tel. Co.*, 769 F.2d 541, 548 (9th Cir. Cal. 1985) It is also well settled that Pretrial Orders have the effect of amending the pleadings, thus an omitted claim that was fully litigated prior to the pretrial order may be cured by incorporation into the Pretrial Order. *Ryan v. Illinois Dep't of Children & Family Servs.*, 185 F.3d 751 (7th Cir. Ill. 1999) The Pretrial Order issued by the Court clearly indicates that Oyarzo may seek damages for the period from March 18, 2008 to February 28, 2009. Defendants failed to file any objections to the Pretrial Order and as such should not now be permitted to object to Oyarzo's introduction of evidence on the issue on the basis of a failure to plead in an original complaint when said complaint has been superseded by the Pretrial Order and given the fact that Defendants were on notice of the contention since at least April 2012 and have the opportunity to conduct and have in fact conducted discovery on the issue. For these reasons, Plaintiff's request that the Court deny Defendants motion in limine on this issue.

////

////

////

////

XII.    **OPPOSITION TO MOTION TO EXCLUDE ANY REFERENCE TO FUTURE LOST WAGES AND BENEFITS RELATED TO HART'S CALIFORNIA LABOR CODE § 6310 CLAIM (No. 12)**

Defendants' reliance upon Cal. Lab. Code § 6310 as a basis for limiting Hart's claim for future wages and benefits is misplaced. Cal. Lab. Code § 6310 notes:

> "Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because the employee has made a bona fide oral or written complaint to the division…shall be entitled to reinstatement **and** reimbursement for lost wages and work benefits" Cal. Lab. Code § 6310 (emphasis added)

The plain meaning of the statute clearly lays out two separate remedies for employees whose rights have been violated by employers. These are 1) reinstatement and 2) reimbursement for lost wages and work benefits. Had the California Legislature, in enacting Cal. Lab. Code § 6310, intended to limit the remedy to past wages, as asserted by Defendants, then the Legislature would have clarified this issue indicating past wages. However, the plain meaning of the language of the statute notes that an employee is entitled for wages and work benefits lost as a result of the employer's violation of Cal. Lab. Code § 6310. Conceivably, if a prevailing plaintiff could not be reinstated or as a result of the violation of Cal. Lab. Code § 6310 the impact resulted in continuing income loss extending into the future, then these would be wages and benefits lost as a result of the actions of the violating employer. Therefore, a jury could determine that as a result of employer's violation of Cal. Lab. Code § 6310, an employee lost wages and work benefits that extended to include future wages, then the plain meaning of the statute would allow the jury to so determine.

Further, a prevailing plaintiff on a Cal. Lab. Code § 6310 could conceivably be made whole by an award of reinstatement coupled with an award of the plaintiff's to date lost wages and work benefits. Under California law, reinstatement is the return of the employee to a former position with the restoration of the employee's title, salary, duties, and responsibilities. *Norton v. San Bernardino City Unified School Dist.*, 158 Cal.App.4th 749, 762 (2008). But reinstatement may not be feasible in all cases, either because the position is not available at the time of judgment or the relationship between the parties may have been so damaged by animosity that reinstatement is impracticable. *Cancellier v. Federated Department Stores*, 672 F.2d 1312, 1319 (9th Cir.), cert. denied, 459 U.S. 859, 74 L. Ed. 2d 113, 103 S. Ct. 131 (1982) In such circumstances, the remedial purpose of the statute allowing for reinstatement would be thwarted and plaintiff would suffer irreparable harm if

23

front pay (i.e. future wages) were not available as an alternate remedy to reinstatement. *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir. 1984). In such case, a front pay award is the monetary equivalent of the equitable remedy of reinstatement. *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 383 (3d Cir. N.J. 1987) (Overturned on other grounds, but affirmed at to the front pay issue). Had the legislature intended, as Defendants contend, that only past wage loss would be recoverable, then the Legislature would not have included reinstatement as a remedy to violations of Cal. Lab. Code § 6310. Instead, the legislature in enacting this code, gave the remedies of both reinstatement and lost wages and work benefits, signaling an intention to allow a prevailing party the possible remedy of future wage loss. For these reasons, Plaintiffs' contend that introduction of evidence on the issue of future wages in the context of Hart's Cal. Labor Code § 6310 claim is appropriate and Defendants' motion in limine on this point should be denied.

## XIII.   OPPOSITION TO MOTIONS TO EXCLUDE EVIDENCE PERTAINING TO ISSUES BASED ON THE SUMMARY JUDGMENT ORDER (No. 13)

Defendants improperly seek to limit the evidence that can be offered in support of Oyarzo's FLSA claim and Hart's claims for retaliation under the First Amendment and Labor Code § 6310 to the evidence Plaintiffs cited in opposition to Defendants' motions for summary judgment. Defendants' argument is misplaced, as it would border on the absurd to allow parties to introduce at trial only the evidence that was offered at summary judgment, or to find that evidence presented in support of a claim dismissed at summary judgment cannot be presented in support of surviving claims at trial.

### A.   Oyarzo's Rank

Defendants have mischaracterized the Court's summary judgment order. The Court indeed stated that "[t]here is simply no evidence that Oyarzo was anything other than the 'Fire Chief' …" (MSJ Order, Dkt. No. 107). However, the Court's reference to evidence of Oyarzo's rank was provided in the context of Oyarzo's First Amendment claims, not his FLSA claims, and, more importantly, the Court *did not grant or deny summary judgment on the matter*. While Oyarzo is clearly precluded from pursuing his First Amendment actions at trial based on the granting of summary judgment as to those claims, the fact that the Court determined that "no evidence" had been

24

provided *at summary judgment* to establish Oyarzo's rank as Captain in no way precludes Oyarzo from presenting evidence of duties he performed in the capacity of Captain in support of his FLSA claim. Therefore, Defendants' motion to exclude evidence regarding Oyarzo's duties when acting as Captain should be denied.

### B.    Hart's Theories of Liability Under the First Amendment

Because the Court granted summary judgment on the matter, Plaintiffs agree that Hart cannot proceed under a theory that the retaliation against him was motivated by his participation in the annexation effort. (*See* MSJ Order, Dkt. No. 107, 10:19 – 11:2.)

However, the Court did *not* hold that "support for Oyarzo" was the only theory upon which Hart can proceed under the First Amendment. In fact, in determining whether sufficient evidence was present to establish that Hart spoke on a matter of public concern, the Court explicitly referenced Hart's refusal to engage in what Hart believed to be illegal actions against Oyarzo: "Hart claims that he refused to assist Powers and informed Powers of his belief that such activity was illegal…" (MSJ Order, Dkt. No. 107, 7:1 – 2; 25:10 - 11.) Further, in finding that Hart spoke as a private citizen, the Court explained that "common sense dictates that plaintiff's remark that she would not participate in illegal activity was not within Plaintiff's job duties…" (*Id.*, 33:4 – 7)(quoting *Dowell v. Cnty. Of Contra Costa,* 2013 WL 2181653 (N.D. Cal 2013.).

While the difference between "support for" Oyarzo and "refusal to engage in" activity Hart believed to be illegal with regard to Oyarzo may be slight, it is clear that Hart's First Amendment retaliation claims can be supported by evidence that he not only supported Oyarzo but also refused to engage in what he believed to be illegal activity with regard to Oyarzo. Therefore, Defendants' motion to restrict Hart's theories of liability beyond those ordered by the Court should be denied.

### C.    Evidence Regarding Adverse Actions Against Hart by Powers

At summary judgment, courts must determine whether the moving party has demonstrated "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). To survive summary judgment, the opposing party must simply "make a showing sufficient to establish the existence" of "specific facts showing that there is a genuine issue for trial." *Celotex Corp v. Catrett*, 477 U.S. 317, 322 – 324 (1986). Never in the

25

history of American jurisprudence has a court required that a party opposing summary judgment present all of the facts and evidence at summary judgment that the party intends to offer into evidence at trial in support of the party's claim.[5]

Defendants correctly recite the evidence offered by Hart in opposition to Powers' motion for summary judgment. *See* Def. Mot. in Limine, Dkt. 153, 24:4 – 12.) Defendants also are correct that the Court ruled Powers could not be held liable for the employees' and interns' mocking and ostracization of Hart, for Hockett's forcing Hart to work 48-hour shifts alone, or for Powers' failure to inform Hart that TFD's presence was requested at a funeral (for which Hart was ultimately disciplined), and that the Court found that Powers' placing of Hart under Powers' direct supervision and transferring of Hart's responsibilities to interns could be offered as examples of adverse action by Powers against Hart. (MSJ Order, Dkt. 107, 34:14 – 38:20.)

However, nowhere in the Court's ruling on Defendants' motions for summary judgment did the Court state that Hart was *limited* to the evidence presented in his oppositions to summary judgment. Instead, the Court issued rulings on the evidence brought before it at the summary judgment stage. While the Court may grant summary judgment based on insufficient evidence to raise a triable issue of material fact, nowhere is authority provided that would allow a court to exclude evidence at trial *because it wasn't presented at summary judgment*.

Defendants' attempt to mischaracterize the Court's granting of summary judgment as to *some* of the factual matters it was presented with at summary judgment as somehow implicitly prohibiting the introduction of other evidence – evidence which the Court did not issue any ruling on – is improper because Defendants have not provided any, and Plaintiffs' counsel are unaware of any, authority that would support the exclusion of evidence at trial on the basis that the evidence was not presented at summary judgment.[6]

---

[5] Plaintiffs' counsel have conducted an exhaustive search of federal case law and have been unable to identify any such authority.

[6] Plaintiffs recognize that, based on the Court's summary judgment ruling, the jury cannot rely on the ostracization of Hart, his working 48-hour shifts alone, or Powers' failure to inform him of the funeral to satisfy the "adverse action" prong of Hart's First Amendment claims against Powers. This

26

**D.**     **Evidence Regarding Adverse Actions Against Hart by Hockett**

Here again, Defendants argue, without authority, that the evidence Hart may offer at trial in support of his First Amendment claim against Hockett should be restricted to the evidence Hart presented in opposition to Hockett's summary judgment motion. For the reasons explained under Section XII.C., above, Defendants' arguments are misplaced.

At summary judgment, the Court ruled that Hart had presented sufficient evidence with regard to being forced to work a 48-hour shift alone, being disciplined for a volunteer working at the firehouse, and being disciplined for TFD's failure to appear at a funeral to defeat summary judgment as to these issues with regard to Hockett. (MSJ Order, Dkt. No. 107, 39:19 – 43:19.) The only restriction placed by the Court on Hart with regard to his First Amendment claim against Hockett was that Hockett could not be found liable on the basis that he "joined in the retaliation" alone because, the Court held, no authority exists "that would render the supervisor himself personally liable under a failure to prevent theory." (*Id.*, 39:9 – 39:18.)

Defendants' efforts to exclude evidence based on the fact that the evidence was not offered at summary judgment, and accompanying mischaracterizations of the Court's summary judgment ruling, are improper and are wholly lacking in authority. For the reasons explained in Section XII.C., above, exclusion of evidence not presented at summary judgment and, therefore, not ruled upon by the Court, would be improper.

**E.**     **Evidence Regarding TFD's Policy, Custom, or Practice**

While Plaintiffs agree that a First Amendment action cannot be pursued at trial against TFD due to the fact that Plaintiffs' First Amendment claims against TFD were dismissed at summary judgment, Defendants are mistaken in their belief that the Court's granting of summary judgment as to that claim precludes evidence of previous terminations.

Rex Buthman will not be called by Plaintiffs. However, James Rafferty will be called for the purpose of establishing Defendants' knowledge of the Firefighters Procedural Bill of Rights, by and through its Board of Directors, which is directly relevant to establishing malice on the part of TFD's

does not, however, preclude Hart from offering evidence in support of other adverse actions carried out against him by Powers.

27

agents or employees when violating Hart's rights under the FPBR. Therefore, Defendants' motion in limine on this matter should be denied.

**F.      Evidence Regarding Punitive Action Under the FPBR**

For the reasons stated in Plaintiffs' Briefing in Support of Request for the Court to Revise its Rulings on Defendants' Motions for Summary Judgment (Dkt. No. 144, 2:1 – 6:5), Plaintiffs again assert their objection to the Court's ruling prohibiting Hart from seeking damages under the FPBR for his termination. However, without waiver as to the objections raised in Plaintiffs' Briefing (Dkt. No. 144) and at oral argument during the parties' September 20, 2013 Pretrial Conference (Dkt. No. 146), which are herein incorporated, Plaintiffs understand that the Court has ruled that Hart cannot seek damages under the FPBR based on his termination, thereby preemptively mooting Defendants' request.

**G.      Conclusion**

Because evidence cannot be excluded on the basis that it was not offered at summary judgment, because evidence cannot be excluded as to all claims on the basis that any one <u>claim</u> was summarily adjudicated, and because Defendants' remaining requests are rendered moot by the Court's summary judgment ruling, Plaintiffs request that the Court deny each of the requests presented through Defendants' thirteenth motion in limine.

DATED: October 8, 2013                                SEIBERT & BAUTISTA


                                                By:   _/s/ Shannon Seibert_____
                                                         Shannon Seibert
                                                         Attorneys for Plaintiffs BENJAMIN C. OYARZO
                                                         and NICHOLAS HART